# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> PLAY BEVERAGES, LLC, a Delaware limited liability company; CIRTRAN BEVERAGE CORPORATION, a Utah corporation; and CIRTRAN CORPORATION, a Nevada corporation, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>) Judge:<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CHRISTINE COFFELT IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Christine Coffelt, declare as follows:

1.      I am Senior Vice President, Global Licensing of Playboy Enterprises International, Inc. ("Playboy"). In this capacity, I have developed institutional knowledge of Playboy. I have personal knowledge of the facts set forth in this declaration, and if called to testify, I could and would competently testify thereto.

2.      Playboy is one of the most recognized and popular consumer brands in the world. Playboy is a media and lifestyle company that markets the brand through a wide range of media properties and licensing initiatives. The company publishes *Playboy* magazine in the United States and abroad and creates content for distribution via television networks, websites, mobile platforms and radio. Through licensing agreements, the Playboy brand appears on a wide range of consumer products in more than 150 countries as well as retail stores and entertainment venues.

1

3.      Playboy owns over 250 federally registered trademarks.  These include registrations for the word "PLAYBOY" and the Rabbit Head Design in several categories, including Class 32, the category covering energy drinks (the "Playboy Marks").  True and correct copies of the registrations for the Playboy Marks are attached hereto as Exhibit A.

4.      The Playboy Marks (as used in Class 32) have been in continuous use since 2008, and the designation PLAYBOY and the Rabbit Head Design have been in continuous use by Playboy with respect to other categories of goods and services for decades.

5.      Each year, Playboy spends millions of dollars advertising, promoting, developing, and protecting its trademarks, including the Playboy Marks, which are central to Playboy's success and the success of its United States and worldwide licensees.

6.      Through Playboy's extensive marketing efforts, media projects, and product licensing initiatives, Playboy built substantial consumer good will associated with the Playboy Marks.

7.      Playboy uses or licenses others to use the Playboy Marks to promote the Playboy brand and to market, advertise, and sell consumer goods and services.  Playboy's robust licensing program includes licensing in the category of beverages in general and energy drinks specifically.

8.      Playboy's brand recognition and the hundreds of trademarks that it owns are its most valuable assets.

9.      Play Beverages, LLC ("PlayBev") is a former licensee of Playboy.  In 2006, PlayBev and Playboy entered into a license agreement, under which PlayBev had the limited right to manufacture and sell certain non-alcoholic beverages, including Playboy-branded energy drinks (the "License Agreement").

2

10.     All expiration dates in the Playboy/PlayBev agreement extending the expiration of the License Agreement (the "Second Extension Agreement") have passed: (i) PlayBev's proposed reorganized debtor did not make the mandatory $2 million escrow payment; (ii) PlayBev cancelled its confirmation hearing and therefore did not obtain confirmation of its Chapter 11 plan of reorganization; and (iii) the hard deadline of September 30, 2012 also has passed.

11.     Both the Second Extension Agreement and an earlier extension agreement specified that they were in furtherance of the parties' negotiations for a settlement of claims and a new license agreement. The new license agreement was subject to certain conditions precedent before it could take effect: confirmation of a Chapter 11 plan of reorganization, and an upfront fee of $2 million paid into escrow. A true and correct copy of the new license agreement is attached hereto as Exhibit B.

12.     When PlayBev promptly defaulted on the conditions precedent to the new license agreement, the new agreement never took effect. Thus, neither the original Agreement nor the new license agreement is operative now (or for the past several months).

13.     Since all possible expiration dates set forth in the Second Extension Agreement have since passed, the License Agreement has expired. As such, PlayBev (as well as CirTran Corporation ["CirTran"], and CirTran Beverage Corporation ["CBC"], and any other sub-licensees or sub-distributors of PlayBev) is not currently authorized to use the Playboy Marks (PlayBev, CirTran, and CBC are collectively referred to as "Defendants"). Playboy has repeatedly advised PlayBev of the expiration of the License Agreement.

14.     At a Bankruptcy Court status conference on November 1, 2012, Playboy again explained that it was obliged to protect its Marks from PlayBev's infringement.

other sub-licensees or sub-distributors of PlayBev) is not currently authorized to use the Playboy Marks (PlayBev, CirTran, and CBC are collectively referred to as "Defendants"). Playboy has repeatedly advised PlayBev of the expiration of the License Agreement.

14.    At a Bankruptcy Court status conference on November 1, 2012, Playboy again explained that it was obliged to protect its Marks from PlayBev's infringement.

15.    The Playboy Marks are prominently displayed on Playboy Energy Drink itself, which continues to be advertised, promoted, and distributed.

16.    Since the License Agreement has expired, Playboy's ability to further develop and use this category of goods (i.e., non-alcoholic beverages, including energy drinks) is hampered by Defendants' unauthorized use of the category.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of February, 2013 at Beverly Hills, California.

Christine Coffelt

4

EXHIBIT A

EXHIBIT A

Int. Cl.: 32

Prior U.S. Cls.: 45, 46, and 48

United States Patent and Trademark Office

Reg. No. 3,496,428
Registered Sep. 2, 2008

## TRADEMARK
### PRINCIPAL REGISTER

# PLAYBOY

PLAYBOY ENTERPRISES INTERNATIONAL, INC. (DELAWARE CORPORATION)
680 N. LAKE SHORE DRIVE
CHICAGO, IL 60611

FOR: ENERGY DRINKS, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

FIRST USE 4-1-2008; IN COMMERCE 4-1-2008.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 77-043,700, FILED 11-14-2006.

KAREN BRACEY, EXAMINING ATTORNEY

Int. Cl.: 32

Prior U.S. Cls.: 45, 46, and 48

United States Patent and Trademark Office

Reg. No. 3,496,429

Registered Sep. 2, 2008

# TRADEMARK
## PRINCIPAL REGISTER



PLAYBOY ENTERPRISES INTERNATIONAL,
  INC. (DELAWARE CORPORATION)
680 N. LAKE SHORE DRIVE
CHICAGO, IL 60611

FOR: ENERGY DRINKS, IN CLASS 32 (U.S. CLS.
45, 46 AND 48).

FIRST USE 4-1-2008; IN COMMERCE 4-1-2008.

THE MARK CONSISTS OF RABBIT HEAD DE-
SIGN.

SN 77-043,708, FILED 11-14-2006.

KAREN BRACEY, EXAMINING ATTORNEY



EXHIBIT B

# PRODUCT LICENSE AGREEMENT

## SUMMARY OF COMMERCIAL TERMS

Subject to Part II attached hereto, and hereby incorporated by reference, which sets out the terms and conditions of this Agreement and which is incorporated into this Agreement in its entirety, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the following is hereby agreed by the parties:

1. **Parties**

   (a)  **Playboy Enterprises International Inc.** with offices at 9346 Civic Center Drive, Beverly Hills, CA 90210 ("Licensor"); and

   (b)  **PB Energy Corporation,** with offices at 4125 South 6000 West, West Valley City, UT 84128 ("Licensee").

2. **Property**

   PLAYBOY (including all foreign language translations and registrations thereof, e.g., 花花公子 in China); RABBIT HEAD DESIGN; and certain labels for Playboy Energy Drink that have been previously approved by Licensor, all as depicted in Schedule A-1 attached to the Agreement and made a part hereof.

   Licensee may submit to Licensor a request to use certain images, patterns and graphics from Licensor's art and photo archives and style guides, which must be approved in advance in writing by Licensor on a case-by-case basis pursuant to Section 4.5 of the Agreement. Such approval will in part be based on appropriateness for the Licensed Products, current strategic or business plans and availability of rights.

   The Property must be used:  (a) in its entirety and as depicted in Schedule A-1 attached to the Agreement; or (b) as may be approved by Licensor hereafter in advance in writing pursuant to Section 4 of the Agreement.  Under no circumstances shall Licensee modify the Property, use any component of the Property independently or use the Property independently of the applicable Licensed Products.

   Those domain names listed in Schedule A-2 attached to the Agreement and hereby incorporated by reference, which may be updated from time to time upon approval and registration of new domain names by Licensor.

3. **Licensed Products**

   (a)  Subject to Licensor's rights of approval as set forth in Section 4 of the Agreement, non-alcoholic energy drinks, non-alcoholic energy shots and any other non-alcoholic energy beverages, all of which may be manufactured, advertised, promoted, distributed and sold by or for Licensee (via Licensee's authorized distributors, manufacturers or other Subcontractors) subject to the terms of the Agreement.

   (b)  The Licensed Products specifically exclude all other beverages of any type, including, without limitation, alcoholic beverages (including, without limitation, alcoholic energy beverages), sexual enhancement beverages and non-energy beverages (e.g., without limitation, Playboy-branded water, ready-to-drink iced teas, lemonades, juice cocktails, juice and fruit beverages, dairy and coffee drinks, sports drinks, sodas and sparkling beverages).  The parties agree that such sports drinks, sodas and sparkling beverages may contain caffeine or other

energy-enhancing ingredients; provided, however, that such beverages may not be marketed as "energy drinks," "energy shots," or "energy-enhancing beverages."

(c)     Licensee has informed Licensor that inclusion of the word "Energy" in the product name and product labelling for Licensed Products in South Korea and China will render Licensee unable to market or sell product in those countries without first going through a lengthy (approximately two years) and expensive governmental approval process. Accordingly, Licensor and Licensee are engaged in good faith discussions regarding branding and promoting Licensed Products in South Korea and China under an alternate product name as may be mutually agreeable to both. Licensee is providing a letter from an attorney licensed in said jurisdictions which letter confirms that the Licensed Product can be marketed and sold without including the word "Energy."

4.   **Distribution Channels**

(a)     The physical location of stores located in the Territory, specifically (i) mass retail stores, (ii) supermarkets, (iii) convenience stores, (iv) wholesale retail outlets such as Costco, (v) discount beverage outlets and (v) specialty stores (each of which may or may not have their own "E-Commerce Website" (as such term is defined below)).

(b)     All bars, clubs, restaurants, casinos, or places involving "Late night activities" and/or sales of food and/or beverages ("Food and Beverage Vendors").

(c)     Non-Playboy-branded catalogs.

(d)     An E-Commerce Website owned or controlled by either Licensee or any E-tailer (as defined below), which will promote the availability of the Licensed Products via such E-Commerce Website and which will fulfill orders for the Licensed Products placed through such E-Commerce Website to, and only to, physical addresses located in the Territory. "E-Commerce Website" shall mean a website through which the Licensed Products may be promoted, provided for sale and purchased. All rights granted under this Agreement shall be subject to the terms and conditions of the E-Commerce Guidelines attached to the Agreement as Schedule C and made a part hereof. "E-tailers" shall mean any entity engaged in the promotion and sale of goods (i) whose primary means of promotion, sale or distribution of such goods is via an E-Commerce Web Site; or (ii) which is included in Section 4(a) of this Summary, above and also operates an E-Commerce Web Site.

5.   **Territory**

Worldwide, subject to applicable Laws and the approvals required pursuant to Section 4 of the Agreement.

6.   **Term**

The "Initial Term" of the Agreement will begin on the Commencement Date and, unless earlier terminated by either party pursuant to the terms of the Agreement, will end on the last day of the month in which the five-year anniversary of the Commencement Date occurs. If applicable, the Agreement may be renewed by the parties as set forth in Section 13.1 of the Agreement (each a "Renewal Term;" the Initial Term and the Renewal Terms (if any) shall sometimes be collectively referred to herein as the "Term").

Notwithstanding anything to the contrary contained herein, the Agreement shall not become effective unless and until (i) a Chapter 11 Plan (and all related documents) (collectively, the "Plan"), the form and substance of which is acceptable to both the Debtor and Licensor, is confirmed by order of the Bankruptcy Court in the bankruptcy case entitled *In re Play Beverages, LLC*, Case No. 11-26046 pending in the United States Bankruptcy Court for the

District of Utah (the "Bankruptcy Case"), (ii) the order confirming the Plan ("Confirmation Order") becomes a Final Order, and (iii) the "Effective Date" of the confirmed Plan occurs; provided, however, that the Parties' obligations to cooperate and make reasonable efforts to seek entry of the Confirmation Order in form satisfactory to both Parties shall be binding, effective and enforceable as between Licensor and Licensee upon the execution of this Agreement. The "Effective Date" of the confirmed "Plan" shall be the "Commencement Date". The Plan, the Confirmation Order and/or separate findings of fact and conclusions of law, all of which shall be in form and substance acceptable to Licensor, shall provide as follows:

(a)     The Plan, Confirmation Order and/or findings and conclusions (i) shall confirm that the existing Product License Agreement entered into by and between Licensor and Play Beverages, LLC ("Debtor," as further defined in Section 1.13 of the Agreement) as of November 1, 2006 (as previously amended, "2006 Agreement") has "expired" according to its own terms, and/or (ii) shall provide, authorize and confirm that the 2006 Agreement shall be, and is, "rejected" within the meaning of Section 365 of the Bankruptcy Code in its entirety;

(b)     The Plan, Confirmation Order and/or findings and conclusions shall ratify and approve this Agreement in its entirety;

(c)     The Plan and/or Confirmation Order shall ratify and approve the Settlement Agreement between the Parties and PB Energy Corporation, including the releases of claims between Licensor and Debtor, as set forth in an executed agreement in a form substantially similar to Schedule D to this Agreement; and

(d)     The Plan and/or Confirmation Order shall enjoin Debtor, Debtor's estate, and any liquidating trustee, plan administrator or any other successor or assign of the Debtor, all parties in interest, all creditors and all parties whose Claims against any person are treated under or affected by the Plan, from pursuing any Claims released or treated under or affected by the Plan. Without limiting the generality of the foregoing, pursuant to Sections 105(a), 363, 365, 1123(a)(5)(D), 1123(b), 1141(c) and 1146(a) of the Bankruptcy Code, all Persons, Entities and Governmental Units (as defined in Sections 101(15), 101(27), and 101(41) of the Bankruptcy Code) including, without limitation, all parties in interest, all creditors, and all parties whose Claims against any person are released or treated under or affected by the Plan, shall be enjoined, estopped and barred from pursuing or asserting any such Claims (including Claims derivative of any claims owned or controlled by Debtor, Debtor's estate or any successor thereof) against Licensor, and from otherwise taking any action against Licensor to recover any Claims that such Person, Entity, creditor, Governmental Unit, or other party in interest has or may assert against Debtor or Licensor, as such Claims exist, arose, accrue, or otherwise relate to the period prior to the Effective Date, and from all liabilities retained by Debtor. The Bankruptcy Court shall have jurisdiction to determine and award damages for any violation of such injunctions, including compensatory damages, professional fees and expenses, and exemplary damages for any willful violation of said injunction. Upon entry of the Confirmation Order, all Claims against Licensor and its current and former employees, agents, officers, directors, principals, and affiliates shall be released, and all creditors, all parties whose claims against any person are treated under or affected by the Plan, and all other parties in interest shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, including the consummation of this Agreement.

As more particularly described in Section 13.6 hereof and subject to that Section's terms and conditions (including the requirement of notice by Licensor), if the Commencement Date does not occur on or before October 15, 2012, Licensor shall have the right to declare this Agreement to be void.

7.   **Upfront Fee**

U.S.$2,000,000, due and payable upon the Commencement Date. Although the Upfront Fee is not due and payable until the Commencement Date, it shall be paid into trust or into escrow no later than twenty (20) days after execution of the Agreement. The deposit will be made according to escrow instructions in substantially the form attached as Schedule L, or in such other form as the Parties mutually approve in writing.

8.   **Minimum Guaranteed Royalty and Payment Terms**

| License Year | Amount |
|---|---|
| LY 1 (xx/xx/12 – xx/xx/13) | Upfront Fee |
| LY 2 (xx/xx/13 – xx/xx/14) | U.S.$2,500,000 |
| LY 3 (xx/xx/14 – xx/xx/15) | U.S.$2,500,000 |
| LY 4 (xx/xx/15 – xx/xx/16) | U.S.$3,000,000 |
| LY 5 (xx/xx/16 – xx/xx/17) | U.S.$3,000,000 |

Beginning as of License Year 2, Minimum Guaranteed Royalty payments shall be made Quarterly in arrears in equal installments (*i.e.*, one-fourth (1/4) of the Minimum Guaranteed Royalty shall be due and payable at the end of each License Quarter).

In the event that Licensee meets all conditions of renewal and the Term of the Agreement is renewed pursuant to Section 13.1(b), (c) and (d) of the Agreement, the Minimum Guaranteed Royalty for each of the License Years of each of the first, second and third Renewal Terms, if applicable, shall be as follows:

| | License Year | Amount |
|---|---|---|
| Renewal Term 1: | LY 6 (xx/xx/17 – xx/xx/18) | U.S.$3,500,000 |
| | LY 7 (xx/xx/18 – xx/xx/19) | U.S.$3,500,000 |
| | LY 8 (xx/xx/19 – xx/xx/20) | U.S.$3,500,000 |
| | LY 9 (xx/xx/20 – xx/xx/21) | U.S.$4,000,000 |
| | LY 10 (xx/xx/21 – xx/xx/22) | U.S.$4,000,000 |
| Renewal Term 2: | License Years 11 through 15 | U.S.$4,500,000 |
| Renewal Term 3: | License Years 16 through 20 | U.S.$5,000,000 |

Notwithstanding the foregoing, in the event that in each of LY 9 and LY 10, Licensee pays to Licensor Royalties of at least ten percent (10%) (*i.e.*, U.S.$400,000) in excess of the Minimum Guaranteed Royalty payment amounts due for such License Year, then the Minimum Guaranteed Royalty due for LY 11 shall be reduced to U.S.$4,000,000. The Minimum Guaranteed Royalty due for each succeeding License Year in Renewal Terms 2 and 3 shall be similarly reduced to U.S.$4,000,000, as long as Licensee pays to Licensor Royalties of at least ten percent (10%) (*i.e.*, U.S.$400,000) in excess of the Minimum Guaranteed Royalty due for the immediately preceding License Year. In the event that such excess Royalties are not generated and/or paid to Licensor during any License Year, the Minimum Guaranteed Royalty due for the next License Year shall be increased by U.S.$500,000 up to a maximum of the applicable amount specified above.

For purposes of example and not limitation:

(a)   In the event that in each of LY 9 and LY 10, Royalties of less than U.S.$4,400,000 for each of those License Years are paid to Licensor, then in LY 11, the Minimum Guaranteed Royalty will be U.S.$4,500,000;

(b) In the event that in each of LY 9 and LY 10, Royalties of U.S.$4,400,000 or more for each of those License Years are paid to Licensor, then in LY 11, the Minimum Guaranteed Royalty will be U.S.$4,000,000;

(c) If in LY 12, Royalties of less than U.S.$4,400,000 are paid, then in LY 13 the Minimum Guaranteed Royalty due will be U.S.$4,500,000; and

(d) If in LY 12 the applicable Minimum Guaranteed Royalty payment was $4,500,000 and Royalties of U.S. $4,950,000 or more are paid, then in LY 13 the Minimum Guaranteed Royalty due will be reduced to U.S.$4,000,000.

9.    **Minimum Sales**

Not applicable.

10.    **Specified Currency**

U.S. Dollars

11.    **Royalty Rate**

(a)    Gross Revenue generated under this Agreement in connection with direct retail sales of Licensed Product by Licensee to consumers, which may include, but is not limited to, mass retail/supermarkets, convenience stores, other retail outlets, Food and Beverage Vendors, E-commerce, specialty stores (collectively, "Retail Sales") shall be paid at the following Royalty Rate:    **5%**

(b)    Gross Revenue generated under this Agreement in connection with any payment from a distributor or other Subcontractor to Licensee representing wholesale sales of the Products ("Wholesale Sales") shall be paid at the following Royalty Rate:
**10%;**

(c)    Gross Revenue generated under this Agreement in connection with any initial fee, gross minimum and other royalty payments and/or other payments by distributors or other Subcontractors ("Distributor Payments"), shall be paid at the following Royalty Rate:
**20%; and**

(d)    Gross Revenue generated under this Agreement in connection with events, including, without limitation, direct Retail Sales of Licensed Product by Licensee at events, ticket sales, sponsorship revenue, etc. ("Event Revenue") shall be paid at the following Royalty Rate:    **5%**

As more fully described in Sections 5.3 and 5.6 of the Agreement, until the total Royalties calculated under this Section 11 of the Summary during any License Year exceed the Minimum Guaranteed Royalty payable in the same License Year, only the Minimum Guaranteed Royalty shall be payable. When the Royalties calculated under this Section 11 exceed the Minimum Guaranteed Royalty paid or payable for the same License Year, such Royalties in excess of the applicable Minimum Guaranteed Royalty shall be payable in addition to the Minimum Guaranteed Royalty for the applicable License Year.

12.    **Reporting Period:**

Quarterly

13.   **Specified Number of Samples**

Licensee shall provide Licensor with samples of Licensed Products pursuant to Section 4.1 of the Agreement.

14.   **Sell-Off Period**

One hundred twenty (120) days; provided, however, that no Sell-Off Period will apply in the event of termination of the Agreement pursuant to Section 13.2 or 13.3 of the Agreement.

15.   **Licensee Marketing Spend**

Licensee shall spend an amount equal to three percent (3%) of its Retail Sales and Wholesale Sales to advertise and promote the Licensed Products, increase distribution, and increase recognition and visibility of the Licensed Products. Licensee may satisfy this obligation: (a) through its own spending, (b) by mandating that distributors or other Subcontractors who purchase Licensed Products on a wholesale basis engage in minimum marketing spending, or (c) any combination thereof.

Where Licensee grants both manufacturing and distribution rights to a distributor in a particular country or region, Licensee shall require such distributor to spend an amount equal to three percent (3%) of direct sales by such distributor to advertise and promote the Licensed Products and to increase recognition and visibility of the Licensed Products.

16.   **Marketing Fund Payment**

Licensee may, but shall not be required to, contribute towards Licensor's general marketing fund. If Licensee, in its sole and absolute discretion, contributes to the marketing fund, it shall be on such terms and conditions as may be mutually acceptable to Licensee and Licensor.

17.   **Licensed Product Credit**

Not applicable.

18.   **Photo Shoots**

In the event Licensor, itself or through a third-party representative, decides to conduct Playboy photo shoots, Licensee may, at its option, participate in at least two (2) shots per photo shoot which will be directed by Licensor, and Licensee consents to be under Licensor's direction during such photo shoots. Licensee will share in the costs of any photo shoots in which it participates, which costs will be determined by Licensor based upon various factors, including, but not limited to, the number of shots taken in which Licensee participates and the model(s) featured. Licensee's share of the costs will be due and payable immediately upon receipt by Licensee of Licensor's invoice for such costs. Licensee may include these costs in the calculation of the Marketing Spend for the License Year in which such costs were incurred.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of
the dates below written.

Print: _____

Title: _____

Date: _____

For and on behalf of
**PLAYBOY ENTERPRISES
        INTERNATIONAL, INC.**

For and on behalf of
**PB ENERGY CORPORATION**

Print:  <u>IEHAB J. HAWATMEH</u>

Title:  <u>President/CEO</u>

Date:  <u>Aug. 9, 2012</u>

License Agreement – Summary of Commercial Terms – Signature Page

[00145018.DOCX / 16 ]

## PRODUCT LICENSE AGREEMENT

This Product License Agreement is executed as of August 8, 2012, by and between Playboy Enterprises International, Inc., a Delaware corporation ("Licensor"), and PB Energy Corporation, a Utah corporation ("Licensee").

WHEREAS, subject to the terms and conditions contained herein, the parties hereto desire that Licensor grant to Licensee a license to manufacture and distribute certain PLAYBOY-branded energy beverage products for sale to consumers as provided for and consistent with the terms herein; and

NOW, THEREFORE, in consideration of the mutual promises and covenants herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, Playboy and Licensee agree as follows:

1.     **DEFINITIONS.** In this Agreement and the Summary to which this Agreement is attached the following definitions and rules of construction shall be applicable:

1.1.     "Advertising" shall mean advertising and promotions using third-party above-the-line consumer media (television, print, third-party websites and/or outdoor) and/or consumer point-of-sale displays and materials, but excluding any business-to-business or trade promotions of any kind.

1.2.     "Affiliate" shall mean a Person that directly or indirectly Controls, is Controlled by or is under common Control with another Person now or in the future.

1.3.     "Agreement" shall mean this document, including the Summary and all Schedules hereto.

1.4.     "Ancillary Mark" shall mean any name or logo (other than the Property), including any of Licensee's trademarks or logos, which is used in connection with Licensed Products or Related Materials.

1.5.     "Bankruptcy Case" shall have the meaning set forth in Section 6 of the Summary.

1.6.     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Utah.

1.7.     "Claims" shall mean any and all claims, complaints, rights, manner of action or actions, cause or causes of action, suits, debts, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees) sums of money, controversies, damages, accounts, agreements, covenants, contracts, judgments, reckonings, liens and liabilities of every kind and nature whatsoever, whether at law or in equity, whether based upon statute, common law or otherwise, whether matured, contingent or non-contingent, whether direct or indirect, whether known or unknown, whether suspected or unsuspected, whether or not hidden and without regard to the subsequent discovery or existence of different or additional facts, that arose or are arising out of, based on, asserted in, or in connection with any matter, cause, or thing related to the relationship between Debtor and Licensee that arose prior to the date of this Agreement.

1.8.     "Collections Agent" shall mean the agent duly authorized by Licensor to collect the amounts payable by Licensee pursuant to the provisions hereof.

1.9.     "Commencement Date" shall mean the first day of the Term on which this Agreement shall become effective, as more particularly defined in Section 6 of the Summary.

1.10.     "Confirmation Order" means the order confirming the Plan as entered by the Bankruptcy Court in the Bankruptcy Case.

1.11.    "Competing Products" means and refers to all goods, things and other products of similar nature and kind to those listed in Section 3(a) of the Summary including, without limitation, (a) non-alcoholic energy drinks, non-alcoholic energy shots and any other non-alcoholic energy beverages, and (b) all energy drinks, energy shots and other energy-enhancing beverages manufactured, promoted, sold and/or distributed by a Licensee Competitor.

1.12.    "Control" shall mean possession, directly or indirectly, through one or more intermediaries, of the power to direct or cause the direction of management or policies of a Person, whether through ownership of equity, voting or other interests, by contract or otherwise. A shareholder, member, partner or other holder of equity securities shall not be deemed to have "Control" of a Person unless he, she or it controls more than fifty percent (50%) of the voting rights of the Person and/or has the right to appoint a majority of the directors, officers or managers of the Person.

1.13.    "Debtor" means and refers to Play Beverages, LLC, a Delaware limited liability company in its pre-bankruptcy capacity, its post-bankruptcy capacity, in its capacity as the debtor-in-possession in the Bankruptcy Case and its capacity as reorganized debtor under the Plan.

1.14.    "Distribution Channels" shall mean the channels of distribution, as set forth in Section 4 of the Summary.

1.15.    "Distributor Payments" shall have the meaning set forth in Section 11(c) of the Summary

1.16.    "F.O.B" shall mean freight on board.

1.17.    "Final Order" shall mean an order, decree, or judgment of the Bankruptcy Court, as entered on the docket in Bankruptcy Case that is not subject to a stay (a) pursuant to Federal Rule of Bankruptcy Procedure 3020(e), (b) pursuant to any order entered in the Bankruptcy Case or (c) in connection with an appeal of the Confirmation Order. Licensee covenants that neither it nor the Debtor will seek or direct, or solicit others to seek entry of an order staying the Confirmation Order without the express written agreement of Licensor. Once an order or judgment has become a "Final Order," it shall not cease to be a "Final Order" on account of a subsequent stay, reversal, modification or amendment of the order if the Commencement Date has occurred and Licensee has delivered the Upfront Fee to Licensor.

1.18.    "Gross Revenue" shall mean all consideration received by Licensee relating to the manufacture, sale or promotion of Licensed Products, less only: (a) returns, refunds, credits and allowances actually made or allowed by or to distributors, Subcontractors or other customers for Licensed Products; (b) customary trade discounts (including anticipations) afforded to and actually taken by distributors, Subcontractors or other customers against payment for the Licensed Product; and (c) taxes or tariff's assessed on sales or importation (only where applicable and where paid or payable by Licensee). Without limitation, "Gross Revenue" shall include cash consideration paid to Licensee on account of: (i) Retail Sales; (ii) Wholesale Sales; (iii) Distributor Payments; and (iv) Event Revenue. Combined total returns, refunds, credits, allowances and trade discounts in a single License Year shall not reduce or limit the Royalty paid or payable to Licensor to the extent they exceed an amount equal twenty percent (20%) of total combined Retail Sales, Distributor Payments, Wholesale Sales and Event Revenue in a License Year. Licensee understands, agrees and acknowledges that in the event that any sale or other disposition or transfer of Licensed Products is made by or on behalf of Licensee to any person, organization, middleman, distributor, Subcontractor or other entity of any kind related or connected in any manner to Licensee, or its officers, directors or major shareholders (individually and/or collectively "a Related Third Party"), the amount used for reporting Gross Revenue of such a sale or transfer shall always be the amount of cash or other consideration booked and/or received by Licensee only from the first party that is not a Related Third Party in the commercial chain for the sale or transfer of the Licensed Products leading from Licensee to the final consumer. Stated another way, Gross Revenue shall not include revenues received by distributors, Subcontractors or other third parties upon their sale or resale of Licensed Product.

{00145018.DOCX; 16}                                                9

Licensee's receipt of a cash deposit, letter of credit or other security to assure future payment does not constitute Gross Revenue until earned by Licensee.

1.19.    "Initial Term" shall have the meaning set forth in Section 13.1(a) of this Agreement.

1.20.    "Internet Sales" shall mean the advertisement, promotion and sale of Licensed Products solely to physical addresses located in the Territory throughout the Term to individual consumers who submit orders for such Licensed Products directly through an E-Commerce Website consistent with the terms of this Agreement.

1.21.    "Laws" shall mean collectively all laws, rules, regulations, judicial decisions and similar restrictions, and any guidelines, industry self-regulatory codes and such other similar standards in the Territory, including each nation in which Licensee or its Subcontractor sells or offers for sale the Licensed Products.

1.22.    "Letter of Credit" shall mean an irrevocable Stand-By Letter of Credit, as more fully described in Section 5.11.

1.23.    "License Quarter" shall mean each successive period of three (3) full consecutive calendar months during the Term, and "Quarterly" shall be construed accordingly. To the extent the Commencement Date occurs on a day that is not the first day of the month, the first License Quarter shall include the partial month starting on the Commencement Date as well as the three subsequent full months.

1.24.    "License Year" or "LY" shall mean a twelve (12) month period during the Term, and the term "Annual" shall be construed accordingly. To the extent the Commencement Date occurs on a day that is not the first day of the month, the first License Year shall include the partial month starting on the Commencement Date as well as the twelve subsequent full months.

1.25.    "Licensed Domain Names" shall mean the Internet location or resource designators (URLs, domain names, etc.) set forth in Schedule A-2 attached hereto and hereby incorporated by reference, and/or to the extent approved in advance in writing by Licensor, as the case may be, modifications thereof.

1.26.    "Licensed Products" shall mean all products listed in Section 3(a) of the Summary, which are marked with the Property and advertised or promoted using the Property, and which have been approved by Licensor in accordance with the terms hereof, including, without limitation, Section 4.1 of this Agreement.

1.27.    "Licensee Competitor" means a Person that a majority of consumers would recognize as a competitor of Licensee's energy beverage products (*i.e.*, the Licensed Products) and any Person who derives a significant portion of its revenues from the sale, manufacture, distribution, advertisement or promotion of Competing Products, including without limitation Red Bull, Monster, Rockstar, 5-hour Energy, AMP, Full Throttle, Doubleshot, NOS, No Fear, Private Label, SOBE Adrenaline, Vitamin Energy, SOBE Lean, Venom, Jot and Go Girl.

1.28.    "Licensee Marketing Spend" shall mean those amounts set out in Section 15 of the Summary.

1.29.    "Licensor Competitor" means a Person that consumers reasonably would recognize as a competitor of Licensor, including without limitation its products and/or services, and/or a licensee of such a competitor.

1.30.    "Marketing Fund Payment" shall mean Licensee's payment towards Licensor's global cross-marketing initiative to which licensees contribute, as set out in Section 16 of the Summary.

1.31.  "Minimum Guaranteed Royalty" shall mean each of the irrevocable and non-refundable guaranteed minimum Royalty payment amounts set forth in Section 8 of the Summary.

1.32.  "Person" shall mean any natural person, unincorporated association, partnership or legal or incorporated entity, such as a company or corporation.

1.33.  "Plan" shall mean a Chapter 11 Plan (and all related documents), the form and substance of which are acceptable to both Debtor and Licensor, which is confirmed by the Bankruptcy Court in the Bankruptcy Case upon the Bankruptcy Court's entry of the Confirmation Order, including any amendments or modifications thereof; provided, however, that absent the prior written consent and approval of Licensor, the Plan shall not be modified or amended in a manner that does, or purports to, (a) amend or modify the terms of this Agreement, (b) limit any rights or remedies available to Licensor under the Plan or (c) provide any additional rights to Licensee with respect to this Agreement.

1.34.  "Premium" shall mean any item of merchandise given away free of charge or sold at a substantial discount by Licensee as a part of any plan intended to promote the Licensed Products, services or business of such party.

1.35.  "Property" shall mean the licensed property set forth in Section 2 of the Summary.

1.36.  "Proprietary Material" means and includes, without limitation (1) the materials and information referenced and identified in section 18.1, and (2) any and/or all of the following information created, developed, owned, licensed, held or used by a discloser that is disclosed to or otherwise received by a recipient in any oral, written or electronic form:

(a)  Any and all trade secrets, intellectual property, and other confidential or proprietary information related to the discloser's business, products, services or technologies, including without limitation:

(i)  methods, processes, know-how, formulas, designs, research, ideas, inventions, discoveries, technologies, artwork, drawings, reports, summaries, models, test results, technical materials, operating instructions, manufacturing techniques, computer programs, source code, object code, executable code, trade secrets, patents pending, works of authorship, databases, testing data and research information;

(ii)  information regarding discloser's business, business relationships, programs, products and services, and research and development efforts, and any business, financial research and development, marketing and sales plans related thereto, including but not limited to discloser's business plans, marketing plans and/or any private offering memoranda;

(iii)  names and addresses of a discloser's past, present and anticipated future manufacturers, distributors, subdistributors, Subcontractors, business contacts, customers, pricing data, sales data, source of supply, internal procedures, quality control programs, systems, forms, manuals, instructions, financial data, market surveys and plans, customer service information, and sales and related information;

(iv)  financial statements, tax returns, bank statements, and other financial and accounting information; and

(v)  all other such information relating to discloser, its business, business strategies or plans, projects, programs, products and services, assets, liabilities, restructuring possibilities and/or litigation strategies that is not generally known to the public, including but not limited to, non-public offering documents, circulars, prospectuses, and related documentation;

11

(b)    The terms of this Agreement.

1.37.    "Related Materials" shall mean all materials whatsoever accompanying or in any way associated with Licensed Products, including without limitation all labels, cartons or containers (including without limitation packing and wrapping material), all stationery, prototypes, photography, and all advertising, marketing, promotional, point-of-sale and display materials, such as dispensers and coolers.

1.38.    "Renewal Term" shall mean and refer to, if applicable, any separate period during which the Term of this Agreement may renew and continue, as referenced in Section 13 of this Agreement.

1.39.    "Reporting Period" shall mean the period in respect of which Licensee provides its royalty statements and Royalties to Licensor, as set out in Section 12 of the Summary.

1.40.    "Royalties" shall mean the amounts due, payable and/or paid as either the Minimum Guaranteed Royalties or based on the Royalty Rates as set forth in Section 11 of the Summary, against Gross Revenue.

1.41.    "Royalty Rate" shall mean the rates set out in Section 11 of the Summary.

1.42.    "Retail Sales" as used herein means direct Sales of Licensed Product by Licensee at retail to the consuming public, and does not include any Wholesale Sales.

1.43.    "Sales," whether at retail or wholesale, means and refers to the invoice quantity and invoice price charged by Licensee for Licensed Products less: (a) returns, refunds, credits and allowances actually made or allowed by or to distributors, Subcontractors or other customers for Licensed Products; (b) customary trade discounts (including anticipations) afforded to and actually taken by distributors, Subcontractors or other customers against payment for the Licensed Product; and (c) taxes or tariffs assessed on sales or importation (only where applicable and where paid or payable by Licensee); provided that, combined total returns, credits, allowances and trade discounts in a single License Year shall not reduce or limit the Royalty paid or payable to Licensor to the extent they exceed an amount equal twenty percent (20%) of total combined Retail Sales, Distributor Payments, Wholesale Sales and Event Revenue in a License Year.  Accepting a cash deposit, letter of credit or other security to assure future payment does not constitute a Sale.

1.44.    "Sell-Off Period" shall mean that period specified in Section 14 of the Summary.

1.45.    "Specified Currency" shall mean the currency specified in Section 10 of the Summary.

1.46.    "Specified Number of Samples" shall mean the number of samples specified in Section 13 of the Summary to be supplied to Licensor free-of-charge (including any shipping charge or customs duties) to Licensor.

1.47.    "Subcontractor" shall have the meaning specified in section 4.3(a).

1.48.    "Summary" means and refers to the Summary of Commercial Terms consisting of several numbered pages and signed by both Licensee and Licensor.

1.49.    "Territory" shall mean worldwide, as specified in Section 5 of the Summary, subject to Licensor's compliance with Laws and the approval requirements set forth in Section 4 of the Agreement, as more fully discussed in Section 8.4 of the Agreement.

1.50.    "Term" shall mean that period specified in Section 6 of the Summary.

1.51.   "Wholesale Sales" as used herein means Sales of Licensed Product by Licensee to (a) distributors or other Subcontractors, (b) other wholesalers and/or (c) industrial, commercial, institutional or other professional business users (*i.e.*, a Sale to anyone other than a standard end-user consumer).

1.52.   Headings in this Agreement are for convenience only and shall not affect its interpretation.

1.53.   To the extent this Agreement makes a reference to any number of days without specifying calendar versus business days, any reference to a period of five days or less shall be deemed to refer to business days and any reference to six or more days shall refer to calendar days.

1.54.   In the event the time for the performance of any obligation or the taking of any action under this Agreement is due, or any applicable deadline expires, on a Saturday, Sunday or legal holiday recognized by either the United States, the State of California or the State of Utah, the time for performance or taking such action shall be extended to the next succeeding day which is not a Saturday, Sunday or legal holiday.

1.55.   All references to an "article" or "articles" are to articles in this Agreement, including all sections, subsections, and numbered paragraphs under the referenced article. All references to a "section" or "sections" are to the section of this Agreement and all numbered paragraphs or subsections within such section. All references to a "section," "paragraph," "sections" or "paragraphs" designated by numbers are to the individual numbered sections or numbered paragraphs in this Agreement. Unless otherwise specified herein, the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, sub-section or clause contained in this Agreement.

## 2.   ACKNOWLEDGEMENT AND GRANT OF RIGHTS

2.1.   Subject to the terms and conditions of this Agreement and limited as provided herein, Licensor grants to Licensee, subject to and on the terms of this Agreement, an exclusive, non-transferable, non-assignable, and terminable in whole or in part (as specified herein) world-wide right and license to:

(a)   Use the Property on and in connection with the manufacture, promotion and sale of Licensed Products in the Territory during the Term, consistent with and subject to the terms of this Agreement, via the Distribution Channels set forth in Sections 4(a) through 4(d) of the Summary;

(b)   Subject to the E-Commerce Guidelines, attached hereto as Schedule C and hereby incorporated by reference, make Internet Sales of Licensed Products via the retail websites of Distribution Channels, as set forth in Section 4(d) of the Summary, owned or controlled by either Licensee or such permitted Distribution Channels, provided that (i) Licensee has received Licensor's prior written approval over the websites through which such Internet Sales are to be made and any associated use of the Property, and (ii) no sales are made to any consumer (and no Licensed Products are delivered to any address) physically located outside the Territory granted for such Distribution Channel.

(c)   Use the Licensed Domain Names during the Term in connection with the promotion of the Licensed Products. The Licensed Domain Names shall at all times be owned by Licensor as registrant, and neither Licensee nor any of Licensee's subcontractors shall register any domain names in connection with the Licensed Products. If Licensee or a subcontractor of Licensee desires to use any other domain name(s) or Internet locator(s)/designator(s) in connection with the Licensed Products or otherwise utilizing Playboy-related marks, Licensee shall so notify Licensor, who may at its sole discretion, choose to register the same at its expense. Any such additional domain names or Internet locators/designators shall be owned by Licensor as registrant, and Licensee shall receive a limited license to use the same as Licensed Domain Names hereunder, solely in connection with the exploitation of Licensee's rights hereunder during the Term.

2.2.    (a)    Licensor retains all rights not expressly and exclusively conveyed herein, and Licensor may license firms, individuals, partnerships or corporations to use the Property and all other artwork and textual matter in connection with products other than the Licensed Products. It is expressly understood that Licensee may use the Property and the Licensed Domain Names only in connection with Licensed Products, as set forth in Section 3 of the Summary and subject to the terms hereof.

(b)    In addition, it will not be a violation of this Agreement for the name, signature, likeness or other associated rights of Hugh M. Hefner (collectively, the "Hefner Properties") to appear on or in connection with any products manufactured and/or distributed anywhere in the world by third parties in connection with the distribution of any product that is a Licensed Product hereunder. For the avoidance of doubt, for purposes of this Agreement, this shall not include use by Hugh M. Hefner of the trademarks PLAYBOY and RABBIT HEAD DESIGN, as licensed to Licensee hereunder. Licensee acknowledges that this Agreement does not purport to grant any right to use the Hefner Properties, in whole or in part. In the event Licensee wishes to use or otherwise exploit the Hefner Properties in any manner, Licensee shall notify Licensor, and Licensor will consider whether to assist Licensee to secure such rights from Mr. Hefner. Licensor makes no representations with regard to its ability to secure any such rights and assumes no liability for any failure to acquire the rights or any subsequent dispute between Licensee and Mr. Hefner.

2.3.    Except as specifically set forth in this Agreement, while the manufacture of the Licensed Products may take place outside the approved Territory, none of the Licensed Products may be advertised, promoted, sold or distributed outside the approved Territory by or through Licensee or its distributors or other Subcontractors.

2.4.    Licensee shall be responsible for and shall assume and pay for all costs and expenses arising out of or in connection with Licensee's responsibilities, duties and obligations set forth in this Agreement, including, but not limited to, those costs and expenses related to Licensee's design, manufacture, advertising, promotion, sale and distribution of the Licensed Products.

2.5.    Anything in this Agreement to the contrary notwithstanding, Licensee shall have no right through the Agreement to open or operate a free-standing retail store or other physical location (including, but not limited to, any club or café) using the Property, Licensed Products or any of Licensor's other intellectual property on or in connection with the same or for signage in connection therewith.

2.6.    To the best of Licensor's knowledge as of the date of this Agreement, it is not presently a party to any existing license or other agreement which grants rights to a licensee or other person to use the Property on and in connection with the manufacture, promotion and sale of Licensed Products.

(a)    Licensor shall not enter into any direct agreement with a Licensee Competitor that intentionally causes or permits such Licensee Competitor to use the Property (including, without limitation, Licensor's trade names, marks and trade dress) to be associated with or used to promote or enhance any Competing Products or goodwill of any Licensee Competitors.

(b)    Licensee acknowledges and agrees that it shall not constitute a violation of this Section 2.6 if a third party (including, without limitation, another licensee, sponsor or promoter of Licensor) enters into an agreement with a Licensee Competitor to use, or otherwise uses, the Property (including, without limitation, Licensor's trade names, marks and trade dress) in a manner which directly or indirectly promotes a Competing Product or enhances any Competing Products or goodwill of any Licensee Competitors. By way of example and not limitation, there would be no violation if a licensee of Licensor holds an event to promote products containing the Property and retains a Licensee Competitor as a sponsor of such event or if a promoter holds an event at the Playboy Mansion and brings Competing Products into such event.

(c)    Licensee further acknowledges and agrees that it shall not constitute a violation of this Section 2.6 if Licensor accepts, displays or exhibits advertisements by Licensee Competitors or of Competing Products in Playboy Magazine, on the Playboy Channel or through any other media offered or distributed by or on behalf of Licensor: provided, however, that Licensor shall not authorize the content of such advertisement to include the Property (including, without limitation, Licensor's trade names, marks, trade dress) to suggest an affiliation with or endorsement by Licensor of such Licensee Competitor or its Competing Product.

## 3.    QUALITY CONTROL OF LICENSED PRODUCTS AND PROPERTY

3.1.    Licensee agrees that the Licensed Products and all the ingredients and components thereof shall be of a high standard, quality, workmanship, taste, color and appearance and compliant in all respects with this Agreement and all applicable Laws. Licensee shall not cause, condone, or authorize: (a) the use of any substandard or offensive materials in or in connection with any of the Licensed Products; (b) any violation of any Law, including but not limited to provisions thereof imposing advertising standards or requiring trade or content description of the Licensed Products; or (c) the use of the Property or any other word, device, or symbol associated in any way with Licensor, its subsidiaries and/or affiliates in connection with any product or activity that is not the subject of this Agreement.

3.2.    Throughout the Term, Licensee shall be solely responsible for knowledge of and compliance with all applicable Laws and the terms of this Agreement in all aspects of the Licensed Products, and Licensee's performance obligations hereunder, including, but not limited to, those governing the quality, labelling and safety of such Licensed Products in connection with the manufacture, distribution and promotion of, and the formulas used for, the Licensed Products. Licensee shall not cause, condone or authorize any violation of any Law, including, but not limited to, the United States Department of the Treasury's economic and trade sanctions, which include, but are not limited to, any Executive Order Blocking Property of Certain Persons for any reason in any country of the Territory set by the United States Department of the Treasury Office of Foreign Assets Control, or the terms of this Agreement. Licensee shall cause all of its distributors and other Subcontractors to agree in writing not to cause, condone or authorize any such violations. If any distributors or other Subcontractors violate such terms, Licensee promptly shall take appropriate action, as more particularly described in Section 3.12 and/or as provided by Schedule K. Any violation of Law by Licensee in connection with the manufacture, promotion or sale of the Licensed Products shall be a default under this Agreement and, subject to Licensee's right to notice and an opportunity to cure, may give rise to Licensor's termination rights as set forth in Section 13.2 of this Agreement. Further, if any distributor, manufacturer or other Subcontractor of the Licensed Products violates applicable Laws or the terms of this Agreement in connection with the manufacture, promotion or sale of the Licensed Products, Licensee shall take appropriate actions to remedy such violation as more particularly described in Section 3.12 and/or as provided by Schedule K, including, if such Person fails to cure or correct its conduct within a reasonable time after notice, terminating the rights of such Person to distribute or manufacture the Licensed Products. If Licensee fails to comply with the preceding sentence or fails to remedy the violation as more particularly described in Section 3.12 and/or as provided by Schedule K then, subject to Licensee's right to notice and an opportunity to cure, Licensor shall have the right to terminate this Agreement pursuant to Section 13.2 hereof.

3.3.    Licensee will not knowingly cause or authorize any of the Licensed Products not conforming to the terms of this Agreement to be sold or distributed, and will not knowingly use any Related Materials in a manner materially inconsistent with the terms of this Agreement to the extent doing so may adversely affect Licensor's goodwill in the Property.

3.4.    Licensee will not knowingly use the Property, and will not knowingly authorize or permit the Property to be used, in a manner materially inconsistent with the terms of this Agreement.

3.5.    To the extent Licensor believes that Licensee is using the Property in a manner not authorized by this Agreement, Licensor shall give Licensee notice of such perceived unauthorized use. Licensee immediately shall take action to correct any misuse of the Property and/or shall request

appropriate approvals by Licensor. To the extent Licensor determines in good faith that it does not approve the use of the Property in the manner being used or so requested, Licensee shall make commercially reasonable efforts to recall or remove such non-conforming Licensed Products and Related Materials and shall destroy them at Licensee's sole cost and expense. If Licensee does not make commercially reasonable efforts to undertake such recall within thirty (30) days of notification of non-approval from Licensor then, subject to Licensee's right to notice and an opportunity to cure, Licensor shall have the right to terminate this Agreement pursuant to Section 13.2 hereof.

3.6.     To the extent Licensor believes that a distributor or other Subcontractor of Licensee is using the Property in a manner not authorized by this Agreement, Licensor shall give Licensee notice of such perceived unauthorized use. Licensee immediately shall direct the applicable distributors or other Subcontractors to take action to correct any misuse of the Property and/or shall request appropriate approvals by Licensor. To the extent Licensor determines in good faith that it does not approve the use of the Property in the manner being used by the distributor or other Subcontractor or so requested, Licensee shall demand that the distributor and other Subcontractors make commercially reasonable efforts to recall or remove such non-conforming Licensed Products and Related Materials from the marketplace, and to destroy them at the distributor's or Subcontractor's sole cost and expense. If the distributor or other Subcontractor does not make commercially reasonable efforts to undertake such recall within thirty (30) days of notification of non-approval from Licensor then, Licensee promptly shall take appropriate action, as more particularly described in Section 3.12 and/or as provided by Schedule K. If Licensee fails to comply with the preceding sentence or fails to remedy the violation as more particularly described in Section 3.12 and/or as provided by Schedule K then, subject to Licensee's right to notice and an opportunity to cure, Licensor shall have the right to terminate this Agreement pursuant to Section 13.2 hereof.

3.7.     Licensee shall not knowingly depart from the style, quality and/or appearance of the approved Licensed Products and Related Materials in any material respect without the prior written consent of Licensor, and Licensee shall periodically send samples to Licensor upon request of Licensor to confirm compliance with the foregoing standards.

3.8.     Any use of any Ancillary Mark on the Licensed Products and/or any Related Materials shall be subject to Licensor's prior written consent. Licensee warrants that it is the owner of or has the rights to use any such Ancillary Mark and that the use of Ancillary Mark on any Licensed Product and/or Related Materials will not infringe the IPR of any third party nor result in any loss or damage to the goodwill or reputation of Licensor.

3.9.     As a material condition of this Agreement, Licensee undertakes not to use and not to permit the use by any Affiliate (which shall include without limitation any party connected with the subject matter of this Agreement) of child labor or any other labor which offends decency, community norms in the Territory or morality in relation to the manufacture, distribution or sale of Licensed Products. In particular, Licensee shall comply with the code of Conduct set forth in Schedule B and with the highest standard of business ethics prevailing in the industry throughout the Term. Further, Licensee shall contractually obligate its Subcontractors, distributors and, subject to the exceptions recognized in Section 4.3(b)(iii), manufacturers to abide these same standards, and shall make commercially reasonable efforts to ensure that they do.

3.10.     Licensee shall comply with the terms and conditions of the E-Commerce Guidelines, and shall contractually obligate its distributors and Subcontractors to comply.

(a)     If Licensor believes that Licensee is violating the terms of the E-Commerce Guidelines, it shall give notice to Licensee. Licensee shall immediately act to correct and remedy any violations by it. Subject to Licensee's right to notice and an opportunity to cure, Licensor may elect to treat an unremedied violation as a default by Licensee. If Licensee does not cure or take meaningful actions to cure any material default relating to any E-Commerce Website within ten (10) days after written notice from Licensor, Licensor shall have the right to direct Licensee to terminate such E-Commerce Website.

{00145018.DOCX / 16 }                                           16

(b)    If Licensor believes that a distributor or other Subcontractor of Licensee is violating the terms of the E-Commerce Guidelines, it shall give notice to Licensee (and may, but is not required, to give direct notice to the distributor or Subcontractor). Licensee, in turn, shall give prompt notice to the distributor or other Subcontractors to cease, desist or correct its violation. If the distributor or Subcontractor does not cure or take meaningful actions to cure any material default relating to any E-Commerce Website within ten (10) days after the written notice from Licensor, Licensor shall have the right to direct Licensee to terminate such E-Commerce Website rights of such distributor or other Subcontractor. If Licensee fails to comply with the preceding sentence or fails to remedy the violation as more particularly described in Section 3.12 and/or as provided by Schedule K then, subject to Licensee's right to notice and an opportunity to cure, Licensor shall have the right to terminate this Agreement pursuant to Section 13.2 hereof.

3.11.    Licensee shall cause all of its Subcontractors to agree to comply with the provisions of this Section 3 and shall enforce all rights and remedies against all such Subcontractors in the event of a breach of any of these provisions. If Licensee fails to comply with the preceding sentence or fails to remedy the violation as more particularly described in Section 3.12 and/or as provided by Schedule K then, subject to Licensee's right to notice and an opportunity to cure, Licensor shall have the right to terminate this Agreement pursuant to Section 13.2 hereof.

3.12.    In the event a non-Affiliate distributor, manufacturer or Subcontractor is acting in any manner inconsistent with this Section 3 or Section 4, below, then Licensee shall respond to such third-party conduct as more particularly described on Schedule K.

4.    **APPROVALS; DISCLOSURES**

4.1.    Products.

(a)    Each and every Licensed Product must be approved by Licensor for each Territory before Licensee may begin any mass manufacturing, production or distribution of such Licensed Product, or any marketing, advertising or selling thereof. Samples of each Licensed Product must be provided to Licensor for approval at each stage of development as follows: (i) samples of each liquid formulated energy drink Licensed Product for Licensor to taste; (ii) an initial sketch or photograph of the can or other container in which the Licensed Product will be sold; (iii) a sample prototype of the can/container or equivalent acceptable to Licensor; and (iv) two (2) samples, including all sizes, colors, flavors (including sugar-free) and variations, as actually manufactured or produced in final form as intended to be mass produced or manufactured sold and distributed by Licensee. Licensee must obtain Licensor's written approval at each stage of development of any Licensed Product as set forth above before proceeding to the next stage. All of the items set forth in (i) – (iv) above shall be delivered to Licensor at Licensee's sole expense (including, without limitation, shipping charges, air freight and customs charges). Within ten (10) days after Licensor's initial receipt of each any of the items set forth in (i) – (iv) above or within five (5) days after resubmission, Licensor shall either (A) provide Licensee with notice of written approval of such item, or (B) provide Licensee with written notice of any objections relating to quality, design or other issues and the grounds therefor, in which case, Licensee shall cooperate with Licensor to cure the defects and resubmit the item in corrected form incorporating Licensor's suggestions and comments for approval pursuant to the foregoing approval procedure. Licensor shall have final approval with respect to the design and quality of the Licensed Products, including the cans or other containers and the formula and taste of the Licensed Products.

(b)    To the extent Licensee or the Debtor at any time previously has delivered to Licensor a particular rendition or version of the Licensed Products and such Licensed Products were approved by Licensor, Licensee shall be deemed to have complied with the requirements of this Section 4.1 with respect to such previously approved Licensed Products.

(c)    All new renditions or versions of Licensed Products or the associated cans or other containers must be submitted to Licensor for its prior approval pursuant to the procedures set

forth in this Section 4.1. No modifications or other changes may be made to previously approved
Licensed Products without submitting the modified Licensed Product(s) to Licensor for its approval
pursuant to the procedures set forth in Section 4.1(a), above.

4.2.    Regulatory. Licensee shall be solely responsible for applying for and obtaining any
and all appropriate regulatory approvals in connection with the manufacture, sale and distribution of
the Licensed Products within the Territory. Licensee shall provide written notice to Licensor within
five (5) business days of securing an approval or disapproval of any government entity.

4.3.    Manufacturers, Distributors and Subcontractors.

(a)    Subject to Licensee's compliance with the terms and conditions of this
Section 4.3, Licensee shall have the right to make arrangements for the subcontract of manufacturing,
finishing, packaging and storing of Licensed Products and the distribution of the Licensed Products to
any party (each a "Subcontractor"); provided, however, that Licensee shall have no right to grant any
sub-licenses hereunder, nor to enter into any agreement which completely and/or substantially
abdicates and delegates Licensee's duties and obligations under this Agreement to another person,
and/or subcontracts to any party substantially all of Licensee's obligations relating to the business,
actions and/or operations which this Agreement contemplates.

(b)    Licensor approves as Subcontractors each of the persons listed on Schedules
H-1 and H-2, attached hereto and incorporated by reference, *subject to satisfaction of all of the
following conditions for each such Subcontractor:*

(i)    the Subcontractor shall have entered into an agreement with Licensee,
in substantially the form of Schedules F-1 or F-2, or shall have signed a consent to assignment
and modification agreement in form mutually acceptable to Licensee and Licensor; and

(ii)    the Subcontractor shall have executed a mutual release with Licensor,
in a form acceptable to both Licensor and Licensee; and

(iii)    any special conditions identified by Licensor on Schedule H as to a
particular Subcontractor shall be satisfied.

(c)    In the event that Licensee wishes to grant any such subcontract, with respect
to each proposed Subcontractor:

(i)    Licensee shall complete and deliver to Licensor the questionnaire
attached hereto as Schedule I, including all information requested in the questionnaire.
Licensor shall have five (5) business days after its receipt of the information to review the
questionnaire and information and either provide Licensee with notice of its approval of the
proposed Subcontractor or provide comments, issue questions or request additional
information regarding the proposed subcontractor. Licensee shall cooperate with Licensor in
providing it with information sufficient for Licensor to complete the approval process.

(ii)    Upon Licensor's approval of a proposed Subcontractor, Licensee may
proceed with negotiations with the proposed Subcontractor regarding a subcontract; provided,
however, that Licensee's negotiations with the proposed Subcontractor must be within the
parameters previously established and agreed upon between Licensor and Licensee. Licensee
must obtain the prior approval of Licensor for any deviations from such parameters.

(iii)    In the event Licensee reaches an agreement in principle with the
proposed contractor, Licensee shall execute an agreement with the proposed subcontractor in
the form attached hereto as Schedule E for suppliers providing products that use the Property,
Schedule F-1 for Subcontractors acting solely as distributors, or Schedule F-2 for
Subcontractors providing manufacturing services and receiving distribution rights as
applicable. Any modifications or changes to the forms, other than populating the

subcontractor-specific information, must be approved in writing by Licensor prior to execution of the modified agreement. Notwithstanding the foregoing, when Licensee enters into a relationship with a supplier (who is not also a distributor), Licensee need not use the form attached hereto as Schedule E in all circumstances. Licensor acknowledges that there may be circumstances (A) in which Licensee determines in its reasonable discretion that only a purchase order and/or invoice is necessary, advisable or possible to memorialize such relationship, or (B) in which the supplier is unwilling to sign any agreement and/or the form of agreement proposed by Licensee.

(iv)    Licensee shall provide Licensor with an executed copy of the subcontract within ten (10) days after execution. Excepting a tri-party agreement signed by Licensor, as contemplated in paragraph 4.3(c), any provision in any agreement or contract with a manufacturer, distributor or other Subcontractor of the Licensed Products that is inconsistent with any provisions of this Agreement shall not be binding on Licensor and shall not affect in any way the duties and obligations of Licensee owing to Licensor under this Agreement. For purposes of this Section 4.3, Subcontractor shall include any entity in which Licensee has an ownership interest or which is controlled by Licensee.

(d)    Each of Licensee and Licensor may request (but, under no circumstances may mandate) a tri-party agreement among Licensor, Licensee and any of Licensee's distributors, manufacturers or other Subcontractors. Neither Licensor nor Licensee shall have any obligation to agree to such a request. Under no circumstances shall a tri-party agreement be deemed approved by or enforceable against Licensee and/or Licensor unless it first has been signed by an authorized signatory of such person.

4.4.    Marketing Plans and Materials.

(a)    Licensee shall submit a business marketing plan (the "Marketing Plan") to Licensor for its review and approval within thirty (30) days after execution of this Agreement, which Marketing Plan shall be updated by Licensee and submitted to Licensor for review and approval within thirty (30) days after the end of each License Year for the following License Year. The Marketing Plan shall include, but not be limited to, proposed events and sponsorship opportunities designed to market and promote the Licensed Products. Within ten (10) days after Licensor's receipt of the initial Marketing Plan and each revised Marketing Plan submitted each License Year, Licensor will advise Licensee of any comments, suggestions, changes and questions and requested changes thereto, and Licensee shall thereafter consider incorporating such comments, and suggestions and changes in good faith. Within five (5) days after Licensee's receipt of any requested changes, Licensee shall deliver to Licensor a revised Marketing Plan. Licensee is solely responsible for executing, administering, implementing and managing each Marketing Plan at its sole cost and expense. All marketing materials produced pursuant to a Marketing Plan must be approved by Licensor in writing prior to Licensee's use of such marketing materials and in accordance with Section 4.5 hereof. The parties agree to make their business representatives available (either by telephone or teleconference or in person) to meet at least one time each License Quarter to discuss and review Licensee's business affairs and marketing strategy relating to the Licensed Products. Following such discussions, Licensee will revise the Marketing Plan to reflect the mutual agreement of the parties. Licensee shall market and promote the Licensed Products only in accordance with the Marketing Plan.

(b)    With respect to each new Territory or Subcontractor that Licensee wishes to exploit, Licensee shall submit for Licensor's consideration, an additional Marketing Plan for such new Territory or Subcontractor. The same review process specified in the foregoing paragraph will apply.

4.5    Related Materials.

(a)    Licensee shall submit to Licensor for approval all Related Materials that it or any Subcontractor desires to use in connection with the Licensed Products or otherwise under this Agreement prior to using such materials. Licensor and Licensee shall undertake the protocol set forth

in Schedule J attached hereto, as applicable to the species of Related Material submitted by Licensee to Licensor for approval. No Related Materials may be produced unless and until Licensor has approved them in writing.

(b)     To the extent Licensee or the Debtor at any time previously has delivered to Licensor a particular rendition or version of the Related Materials and such Related Materials were approved by Licensors, it shall be deemed to have complied with the requirements of this Section with respect to such previously approved Related Materials.

(c)     If Licensee modifies or otherwise makes any changes to any previously-approved Related Materials, Licensee must obtain Licensor's prior written approval of such modified Related Material(s) pursuant to the procedures set forth in Section 4.5(a) above.

4.6     <u>Procedure Applicable to Approvals and Requests for Approval</u>. Unless otherwise specified herein, the following procedures shall govern all approvals and requests for approval.

(a)     Requests for approval, approvals, notices of rejection and notice of conditions all may be made, given or noticed by email, which shall be deemed to have been received at the time of confirmed transmission.

(b)     Whenever this Agreement specifies that Licensor's written approval is required, Licensor shall have the right to approve the request, reject it, to specify conditions upon which approval is or may be given and/or to identify alternative relief that might be approved.

(c)     Whenever this Agreement specifies that Licensor's written approval is required, Licensee's request for applicable approval must be in writing (including an e-mail) and delivered to Licensor.

(d)     This Agreement may specify a time period within which Licensor shall respond to request for a particular type of approval. To the extent a provision requiring Licensor's approval fails to specify a time period within which Licensor shall respond, the period within which Licensor shall respond shall be five (5) calendar days.

(e)     To the extent Licensor fails to provide any response to a request for approval within the applicable time period, Licensee may provide Licensor with a written "reminder" of its request for approval and "notice" of Licensor's failure to respond within the applicable period. To the extent Licensor does not respond within three (3) calendar days after such reminder notice, Licensee may provide Licensor's Chief Revenue Officer with a written "reminder" of its request for approval and notice of Licensor's failure to respond within the applicable period. To the extent Licensor does not respond within three (3) calendar days after such reminder notice to Licensor's Chief Revenue Officer, Licensor's approval shall be implied and Licensee (and its distributors or other Subcontractors) may act as if Licensor had approved the request in writing.

(f)     Any time that Playboy denies or rejects a request for approval, it shall provide a written explanation of the reasons for the denial.

## 5.     PAYMENTS AND STATEMENTS

5.1.     In consideration for the Schedule D and the license granted hereunder for License Year 1 (as allocated in equal proportions), Licensee will pay Licensor the Upfront Fee, which shall be due and payable on the Commencement Date.

5.2.     In consideration for the grant of rights set out herein, Licensee shall pay to Licensor in each License Year the Minimum Guaranteed Royalty in accordance with the payment schedule set out in Section 8 of the Summary. The paid Minimum Guaranteed Royalty for the applicable License Year shall be credited against the Royalties due under Section 5.3 during such License Year. Under no

circumstance will Licensor return to Licensee all or any part(s) of any Minimum Guaranteed Royalty payment. As negotiated sums, the parties acknowledge and agree that all Minimum Guaranteed Royalty amounts are intended and understood as gross amounts to be paid in full by Licensee to Licensor without any deductions whatsoever.

5.3.    As additional consideration, Licensee shall pay to Licensor the Royalties in accordance with Section 5.7 of this Agreement, provided, however, that the full amount of the paid Minimum Guaranteed Royalty which is applicable to the License Year concerned shall first be credited against the payment of any Royalty. If the total amount of Royalties payable in respect of any License Year (a) is less than the Minimum Guaranteed Royalty, no part of the Minimum Guaranteed Royalty shall be refundable by Licensor to Licensee, or (b) is greater than the Minimum Guaranteed Royalty, no excess Royalties may be carried forward to any subsequent License Year.

5.4.    Licensee agrees that during each License Year it shall budget and spend on the advertising of Licensed Products an amount which is no less than the Marketing Spend, as set forth in Section 15 of the Summary, in connection with such License Year.

5.5.    Licensee shall, within forty-five (45) days of the end of each Reporting Period, furnish to Licensor complete and accurate statements, signed and certified to be true and complete by a duly authorized officer of Licensee, showing the following related to such Reporting Period:

(a)    To the extent Licensee engages in Retail Sales of Licensed Products, Sales volume and Gross Revenue (without deductions of any kind) from Licensee's Retail Sales of each Licensed Product by country or region and by distribution channel, including, but not limited to:

    (i)    Mass retail/supermarkets;
    (ii)    Convenience stores;
    (iii)    Other retail outlets;
    (iv)    Bars, clubs, restaurants, clubs & other locations involving late night activities;
    (v)    Ecommerce; and
    (vi)    Other (e.g., specialty stores);

(b)    Licensee's Wholesale Sales by country or region and by distributors or Subcontractors (which Licensee may report anonymously) ;
(c)    Distributor Payments to Licensee by country or region and by distributors or Subcontractors (which Licensee may report anonymously);
(d)    To the extent Licensee engages in direct sales of Licensed Products at Events or otherwise derives revenue from such Events, Event Revenue derived by Licensee;
(e)    Copies of reports, if any, provided to Licensee by its distributors, manufacturers and Subcontractors regarding Retail Sales, Wholesale Sales, Event Revenue and/or other data regarding the sale or distribution of Licensed Products within ten (10) business days after Licensee's receipt of such information;
(f)    Royalties payable to Licensor;
(g)    Any and all currency conversions; and
(h)    Licensee Marketing Spend and the details of all such expenditures.

5.6.    At the same time as delivering such statement, Licensee shall make a payment of the amount by which the Royalties receivable during such Reporting Period exceeded the Minimum Guaranteed Royalty paid to Licensor in respect of such Reporting Period. Licensee shall submit statements in accordance with the foregoing even if no sales have been made by Licensee during such Reporting Period. Licensed Products are considered sold when invoiced, shipped, delivered or paid for, whichever occurs first, and Licensee shall not wait until a customer invoice is paid before reporting Sales and paying any Royalty amount that is due.

5.7.    All payments hereunder shall be made in the Specified Currency without deduction whatsoever, including without limitation deduction of any expenses or withholding or other taxes that Licensee is legally obligated to pay (amounts specified to be net of taxes payable by Licensee).

21

:00145018.DOCX : 16 :

Payments shall be made in cleared funds to Licensor by bank transfer to the account identified in Schedule G.

5.8.    When reasonably requested by Licensor during the Term and the Sell-Off Period (but at a minimum with each Reporting Period), Licensee shall provide Licensor with: (a) copies of Licensee's most recent internal financial statements (and, if available, audited, compiled, or reviewed financial statements, including without limitation footnotes); (b) to the extent they exist, annual reports, 10-K's (including the 10-K's of any other company which for any reason include or take into account information relating to Licensee's financial condition and/or performance), balance sheets or other similar documents that indicate Licensee's financial status; and (c) an updated list of the names and addresses, to the extent known by Licensee, of all manufacturing sources, Subcontractors, distributors, suppliers, dealers, wholesalers, retailers, accounts and others which have been engaged in the design, manufacture, advertising, promotion, sale, distribution or other dealings with any or all of the Licensed Products and the Related Materials during the Term and the Sell-Off Period or either thereof. Such list shall, if so requested by Licensor and known by Licensee, contain the full specification of all designs, utility models, patents or trademarks that may be involved, directly or indirectly, in the manufacture, production or distribution of any or all of the Licensed Products and the Related Materials.

5.9.    Any currency conversions which are required under this Agreement shall be made using the prevailing exchange rate (as reported in the Financial Times) as at the date of Licensee's payment or due date of payment, whichever is earlier. Any cost of conversion built into a bank's exchange rate must be accounted for with a corresponding increase in the amount being converted so that all costs of conversion, as well as wire transfer and other bank fees, shall be the sole expense of Licensee, and Licensor shall receive the full amount of payments without reduction.

5.10.    Overdue payments shall bear interest at the rate of (a) one and one-half percent (1.5%) per month, or (b) the maximum interest rate permissible under law, whichever is less, from the due date of payment until actual payment.

5.11.    Licensee shall provide Licensor with an irrevocable Letter of Credit in favor of Licensor in the amount of U.S.$250,000. Not less than two (2) weeks prior to the confirmation hearing during which the Confirmation Order will be reviewed by the Bankruptcy Court, Licensee shall provide to Licensor for Licensor's review a form for the Letter of Credit proposed to be drawn on a U.S. banking institution. The Parties will use commercially reasonable efforts to agree on such form prior to the Commencement Date. On or before the Commencement Date, Licensee shall either (a) cause such Letter of Credit to be issued in favor of Licensor; or (b) (i) provide evidence to Licensor that U.S.$250,000, held for the purpose of securing the Letter of Credit has been placed into escrow, and (ii) cause the Letter of Credit to be issued within fifteen (15) days after the Commencement Date. Except as otherwise provided in this Section 5.11 of this Agreement, the Letter of Credit will remain in place during the Term of this Agreement and will be confirmed in the sole discretion of Licensor and advised through a U.S. bank approved by Licensor and on terms and in the form and content agreed upon by the parties as set forth above. For License Year 1, the Letter of Credit will be in the amount of U.S.$250,000; provided, however, that, if, based upon Licensor's reporting of Royalties as required hereunder, it appears that the unpaid Royalties due to or to come due during the first License Year will exceed the Upfront Fee by U.S.$1,000,000, then within thirty (30) days of submitting such reporting to Licensor, Licensee will increase the amount of the Letter of Credit for License Year 1 in an amount sufficient to ensure payment of the unpaid portion of such Royalties up to a maximum of U.S.$1,000,000. Not later than the first (1st) day of License Year 2 and each applicable License Year thereafter, Licensee shall increase the amount of the Letter of Credit incrementally such that the Letter of Credit will equal the Minimum Guaranteed Royalty amount for such License Year. By way of example, and not limitation, on the first day of License Year 2, (xxx, 2013), Licensee shall immediately increase the amount of the Letter of Credit to the amount of the Minimum Guaranteed Royalty for License Year 2 (i.e., $2,500,000). In addition to any rights or remedies available to Licensor under this Agreement and/or applicable Law, Licensor will be entitled to draw down on such Letter of Credit if Licensee does not pay Licensor any amount payable to Licensor hereunder in a

timely manner. All costs and expenses associated with such Letter of Credit, including, but not limited to, opening, amending and drawing fees, will be borne by Licensee.

5.12.    Licensee shall pay any withholding or similar taxes that Licensee is legally obligated to pay in a timely manner and shall on written request promptly provide Licensor with a receipt evidencing such payment.

5.13.    Licensor and Licensee agree that Licensor will not be liable for any withholding tax, including any interest, penalties or other associated costs, relating to any withholding obligation imposed by the government or taxing authority of any country, state, province, municipality or any other government jurisdiction arising as a result sales by or other commercial activities of Licensee or Subcontractors governed by this Agreement. Licensee further agrees to indemnify, reimburse and otherwise hold harmless, Licensor for any such costs imposed on Licensor. Licensee's obligation to pay taxes shall survive any expiration or termination of this Agreement.

## 6.    BOOKS & RECORDS

6.1.    Licensee shall keep and maintain, during the Term and for at least five (5) years thereafter, complete and accurate books and records in connection with sales of Licensed Products and the computation of Royalties in respect thereof, including without limitation invoices, correspondence, banking, financial and other records relating to the various items to be shown on the sales reports to be submitted under Section 5.6 hereof. Such books and records shall be available for inspection and audit at any time or times during or after the Term during reasonable business hours and upon reasonable notice by Licensor or its authorized representatives. If Licensor conducts such an audit and inspection which discloses a deficiency of less than five percent (5%) between the amount found to be due to Licensor and the amount actually paid or credited to Licensor, then Licensee shall pay Licensor the amount of the deficiency plus interest at the rate set out in Section 5.10. If the audit discloses a deficiency of five percent (5%) or more between the amount found to be due to Licensor and the amount actually paid to Licensor, then Licensee shall, in addition to paying the deficiency together with interest as calculated above, shall promptly reimburse Licensor and/or its representatives for all costs and expenses incurred in conducting such audit (including without limitation travel, accommodation and local meal expenses).

6.2.    Licensor may, at its own expense, retain an independent certified national public accounting firm or other non-national public accounting firm approved by Licensee, to prepare a statement detailing the information required pursuant to Section 5.5 by country or region, and by Licensed Product. Licensee shall cooperate with Licensor and/or its accounting firm to provide them with access to Licensee's books, records and business information relevant to the compilation and preparation of such a detailed statement.

6.3.    Upon Licensor's written request, Licensee shall provide Licensor with true and correct copies of any internal financial statements (and if available, audited, compiled or reviewed financial statements, including, without limitation, footnotes) that have been prepared by or for Licensee for the requested fiscal year(s).

6.4.    The exercise by Licensor, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted, the acceptance by Licensor of any statement or statements or the receipt and deposit by Licensor of any payment tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of Licensor and shall not estop or prevent Licensor from thereafter disputing the accuracy of any such statement or payment.

## 7.    TERMS OF SALES TO OTHER PARTIES; SALES TO LICENSOR

7.1.    Licensee agrees that Licensed Products will not be sold or otherwise supplied to any party without the prior written consent of Licensor if to the knowledge of Licensee such Licensed Products are intended to be used as a Premium by such party. Further, Licensee agrees that no item of merchandise shall be used as a Premium by Licensee as part of any sales promotion plan intended to

increase sales of Licensed Products without the prior written consent of Licensor. If Licensee wishes to sell or supply Licensed Products for use by any party as a Premium as aforesaid, or if Licensee wishes to obtain the right to distribute Premium items in connection with the promotion of Licensed Products, Licensee shall notify Licensor and shall disclose to Licensor the nature of such proposed Premium arrangement, and in such event Licensor agrees to consider such proposal in good faith taking into account all of the circumstances, subject to payment by Licensee of the applicable Royalty in relation thereto. In no event shall total sales and supply of Premiums be greater than one percent (1%) of Gross Revenues each License Quarter.

7.2.      Licensee may sell products F.A.S. vessel at a named port. F.O.B. the place of shipment, F.O.B. the place of destination, C.I.F., C.F.R. or on such other freight and shipping terms as Licensee determines in is sole and absolute discretion.

7.3.      Licensee shall supply to Licensor, from time to time and following a request by Licensor, such reasonable quantities of the Licensed Products as are requested by Licensor, upon terms no less favorable to Licensor than the terms upon which Licensee supplies Licensed Products to its most favored customers within the respective country or other territory, save that no Royalties shall be payable by Licensee to Licensor in respect of Licensed Products supplied by Licensee to Licensor, and accordingly the price payable by Licensor shall be further discounted by the amount of the Royalties which would otherwise have been payable.

## 8.      INTELLECTUAL PROPERTY

8.1.      All rights not expressly and specifically granted herein to Licensee are reserved by Licensor.

8.2.      Licensee acknowledges and agrees that Licensee and all parties acting by or through Licensee hereunder shall not obtain any right, title or interest in the Property, and that all goodwill from the use of the Property shall accrue for the benefit of Licensor.

8.3.      Licensee and all parties acting by or through Licensee hereunder shall not knowingly misuse or bring into disrepute the Property, nor knowingly do or omit to do or permit there to be done any act which may harm the value of the Property or the reputation of Licensor.

(a)      Licensee acknowledges that for purposes of maintaining and enhancing the reputation of Licensor and the Property, the Licensed Products shall be sold solely through retail sales locations and other channels of distribution in the Territory which are consistent with the reputation and public image of Licensor and the Property. Accordingly, the parties agree that the Distribution Channels set out in Section 4 of the Summary achieve this. Licensee expressly agrees that it shall not distribute Licensed Products nor sell Licensed Products to any distributor or Subcontractor for sale through any discount or off-price retailer without Licensor's prior written approval (which approval Licensor may withhold at its sole discretion) unless such discount channel is explicitly allowed by its inclusion in Section 4 of the Summary. If it is unclear whether a particular store, club, outlet or channel of distribution is a "discount or off-price retailer" or otherwise is outside the scope of approved "Distribution Channels" as delineated in Section 4 of the Summary, either party may request at any time determination or approval. In such an event, Licensor shall determine in its reasonable discretion whether the particular store, club, outlet or channel of distribution either is a "discount or off-price retailer" or otherwise does not qualify as a "Distribution Channel." To the extent Licensee disputes Licensor's determination, it may challenge Licensor's determination pursuant to the dispute resolution procedures outlined in Section 21.2; provided, however, that Licensee and its Subcontractors shall abide Licensor's determination unless and until the arbitrator rules otherwise.

(b)      Licensee will use its best efforts to diligently plan its production, sales and inventory such that there will be minimal unsold inventory in its possession at the end of the Term, and minimal inventory stock at retail or at any other distribution level (for example with wholesalers, distributors or other Subcontractors or any other distribution intermediary) at the end of the Term

{00145018.DOCX / 16}                                          24

unless Licensee has satisfied the requirements under Section 13.1 for renewal or extension of this License Agreement. Licensee will not produce, sell or stock inventory in quantities such that the intent of the end of Term is effectively extended through an over-supply of Licensed Products sold or otherwise disposed in the Territory

8.4.    Licensee acknowledges that, notwithstanding its right to sell Licensed Products, Licensor has registered or applied to register the Property in respect of certain specified uses and certain jurisdictions of the Territory only, and consequently any protection afforded by the registration of the Property will be limited accordingly. Licensee hereby undertakes that during the Term it shall not do or authorize to be done any act which foreseeably may jeopardize or invalidate any registration of the Property, nor do any act which could be reasonably anticipated to assist or give rise to an application to remove the Property from any register, or which could be reasonably anticipated to prejudice the right of or title of Licensor.

8.5.    Licensee shall not register, attempt to register or use the Property, any Licensed Domain Name, the name of Licensor, any other trademark of Licensor, and/or any other name or trademark which is part of or confusingly similar to the foregoing, as its company name, business name, trading name, internet domain name or for any other use whatsoever in any jurisdiction throughout the world unless specifically permitted in terms of this Agreement or approved in writing by Licensor. Licensor may determine, in its discretion, whether to apply for such registrations as may be reasonably requested by Licensee in a jurisdiction in which Licensee is doing business or anticipates doing business; provided, however, the Licensor will not exercise its discretion not to make such registration on the sole ground or basis that Licensor will be required to incur legal or other expenses to file and/or prosecute the registration. If Licensor determines not to apply for a registration requested by Licensee in a particular country of the Territory, Licensor shall provide a written explanation of the basis therefor.

8.6.    In exchange for the consideration provided hereunder, Licensee hereby assigns, grants and delivers (and agrees further to assign, grant and deliver) exclusively to Licensor, all rights, titles and interests of every kind and nature whatsoever in and to any original designs, artwork, photography or other material created by Licensee pursuant to this Agreement that contains the Property, including, without limitation, the Licensed Domain Names. Under all circumstances, Licensee shall obtain from any artist or author written waivers or assignments (as applicable under the domestic Laws of any relevant country) to Licensor of any moral rights in all copyrightable works described in this Section. Licensee further agrees to execute and deliver to Licensor such other and further instruments and documents as Licensor from time-to-time reasonably may request for the purpose of establishing, evidencing and enforcing or defending the complete, exclusive, perpetual and worldwide ownership by Licensor of all rights, titles and interests of every kind and nature whatsoever.

8.7.    During and after the Term, Licensee shall not attack or question the validity or enforceability of, or assist any individual or entity in attacking or questioning, the title or any rights of or claimed by Licensor, its subsidiaries and affiliates and their respective licensees and sub-licensees in and to the Property or any other trademarks, copyrights or such other intellectual or intangible property associated or connected with any or all of Licensor, its subsidiaries and affiliates, their publications, published material, activities, licensees and sub-licensees. Within the EU-member states the obligation not to attack such validity or enforceability is restricted to not challenging Licensor's ownership of the Property.

8.8.    Licensee shall notify Licensor immediately in writing in the event of Licensee becoming aware of:

(a)    any actual, suspected or apparent infringement or imitations by others of the Property; or

(b)    any activity by a third party which amounts to or could amount to passing off in respect of the Property; or

25

(c)    any allegation by a third party that the Property is invalid, unenforceable, infringes or otherwise violates any rights of a third party.

8.9.    Licensor shall make commercially reasonable efforts to enjoin, prevent or limit the unauthorized use of its name, marks and the other Property throughout the Territory, and to enjoin, prevent or limit infringement, dilution, imitation and/or passing off of the Property that might foreseeably materially adversely affect the Licensed Products. Licensor may take such action in regard to infringement, dilution or imitation as Licensor, in its commercially reasonable discretion, deems to be appropriate, including, if commercially reasonable, no action. Licensor may, in its commercially reasonable discretion, decide whether to assert any claim or undertake or conduct any suit with respect to such infringement, dilution or imitation, and Licensee agrees to cooperate fully with Licensor in the prosecution of any such claim. Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, on behalf of Licensor, assert any such claim or handle, undertake and conduct any such suit at Licensor's expense in the name of Licensor or Licensee or in both names as Licensor may direct. Licensee expressly covenants that no discussions whatsoever with the infringing or imitating party or parties, no compromise or settlement of any such claim or suit and no negotiations with respect to any compromise or settlement of any such claim or suit shall be had, made or entered into without the prior written approval of Licensor, which shall not be unreasonably withheld. In no event shall Licensor be responsible to Licensee for consequential or incidental damages that result from any such infringement or imitation.

8.10.    To the extent that Licensee or any Subcontractor creates a database of information relating to retail consumers, then upon request by Licensor, that at all times subject to applicable Laws, Licensee shall provide to Licensor such demographic and transaction information (collectively, the "Customer Data") as may be in Licensee's possession or under its control. Licensor shall own and have rights to all Customer Data collected hereunder. Both parties shall use and maintain the Customer Data in strict accordance with applicable Laws and privacy policies.

8.11.    This Agreement does not grant either party a license under the other party's copyrights or patents or any right to otherwise commercialize or exploit the discloser's Proprietary Material. The parties' rights and obligations regarding Proprietary Material are governed by Section 18 of this Agreement.

9.    **REPRESENTATIONS & WARRANTIES**

9.1.    Each party represents and warrants that (a) it has the full right and authority to enter into this Agreement, perform its obligations and grant the rights and licenses granted hereunder; and (b) its execution, delivery and performance of this Agreement will not result in a breach of any material agreement or understanding to which it is a party or by which it or any of its material properties may be bound.

9.2.    In addition, Licensee represents and warrants that (a) Licensee is neither insolvent, nor shall be rendered insolvent by entering into this Agreement or the transactions contemplated hereunder; (b) Licensee is able to perform all obligations and make all payments contemplated hereunder; and (c) the Licensed Products are safe for the use for which they are being marketed, sold and distributed and have been tested and approved by the FDA and/or the relevant governing bodies prior to any distribution.

9.3.    Except as expressly set forth in this Agreement, and to the extent permitted by Law, each party expressly disclaims all warranties and representations, whether express, implied or statutory, including any implied warranty of merchantability, non-infringement or fitness for a particular purpose.

10.    **INDEMNITY**

10.1.    Licensee shall indemnify, defend and hold harmless Licensor, its parent, subsidiary and affiliated entities, and their respective directors, officers, employees and agents, from and against

any claims, liabilities, costs (including reasonable legal fees), damages, loss of profits or goodwill, or other loss (whether direct, indirect or consequential) whatsoever arising out of or in connection with this Agreement including without limitation (a) the design, manufacture, sale, advertising, promotion, distribution or use of Licensed Products by Licensee, any of its Subcontractors, or any of their Affiliates, employees, officers, directors, agents, and other representatives, (b) any use of the Property by Licensee, (c) any Ancillary Mark used by Licensee in connection with the Licensed Products; (d) any alleged breach or breach by Licensee or any of its Subcontractors of any of the undertakings, representations, warranties or other terms contained in this Agreement; (e) any violation or alleged violation of or other non-compliance with any Law by Licensee or any of Subcontractors; (f) any alleged action or failure to act whatsoever by Licensee; and/or (g) any sales or distribution by Licensee or any of its Subcontractors of the Licensed Products to a country or region that has not been approved by Licensor. Licensee shall cause each of its Subcontractors to execute a similar indemnity provision in favor of Licensee and Licensor, which provision shall expressly identify Licensor as an intended third-party beneficiary.

10.2.    Licensor shall indemnify, defend and hold harmless Licensee, its parent, subsidiary and affiliated entities, and their respective directors, officers, employees and agents, from and against any claims whatsoever arising out of or in connection with (a) any alleged or actual material breach by Licensor of any of its representations, warranties or undertakings hereunder; or (b) the use by Licensee of the Property in accordance with the terms and conditions of this Agreement.

10.3.    If an indemnifiable claim is made against an indemnified party, such party will promptly notify the indemnifying party of such claim. Failure to so notify the indemnifying party will not relieve the indemnifying party of any liability which the indemnifying party might have, except to the extent that such failure materially prejudices the indemnifying party's legal rights. The indemnified party shall cooperate with the indemnifying party in the defense and/or settlement of such Claims; provided however, the indemnifying party shall assume control of the defense of such Claim. The indemnified party may participate in the defense of the claim at its own cost. Notwithstanding anything contained herein, (a) the indemnified party shall not enter into any settlement or compromise that provides for any remedy of the claim without the prior written approval of the indemnifying party, which approval will not be unreasonably withheld; and (b) Licensee may not enter into any settlement or compromise that involves or affects any Property or Licensed Product without Licensor's prior written approval.

11.    **INSURANCE**

11.1.    Licensee shall (a) obtain and maintain, at Licensee's own expense, product liability insurance satisfactory to Licensor in the minimum amount of Ten Million U.S. Dollars ($10,000,000) of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" (or better), and qualified to transact business in the Territory (each such insurance policy shall name each of the Indemnitees as additional insureds by reason of the indemnity contained in Section 10 above and shall evidence the insurer's agreement that such insurance shall not be amended, cancelled, terminated or permitted to lapse without thirty (30) days prior written notice to Licensor), and provide Licensor with a certificate of such insurance within fifteen (15) days after the Commencement Date and on each anniversary date of the grant or issuance of each such policy during the Term and the Sell-Off Period evidencing that each such policy has not been altered with respect to the Indemnitees in any way whatsoever nor permitted to lapse for any reason, and evidencing the payment of premium of each such policy; and (b) cause each such policy to be in full force and effect prior to the commencement of any design, manufacture, advertising, promotion, sale, distribution or dealing with any or all of the Licensed Products whatsoever. Failure by Licensee to obtain the required insurance in a timely manner or failure by Licensee to adequately maintain such insurance during the Term and the Sell-Off Period shall be a default by Licensee under this Agreement.

12.    **NON-CIRCUMVENTION**

12.1.    The Non-circumvention provisions in the agreements for manufacturers, sub-distributors or other Subcontractors previously approved by Licensor, as listed in Schedule H-1,

attached hereto and hereby incorporated by reference (collectively, the "Distributor Agreements"), will remain in full force and effect according to their terms, except as provided in paragraph 12.2. Non-terminated and unexpired Distributor Agreements between CirTran Beverage Corporation and the distributors, subdistractors or other Subcontractors listed on Schedule H-1 will be assigned to Licensee, and the non-circumvention rights may be enforced by Licensee.

12.2.    The scope of Licensee's non-circumvention rights in Distribution Agreements identified as "Post-2011 Contracts" on Schedule H-1, at page 127, will be limited to the Licensed Products.

12.3.    Licensee's rights under any and all covenants of non-circumvention with Licensor and/or with any distributors, manufacturers or other Subcontractors automatically shall terminate, shall be waived and shall cease to be effective in the event either (a) Licensee does not elect to renew this Agreement, or (b) this Agreement is terminated pursuant to Section 13.2(a), 13.2(b) or 13.2(c).

## 13.    TERM & TERMINATION

13.1.    The term of this Agreement will begin on the Commencement Date and unless earlier terminated will continue in effect through the Initial Term, and as applicable or as otherwise agreed by the parties, each of the three (3) separate five (5) year Renewal Terms.

(a)    Initial Term (License Years 1 through 5).  The "Initial Term" of this Agreement will begin on the Commencement Date and end on the last day of the month in which the five (5) year anniversary of the Commencement Date occurs.  As an example, if the Commencement Date is July 15, 2012, then the Initial Term will end on July 31, 2017 at 11:59 p.m. (Pacific Time).

(b)    First Renewal Term (License Years 6 through 10).

(i)    Provided that the Agreement has not been terminated pursuant to the terms of 13.2 and further provided that all of the terms and conditions of this Section 13.1(b) have been met, Licensee shall have the right to elect to renew the Term of this Agreement and all of the rights of the parties hereunder to continue and extend for and through an additional five (5) year renewal period (the "First Renewal Term"); provided however, that:

(A)    On the date which is six (6) months prior to the end of the Initial Term, Licensee together with its Subcontractors, collectively, shall have achieved at least $50,000,000 in total Sales since the Commencement Date;

(B)    On or before the end of License Year 4, Licensee and/or its Subcontractors shall have reported actual Sales of Licensed Products in each of the United States, Canada, Latin America, Asia, India, CIS (including Russia), Europe, the Middle East and Africa and shall have had continuing sales in such regions between the end of License Year 4 and the expiration of the Initial Term; and

(C)    Licensee is not in breach of this Agreement, including its obligations under Schedule K to take appropriate actions to address and remedy violations by Subcontractors, except to the extent that Licensee is within the cure period for such breach, in which case, the term of this Agreement automatically shall be extended until the earlier of (a) the date on which such cure has been performed and the renewal term has commenced, or (b) the end of such cure period.

(ii)    Licensee shall have fifteen (15) days after the date which is six (6) months prior to the end of the Initial Term, to deliver to Licensor a statement certified by an authorized officer of Licensee indicating its election to renew this Agreement and that all of the conditions of Section 13.1(b)(i) have been met. Licensor shall have fifteen (15) days after its receipt of such certification to notify Licensee of any disputes regarding its compliance with the conditions.  In the event of disputes, the parties shall work together to resolve the disputes within sixty (60) days after

Licensee's receipt of Licensor's notice of disputes pursuant to the procedures set forth in Section 21.2 hereof. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then at the end of the Initial Term, Licensee must deliver to Licensor a statement certified by an authorized officer of Licensee certifying that all of the conditions of Section 13.1(b)(i) have been met as of the expiration of the Initial Term. The procedures for Licensor's delivery of notice of disputes regarding such certification and the process for resolution of such disputes previously described in this Section 13.1(b) shall apply. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and/or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then this Agreement will renew for an additional period of five (5) years at the end of the Initial Term. To the extent that the parties cannot resolve their disputes, then the dispute resolution procedure described under Section 21.2(c) will apply in determining whether the conditions precedent to renewal delineated in subparagraph (i), above, have been satisfied. If such a dispute occurs, the Term of this Agreement automatically shall be extended until the earlier of (A) the conclusion of the arbitration proceeding, or (B) one hundred twenty (120) days after the end of the Initial Term. In calculating the total Sales under paragraph (i)(A) above, the dollar volume of Sales by international distributors will be based upon (A) if the currency volume of Sales is available, actual Sales as reported by such distributors, which includes data obtained through audits of distributors or other market intelligence that Licensor or its representatives procure, or (B) if actual Sales data is not available, estimates based upon the best information available to Licensee and Licensor including, for example, by multiplying the reported number of cases sold by the average price per case.

(iii)    In the event that any one or more of the conditions precedent to renewal set forth in Section 13.1(b) have not been met during the Initial Term, the parties will negotiate in good faith to see whether they can come to mutually agreeable terms for the renewal of this Agreement. If the parties fail to reach mutually agreeable terms for such renewal within thirty (30) days prior to the end of the Initial Term, then this Agreement will expire at the end of the Initial Term.

(c)    Second Renewal Term (License Years 11 through 15).

(i)    Provided that the Agreement has not been terminated pursuant to the terms of 13.2 and further provided that all of the terms and conditions of this Section 13.1(c) have been met, Licensee shall have the right to elect to renew the Term of this Agreement and all of the rights of the parties hereunder to continue and extend for and through an additional five (5) year renewal period (the "Second Renewal Term"); provided however, that:

(A)    On the date which is six (6) months prior to the end of the First Renewal Term, Licensee together with its Subcontractors, collectively, shall have achieved at least $50,000,000 in total Sales since the commencement of the First Renewal Term;

(B)    On or before the end of License Year 9, Licensee and/or its Subcontractors shall have reported actual Sales of Licensed Products in each of the United States, Canada, Latin America, Asia, India, CIS (including Russia), Europe, the Middle East and Africa and shall have had continuing sales in such regions between the end of License Year 9 and the expiration of the First Renewal Term; and

(C)    Licensee is not in breach of this Agreement, including its obligations under Schedule K to take appropriate actions to address and remedy violations by Subcontractors, except to the extent that Licensee is within the cure period for such breach, in which case, the term of this Agreement automatically shall be extended until the earlier of (a) the date on which such cure has been performed and the renewal term has commenced, or (b) the end of such cure period.

(ii)    Licensee shall have fifteen (15) days after the date which is six (6) months prior to the end of the First Renewal Term, to deliver to Licensor a statement certified by an

authorized officer of Licensee indicating its election to renew this Agreement and that all of the conditions of 13.1(c)(i) have been met. Licensor shall have fifteen (15) days after its receipt of such certification to notify Licensee of any disputes regarding its compliance with the conditions. In the event of disputes, the parties shall work together to resolve the disputes within sixty (60) days after Licensee's receipt of Licensor's notice of disputes pursuant to the procedures set forth in Section 21.2 hereof. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then at the end of the First Renewal Term, Licensee must deliver to Licensor a statement certified by an authorized officer of Licensee certifying that all of the conditions of Section 13.1(c)(i) have been met as of the expiration of the First Renewal Term. The procedures for Licensor's delivery of notice of disputes regarding such certification and the process for resolution of such disputes previously described in this Section 13.1(c) shall apply. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and/or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then this Agreement will renew for an additional period of five (5) years at the end of the First Renewal Term. To the extent that the parties cannot resolve their disputes, then the dispute resolution procedure described under Section 21.2(c) will apply in determining whether the conditions precedent to renewal delineated in subparagraph (i), above, have been satisfied. If such a dispute occurs, the Term of this Agreement automatically shall be extended until the earlier of (A) the conclusion of the arbitration proceeding, or (B) one hundred twenty (120) days after the end of the First Renewal Term. In calculating the total Sales under paragraph (i)(A) above, the dollar volume of Sales by international distributors will be based upon (A) if the currency volume of Sales is available, actual Sales as reported by such distributors, which includes data obtained through audits of distributors or other market intelligence that Licensor or its representatives procure, or (B) if actual Sales data is not available, estimates based upon the best information available to Licensee and Licensor including, for example, by multiplying the reported number of cases sold by the average price per case.

(iii)     In the event that any one or more of the conditions precedent to renewal set forth in Section 13.1(c) have not been met during the First Renewal Term, the parties will negotiate in good faith to see whether they can come to mutually agreeable terms for the renewal of this Agreement. If the parties fail to reach mutually agreeable terms for such renewal within thirty (30) days prior to the end of the First Renewal Term, then this Agreement will expire at the end of the First Renewal Term.

(d)     Third Renewal Term (License Years 16 through 20).

(i)     Provided that the Agreement has not been terminated pursuant to the terms of 13.2 and further provided that all of the terms and conditions of this Section 13.1(d) have been met, Licensee shall have the right to elect to renew the Term of this Agreement and all of the rights of the parties hereunder to continue and extend for and through an additional five (5) year renewal period (the "Third Renewal Term"); provided however, that:

(A)     On the date which is six (6) months prior to the end of the Second Renewal Term, Licensee together with its Subcontractors, collectively, shall have achieved at least $50,000,000 in total Sales since the commencement of the Second Renewal Term;

(B)     On or before the end of License Year 14, Licensee and/or its Subcontractors shall have reported actual Sales of Licensed Products in each of the United States, Canada, Latin America, Asia, India, CIS (including Russia), Europe, the Middle East and Africa and shall have had continuing sales in such regions between the end of License Year 14 and the expiration of the Second Renewal Term; and

(C)     Licensee is not in breach of this Agreement, including its obligations under Schedule K to take appropriate actions to address and remedy violations by Subcontractors, except to the extent that Licensee is within the cure period for such breach, in

which case, the term of this Agreement automatically shall be extended until the earlier of (a) the date on which such cure has been performed and the renewal term has commenced, or (b) the end of such cure period.

(ii)    Licensee shall have fifteen (15) days after the date which is six (6) months prior to the end of the Second Renewal Term, to deliver to Licensor a statement certified by an authorized officer of Licensee indicating its election to renew this Agreement and that all of the conditions of Sections 13.1(d)(i) have been met. Licensor shall have fifteen (15) days after its receipt of such certification to notify Licensee of any disputes regarding its compliance with the conditions. In the event of disputes, the parties shall work together to resolve the disputes within sixty (60) days after Licensee's receipt of Licensor's notice of disputes pursuant to the procedures set forth in Section 21.2 hereof. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then at the end of the Second Renewal Term, Licensee must deliver to Licensor a statement certified by an authorized officer of Licensee certifying that all of the conditions of Section 13.1(d)(i) have been met as of the expiration of the Second Renewal Term. The procedures for Licensor's delivery of notice of disputes regarding such certification and the process for resolution of such disputes previously described in this Section 13.1(d) shall apply. In the event Licensor accepts Licensee's certification or fails to provide notice of any disagreements within the fifteen (15) day period and/or the parties resolve all disputes in favor of Licensee meeting all of the conditions, then this Agreement will renew for an additional period of five (5) years at the end of the Second Renewal Term. To the extent that the parties cannot resolve their disputes, then the dispute resolution procedure described under Section 21.2(c) will apply in determining whether the conditions precedent to renewal delineated in subparagraph (i), above, have been satisfied. If such a dispute occurs, the Term of this Agreement automatically shall be extended until the earlier of (A) the conclusion of the arbitration proceeding, or (B) one hundred twenty (120) days after the end of the Second Renewal Term. In calculating the total Sales under paragraph (i)(A) above, the dollar volume of Sales by international distributors will be based upon (A) if the currency volume of Sales is available, actual Sales as reported by such distributors, which includes data obtained through audits of distributors or other market intelligence that Licensor or its representatives procure, or (B) if actual Sales data is not available, estimates based upon the best information available to Licensee and Licensor including, for example, by multiplying the reported number of cases sold by the average price per case.

(iii)    In the event that any one or more of the conditions precedent to renewal set forth in Section 13.1(d) have not been met during the Second Renewal Term, the parties will negotiate in good faith to see whether they can come to mutually agreeable terms for the renewal of this Agreement. If the parties fail to reach mutually agreeable terms for such renewal within thirty (30) days prior to the end of the Second Renewal Term, then this Agreement will expire at the end of the Second Renewal Term.

13.2.    Licensor shall have the right, but not the obligation, to terminate this Agreement immediately for cause and forthwith by notice in writing to Licensee in the event that:

(a)    Licensee does not pay when due

(i)    a Minimum Guaranteed Royalty or Royalty payment, and does not remedy such breach within ten (10) days of receipt of notice from Licensor, or

(ii)    any other payment due under the terms of this Agreement, and does not remedy such breach within ten (10) days of receipt of notice from Licensor; or

(b)    Licensee fails to:

(i)    As more particularly described in Section 5.11 of this Agreement, perform its obligation as of the Commencement Date to either: (A) cause a Letter of Credit to be issued; or (B) provide evidence that the necessary funds to secure the Letter of Credit have

;00145018.DOCX / 16 ;

31

been placed into escrow, with issuance of the Letter of Credit occurring within fifteen (15) days after the Commencement Date; or

(ii)     Increase the amount of the Letter of Credit in any License Year as and when required under Section 5.11 of this Agreement, and does not remedy such breach within fifteen (15) days after receipt of notice from Licensor; or

(c)     (i) Licensee violates its obligations under Sections 3 and/or 4.1 of this Agreement in a manner that (A) materially jeopardizes Licensor's registration rights, if any, in registered trade names or marks, or (B) objectively and materially diminishes the value of Licensor's registered trade names or marks, **_and_** (ii) Licensee fails, with thirty (30) days after notice from Licensor to take reasonable steps (or to initiate such actions) to cure, correct or reasonably mitigate such material violation; or

(d)     In the event (i) Licensee voluntarily makes any assignment for the benefit of creditors, (ii) Licensee consents to appointment of a receiver, custodian, administrator or trustee for all or substantially all of Licensee's business and assets or, notwithstanding Licensee's lack of consent, an order appointing such a receiver, custodian, administrator or trustee is entered by a court of competent jurisdiction and such order is not stayed, reversed, modified or vacated within fifteen business days, (iii) Licensee voluntarily files a petition for relief under title 11 of the United States Code (the "Bankruptcy Code") or the insolvency laws of any other jurisdiction, (iv) Licensee fails timely to contest any involuntary bankruptcy petition that is filed against Licensee under section 303 of the Bankruptcy Code or similar insolvency laws of any other jurisdiction, or (v) an "order for relief" is entered against Licensee pursuant to section 303 of the Bankruptcy Code jurisdiction and such order is not stayed, reversed, modified or vacated within fifteen business days (collectively, an "Insolvency Event"); or

(e)     Licensee merges or consolidates with any other entity which was not an Affiliate, subsidiary or a company related to or affiliated with Licensee prior to such merger or consolidation; or

(f)     Licensee sells, assigns or transfers all or substantially all of its business related to the manufacture, sale or marketing of the Licensed Products to another person; or

(g)     A change in Control of Licensee occurs; or

(h)     Excepting its agreements and contracts with Subcontractors as contemplated under Section 4.3 of this Agreement, which do not have the effect of or result in Licensee completely and/or substantially abdicating and delegating its duties and obligations under this Agreement to such Subcontractors, Licensee enters into an arrangement which completely and/or substantially abdicates and delegates Licensee's duties and obligations under this Agreement to another person; or

(i)     Licensee knowingly enters into any business or business arrangement to advertise, promote, sell or distribute non-alcoholic energy drinks, non-alcoholic energy shots or other non-alcoholic energy beverages that exhibit or rely upon the names or trademarks of any Licensor Competitor; or

(j)     (i) Licensee materially fails to follow any or all of the approval procedures set forth in Section 4 relating to Licensed Products, Subcontractors, and/or Related Materials, including, without limitation, selling unapproved Licensed Products, failing to remedy quality or design issues relating to Licensed Products or using any unapproved subcontractor or Related Materials, **_and_** (ii) Licensee fails, with thirty (30) days after notice from Licensor to take reasonable steps (or to initiate such actions) to cure, correct or reasonably mitigate such material violation; or

(k)     (i) Licensee materially fails to take action when necessary pursuant to Section 3.10 or as contemplated by Schedule K, or encourages any Subcontractor to violate this Agreement or the Subcontractor agreement to which it is a party in any manner which would be harmful to the

Property, *and* (ii) Licensee fails, with thirty (30) days after notice from Licensor to take reasonable steps (or to initiate such actions) to cure, correct or reasonably mitigate such material violation.

13.3.    In the event the license granted hereunder is terminated pursuant to Section 13.2 on account of an Insolvency Event, neither Licensee nor any receiver, custodian, representative, trustee, agent, administrator, successor and/or assign of Licensee shall have any right to sell, exploit or otherwise deal with or in the Licensed Products

13.4.    Upon the occurrence of an Insolvency Event, Licensee agrees that Licensor shall be entitled to take all action to terminate and enforce this Agreement without regard to the automatic stay or other injunction imposed under Title 11 of the United States Code or other applicable Law. In the event that Licensee becomes subject to an Insolvency Event, Licensee consents to, and agrees not to oppose any motion by Licensor or its agents to lift the automatic stay or other injunction imposed under applicable law, which motion may be brought and determined on an expedited basis.

13.5.    Termination of this Agreement for any reason shall be without prejudice to the rights and obligations of either party existing at termination including, without limitation, the right to take action in respect of the circumstances giving rise to such termination.

13.6.    If on or before October 15, 2012, either (a) the Commencement Date does not occur, and/or (b) Licensee fails to pay the Upfront Fee as set forth in Section 5.1, then Licensor shall have the right (but not the obligation) to give written notice to Licensee, which notice shall identify the condition(s) precedent to the Commencement Date that remains unsatisfied. If the Commencement Date does not occur, or the Upfront Fee payment is not received by Licensor, within five (5) business days after the date such written notice is received by Licensee pursuant to Section 17, then this Agreement automatically shall become void in all respects, and never shall become effective or enforceable against the Parties.

14.    **CONSEQUENCES OF TERMINATION**

14.1.    Upon the expiration or termination of this Agreement for any reason Licensee shall, subject to Licensee's rights during the Sell-Off Period, as described in Section 15 hereof:

(a)    immediately relinquish all rights to manufacture, distribute, promote, advertise and sell or in any way deal with Licensed Products or Related Materials, except as is specifically permitted by Sections 14 and 15 (if applicable), and shall provide a written declaration of the same;

(b)    promptly cease using and distributing all Related Materials in connection with the Licensed Products and, unless Licensor and Licensee reach other mutually acceptable terms regarding their sale or other disposition within thirty (30) days, to deliver or destroy them, at Licensor's direction, and furnish Licensor with sworn affidavits of destruction if Licensor so directs; provided however that if Licensor directs Licensee to deliver the Related Materials, Licensor shall be responsible for the costs associated with such delivery, and Licensee will be responsible for the costs associated with destruction of the Related Materials;

(c)    unless Licensor and Licensee reach other mutually acceptable terms regarding their sale or other disposition within thirty (30) days, ensure that all materials owned or controlled by Licensee in connection with the manufacture, distribution and sale of Licensed Products, including without limitation artwork, moulds, casts and dies, at Licensor's option, are delivered or destroyed, in which case, Licensee shall furnish Licensor with sworn affidavits of destruction if Licensor so directs; provided, however, that if Licensor directs Licensee to deliver such materials, Licensor shall be responsible for the costs associated with such delivery, and Licensee will be responsible for the costs associated with destruction of the materials; and

33

(d)    immediately pay all outstanding balances due hereunder including payment of the total Minimum Guaranteed Royalty which

(i)    complete balance shall be immediately accelerated and payable in full in the event this Agreement is terminated by Licensor for non-payment pursuant to Section 13.2(a), or

(ii)    shall be pro-rated through the date of expiration or termination in the event this Agreement expires or is terminated for any other reasons; and

(e)    provide Licensor with a full list of any subcontractors used to manufacture Licensed Products, including contact information, and a written confirmation from each sub-contractor that such subcontractor has ceased the manufacture of all Licensed Products.

14.2.    Not later than fifteen (15) days after the expiration or termination of this Agreement, Licensee shall furnish to Licensor a statement showing the number and description of each and every Licensed Product then in stock or in process of manufacture. Licensor shall have the right to take a physical inventory to ascertain or verify such statement, and in the event that Licensee refuses to provide such a statement and/or permit Licensor or Licensor's authorized representative to take such physical inventory, Licensee shall forfeit any right to dispose of any Licensed Products in stock or in process of manufacture at the date of termination as would otherwise be allowed under the provisions of Section 15 below.

14.3    Following expiration or termination of this Agreement, Licensee may not manufacture any additional Licensed Products, but, subject to the terms of Section 15 below, Licensor may grant Licensee the right to dispose of any Licensed Products in stock or in process of manufacture at the date of termination; provided that:

(a)    Licensee discharges fully its obligations to Licensor as set out in Sections 14.1 and 14.2, above; and

(b)    The termination of this Agreement has not resulted from Licensor's exercise of the right to terminate under Section 13.2 or 13.3.

14.4    Licensee shall not manufacture, sell or distribute any Licensed Products after termination or expiration of this Agreement, or, if applicable, after the expiration of the Sell-Off Period. Upon such termination of the Agreement or, if applicable, after the expiration of the Sell-Off Period Licensee shall, at Licensor's option:

(a)    unless Licensor and Licensee reach other mutually acceptable terms regarding their sale or other disposition within thirty (30) days, deliver or destroy all remaining stock or inventory of Licensed Products and Related Materials and furnish Licensor with an additional sworn affidavit of such destruction if Licensor so directs (at Licensee's sole cost);

(b)    provide Licensor with a comprehensive final Royalty report, setting out a summary of all statements submitted by Licensee pursuant to Section 5.5 and certified to be true and correct by a duly authorized officer of Licensee; and

(c)    notify all Subcontractors, manufacturers, distributors, and middlemen with whom Licensee deals in respect of the Licensed Products that neither Licensee nor such manufacturer, distributor, middleman or other Subcontractor has the legal right to manufacture or distribute the Licensed Products.

14.5    Licensee hereby acknowledges that its failure to cease the design, manufacture, advertising, promotion, sale or distribution of the Licensed Products and the Related Materials upon the expiration or termination of this Agreement will result in immediate and irreparable harm and damage to Licensor and its business interests. Licensee also acknowledges that there may be no adequate remedy at law for such failure and that in the event thereof Licensor shall be entitled to

{00145018.DOCX / 16 }                                    34

equitable relief in the nature of an injunction and to all other available relief, at law and/or in equity. Accordingly, in the event of expiration or termination of this Agreement and such "failure to cease." Licensor shall be entitled to equitable relief by way of any temporary and permanent injunctions and such other relief as any court of competent jurisdiction may deem just and proper.

14.6    In the event that Licensee's rights under the covenants of non-circumvention with Licensor are terminated, waived and/or cease to be effective, pursuant to Section 12.3 of this Agreement, then upon the expiration or termination of this Agreement, Licensee shall provide and transfer to Licensor all right, title and interest in and to the beverage formulation(s) used to make the Licensed Products without any additional consideration or compensation. In the event that this Agreement is terminated for any other reason, upon Licensor's request, the parties will discuss the compensation to be associated with such transfer of the formula(s). In the event that the parties cannot agree upon a price, and Licensor determines in its sole discretion that it wishes to continue with negotiations, the matter will become subject to the dispute resolution procedure, as set forth in Section 21.2 of this Agreement.

## 15.    SELL-OFF PERIOD

15.1.    Provided that Licensee is performing its obligations under Sections 14.1 and 14.2 hereof, upon termination or expiration of this Agreement Licensee and its Subcontractors and distributors shall have the non-exclusive right to complete the manufacture of Licensed Products which already are in the process of being manufactured as of the date of termination or expiration of the Term and to sell such completed Licensed Products and any Licensed Products in stock at the date of termination or expiration during the Sell-Off Period.

15.2.    To the extent the quantity of Licensed Products in inventory at the time of termination or expiration is substantially in excess of reasonable quantities taking into account Licensee's past sales of Licensed Products, then Licensee's rights under this Section 15 hereof shall be limited to reasonable quantities. In the event the limitations of this Section 15.2 become effective, Licensee may determine, in its discretion, which of the Licensed Products in inventory or in process may be completed and sold during the Sell-Off Period, and which must be treated as described in Section 14.4(a) hereof.

15.3.    If during the Sell-Off Period any of the events specified in Sections 13.2(c) or (h) hereof occur, Licensor shall be entitled to end the Sell-Off Period forthwith by notice in writing.

15.4.    Licensee acknowledges that during the Sell-Off Period the Licensed Products may be sold only in the normal course of business via the approved Distribution Channels and at regular selling prices (unless otherwise agreed by Licensor in advance, in writing). All labels, including bar codes, if any, must remain intact, and the Trademarks may not be removed, hidden or altered in any way. Any Licensed Product returned during the Sell-Off Period may be re-sold solely in the same manner as other Licensed Products during the Sell-Off Period.

15.5.    Licensee fully understands and acknowledges that Sell-Off Period sales should, through diligent sales and stock control by Licensee, be planned to be minimal. Licensee will refrain from "Dumping" Licensed Products. "Dumping" means selling at a volume level that is inconsistent with (and greater than) the volume immediately prior to the beginning of the Sell-Off Period and at sales prices that are inconsistent with (and lower) than the sales prices that were in place immediately prior to the commencement of the Sell-Off Period. If, on the basis of prior sales patterns during the Term (for example unit volume sales for comparable periods), Licensor has, in its sole discretion, reasonable cause to believe that Licensee is not exercising its requirements for the expiration or termination of the license (and related Sell-Off activities) in good faith then Licensor may in its sole discretion end the Sell-Off Period or take other measures (such as for example not authorizing product approvals or fulfilment of hologram orders) to ensure that the end of Term obligations and Sell-Off Period are being realized according to the letter and spirit of this Agreement.

{00115018.DOCX.16}

15.6. Licensee shall pay to Licensor the Royalties on Licensed Products sold during the Sell-Off Period within thirty (30) days following the termination or expiration of the Sell-Off Period, which Royalties may be credited against any Minimum Guaranteed Royalty.

15.7. Licensor shall have the option to conduct physical inventories before termination or expiration of the Agreement, as applicable, and continuing until the end of the Sell-Off Period, in order to ascertain or verify such inventories and/or statement. Immediately upon the earlier of termination or expiration of the Sell-Off Period, Licensee shall furnish Licensor a detailed statement certified by an officer of Licensee showing the number and description of Licensed Products on hand in its inventory and shall sell off such inventory pursuant to the terms of this Agreement at Licensee's expense. In the event Licensee refuses to permit Licensor to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Licensor shall have recourse to all other remedies available to it.

## 16.    LIMITATION OF LIABILITY

16.1. Neither party shall be liable to the other party for any special, consequential, incidental, punitive or indirect damages of any kind (including without limitation loss of profit), whether or not the other party was advised of the possibility of such loss, however caused, whether for breach of contract, breach of warranty, negligence, or otherwise.

16.2. Neither party's total liability to the other party in connection with this Agreement shall be limited to the greater of: (a) the total amounts paid by Licensee to Licensor hereunder in the License Year in which such liability arose; or (b) U.S.$3,000,000.

16.3. Nothing in this Agreement shall limit the liability of any party for, and the waivers provided under Sections 16.1 and 16.2 shall not apply to: (i) claims for personal injury, death or damage to real property caused by negligence; (ii) any claim that is indemnifiable under Section 10 hereof; (iii) any claim to the extent covered by insurance under Section 11 hereof; or (iv) injuries or losses caused by fraud, gross misconduct, willful and malicious conduct, or bad faith.

## 17.    NOTICES

17.1. All notices and statements to be given and approvals to be sought hereunder shall be given or made in respect of Licensor and Licensee to the addresses set out in Section 1 of the Summary.

17.2. Any notice shall be hand delivered, faxed, or sent by prepaid first class post or overnight courier, and shall be deemed to have been received: (a) if hand delivered – at the time of delivery; (b) if sent by fax, at the time of confirmed transmission; (c) if sent by prepaid first class post – two (2) business days after posting if to an address within the country of posting and six (6) business days if to an address outside such country; or (d) if sent by overnight courier – one (1) business days after posting if to an address within the country of posting and three (3) business days if to an address outside such country.

## 18.    CONFIDENTIAL INFORMATION

18.1. Licensor will from time to time during the Term of this Agreement, make available to Licensee materials, including, but not limited to, style guides and licensing manuals, and other information, and Licensee will from time to time during the Term of this Agreement, make available to Licensor Marketing Plans, names of business contacts and other information, all of which is non-public, confidential or proprietary to Licensor and Licensee, as applicable. Such materials, information and the terms and conditions of the License and this Agreement, which is confidential between Licensee and Licensor, will be collectively referred to herein as the "Proprietary Material." Neither Licensee nor Licensor shall disclose the Proprietary Material to third-parties or use the Proprietary Material for any purpose other than in connection with their duties and obligations as set forth in this Agreement. Each of Licensee and Licensor shall ensure that the Proprietary Material

received from the other party will be kept confidential by Licensee/Licensor and its directors, officers, employees, agents, distributors, designers and supplier/subcontractors (collectively "Representatives"), and that all such Representatives shall be made aware of the confidential nature of the Proprietary Material. In the event Licensee or Licensor is requested or required (by oral question, interrogatories, subpoena, civil investigative demand or similar process) to disclose any of the Proprietary Material, the party receiving the request or requirement will promptly notify the other party of such request or requirement and cooperate with the other party so that the other party may seek an appropriate protective order or otherwise seek appropriate protection of the Proprietary Material. In the event that such protection is not obtained or that the other party waives compliance, Licensee or Licensee, as the same may be, shall furnish only that portion of the Proprietary Material which it is advised by written opinion of counsel is legally required to be furnished. Immediately upon the expiration or termination of this Agreement, or within ten (10) days from the date of receipt of prior written request from the other party, Licensee/Licensor will return to the other party, or destroy at the other party's request, all Proprietary Material and all copies of the Proprietary Material produced by the other party or its Representatives or any notes, analysis or other materials prepared or produced by the other party or its Representatives.

18.2.    Unless mandated by Law or a governmental agency, both parties shall keep confidential at all times the terms of this Agreement.

18.3.    Neither party nor their advisors will make a public statement (including, but not limited to, release of information to the marketplace and/or any filing with the Bankruptcy Court) regarding this Agreement or the terms contained herein until and unless the parties have mutually approved in writing the information to be released and the message. Notwithstanding the foregoing, each of the parties may disclose to their shareholders and Licensee may disclose to its actual and prospective Subcontractors, distributors and manufacturers (a) the fact that the Agreement has been signed, (b) that the Agreement is in effect following the Commencement Date, (c) the definition of the Licensed Products, (d) the then current initial or renewal term of the Agreement, and (e) that, subject to the satisfaction of undisclosed conditions precedent, the Agreement may be renewed for applicable renewal terms.

19.    **ASSIGNMENT**

19.1.    Licensee shall not assign, sublicense, delegate, or franchise this Agreement or any of Licensee's rights under this Agreement, whether by operation of law or otherwise. Further, Licensee shall have no right (explicit or implicit) to do so, and any attempt to do so shall be void and constitute a material default under this Agreement. For purposes of this Section 19, a change of Control of Licensee or an agreement or contract with a Subcontractor, which has the effect of or results in Licensee completely and/or substantially abdicating and delegating its duties and obligations under this Agreement to such Subcontractor (but specifically excluding the delegation of marketing, manufacturing and distribution duties and obligations to third parties, to the extent permitted pursuant to Section 4.3 of this Agreement) shall be deemed to be an assignment prohibited by this Section 19.

19.2.    Section 19.1 shall not be construed, and does not, limit or affect Licensee's right (subject to the terms and conditions of Section 4.3 of this Agreement) to contract with distributors, manufacturers and other Subcontractors for the manufacture, finishing, packaging, storage and/or distribution of the Licensed Products.

19.3.    Subject to the foregoing restrictions set forth in this Section 19, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.

20.    **GENERAL**

20.1.    In the event that any Section of this Agreement shall be deemed to be invalid or unenforceable, this shall not affect the legal enforceability of the Agreement as a whole, and the parties agree to replace such invalid Section with a mutually agreed enforceable replacement Section, as close as possible in interpretation to the invalid Section.

37

{00145018.DOCX / 16 }

20.2.    Nothing in this Agreement is intended on a proper construction to confer any benefit on any third party and no term will be enforceable by any third party.

20.3.    Failure of any party at any time to demand strict performance by the other of any of the undertakings, terms or conditions set out this Agreement shall not be construed as a continuing waiver or relinquishment thereof and each party may at any time demand strict and complete performance by the other of the said undertakings, terms and conditions. No written waiver shall excuse the performance of any act other than those specifically referred to therein. The normal expiration of the term of this Agreement shall not relieve either party of its respective obligations accruing prior thereto, nor impair or prejudice the respective rights of either party against the other, which rights by their nature survive such expiration. Neither Licensor nor Licensee makes any warranties or representations except those specifically expressed herein. None of the terms of this Agreement may be modified or otherwise amended except by an express agreement in writing signed by the parties hereto.

20.4.    This Agreement does not constitute and shall not be construed as constituting an agency, partnership or joint venture relationship between Licensee and Licensor. Licensee shall have no right to obligate or bind Licensor in any manner whatsoever, and nothing herein contained shall give or is intended to give any rights of any kind to any third persons.

20.5.    In the event either party hereto files any action against the other to enforce any of the provisions of this Agreement or to secure or protect such party's rights under this Agreement, such party shall be entitled to recover, in any judgment in its favor entered therein, the reasonable attorneys' fees and litigation expenses of such party, together with such court costs and damages as are provided by Law.

20.6.    This Agreement contains the entire agreement between the parties with respect to its subject matter and shall replace and supersede any prior agreements or understandings or course of dealings or course of performance between the parties, whether written or oral, pertaining to the subject matter hereof, including that certain Product License Agreement, commencing as of November 1, 2006, as amended, in connection with which the parties release each other from any claims as set forth in the Settlement Agreement between the Parties (as defined in Schedule D) and the Debtor, including the releases of claims between Licensor and Debtor, as set forth in an executed agreement in a form substantially similar to Schedule D, attached hereto and hereby incorporated by reference, as well as any alleged understandings, agreements, or statements made during the course of Licensee's bankruptcy proceedings. Any amendment or variation hereto must be in writing and signed by both parties. No purported course of dealings, conduct or failure to act shall provide a basis for purported modification of this agreement, of for any waiver of any party's rights or obligations under this Agreement.

## 21.    GOVERNING LAW AND ALTERNATIVE DISPUTE PROCEDURES

21.1.    <u>Governing Law</u>. This Agreement shall be governed by and interpreted under the laws of the State of California without regard to its conflicts of law provisions. Licensee hereby submits to personal jurisdiction in Los Angeles County, California. The parties hereto agree that any and all disputes arising out of or relating in any way to this Agreement shall be litigated only and exclusively through arbitration in Los Angeles County, California, as set forth in Paragraph 21.2, below. Licensee consents to the enforcement of any orders or judgments issued by an arbitrator outside of the state of California (e.g., in Utah).

21.2.    <u>Dispute Resolution</u>.

(a)    Licensor and Licensee shall attempt in good faith to resolve any dispute, claim or controversy (each a "Dispute") arising out of or relating to this Agreement promptly by negotiation between executives of Licensee and Licensor, respectively, who have authority to settle

the controversy. Either party may give the other party written notice of any dispute not resolved in the normal course of business. Within fifteen (15) days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and response shall include with reasonable particularity: (i) a statement of each party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the notice, the executives of both parties shall meet at a mutually acceptable time and place. Unless otherwise agreed in writing by the negotiating parties, this negotiation shall end at the close of the first meeting of executives as described above (the "First Meeting"). Such closure shall not preclude continuing or later negotiations, if desired.

(b)    In the event that such Dispute cannot be resolved pursuant to Section 21.2(a), above, the parties shall submit the Dispute for determination by arbitration in Los Angeles, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the Award may only be entered in any federal or Superior Court in Los Angeles County, California. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c)    In the event Licensor and Licensee become involved in a Dispute regarding whether the conditions precedent to renewal are satisfied under Sections 13.1(b), 13.1(c) or 13.1(d), the Dispute shall be resolved by arbitration as provided in section 21.2(b), above, but subject to the following additional conditions and procedures:

(i)    Licensee and Licensor shall work in good faith and with all due diligence to complete the arbitration so that an award can be issued no later than one hundred twenty (120) days after the end of the applicable Term.

(ii)    The parties jointly shall agree to appoint an arbitrator within fourteen (14) days of the commencement of the arbitration. If the parties cannot agree to the appointment of an arbitrator within fourteen (14) days, each party shall select an arbitrator, and the two arbitrators shall appoint a third arbitrator to chair the panel no later than thirty (30) days after the commencement of the arbitration. If one party fails to select an arbitrator for this purpose on or before the twentieth day, then the sole arbitrator selected by the other party shall serve as the arbitrator in the proceeding notwithstanding any objection by the failing party. The parties shall not engage in any conduct to delay the arbitration.

(d)    All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

(e)    At no time prior to the First Meeting shall either side initiate an arbitration or litigation related to this Agreement except to pursue a provisional remedy that is authorized by Law or by JAMS Rules or by agreement of the parties. The parties acknowledge and agree that any Dispute arising under this Agreement shall be subject to the dispute resolution procedures set forth herein. Neither party shall oppose the other party's motion to compel compliance with these procedures. The parties further acknowledge and agree that the Disputes arising hereunder are non-core matters for purposes of 28 USC Sec 1334.

(f)    All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified above are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling.

21.3.    The parties shall maintain the confidential nature of the arbitration proceeding and the Award, including the Hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a

{00145018.DOCX  16 }

39

preliminary remedy, a judicial challenge to an Award or its enforcement, or unless otherwise required by law or judicial decision.

      21.4.    Notwithstanding anything to the contrary contained herein, the parties agree that Licensor shall be entitled to bring any claims for injunctive relief or interim measures of protection, including claims arising from any alleged infringement or misuse of the Property licensed by Licensor under this Agreement, in any court of competent jurisdiction. For purposes of this provision, each of Licensee and Licensor hereby irrevocably submits and consents to the jurisdiction of the courts of Los Angeles County, California.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of
the date below written.

For and on behalf of
**PLAYBOY ENTERPRISES**
        **INTERNATIONAL, INC.**

Print: Christine Coffelt
Title: SVP, Global Licensing
Date: Aug. 9. 2012


For and on behalf of
**PB ENERGY CORPORATION**

Print: IEHAB J. HAWATMEH

Title: President/CEO

Date: Aug. 9, 2012