**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., a Delaware corporation, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PLAY BEVERAGES, LLC, a Delaware limited liability company; CIRTRAN BEVERAGE CORPORATION, a Utah corporation; and CIRTRAN CORPORATION, a Nevada corporation, )<br>)<br>Defendants. ) | Case No. 13 CV 00826<br>Judge Robert W. Gettleman |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Defendants Play Beverages, LLC ("Play Bev"), CirTran Beverage Corporation ("CBC"), and CirTran Corporation submit the attached memorandum in opposition to Playboy Enterprises International, Inc.'s ("Playboy") Motion for Preliminary Injunction. Defendants further rely upon the accompanying Declaration of Iehab Hawatmeh, Declaration of Bryon J. Benevento, Deposition Testimony of Sarah Haney, and their attached exhibits.

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | STATEMENT OF FACTS | | 3 |
| | A. | The Development of the Playboy Energy Drink. | 3 |
| | B. | Playboy's Extension of the License Agreement and Waiver of Certain Monetary Requirements. | 4 |
| | C. | Playboy's Failure to Honor its Agreement and Attempts to Steal Play Bev and CBC's Business. | 5 |
| | D. | Playboy Interferes with the Defendants' Distribution Network and Ability to Perform Under the Modified Payment Schedule. | 7 |
| | E. | Play Bev and CBC's Illinois Lawsuit. | 10 |
| III. | ARGUMENT | | 11 |
| | A. | Playboy's Claims Should be Dismissed or Stayed Until the Illinois State Court has an Opportunity to Decide the Underlying Facts. | 11 |
| | B. | Playboy Has Not Met its Burden of Demonstrating that a Preliminary Injunction is Warranted. | 11 |
| | | 1. Playboy is Unlikely to Prevail on the Merits. | 12 |
| | | 2. Playboy Will Not Be Irreparably Harmed by the Continuation of the License During the Pendency of the Litigation. | 13 |
| | | 3. The Balance of Harms and Public Interest Weigh Against the Issuance of an Injunction. | 14 |
| IV. | CONCLUSION | | 15 |

## TABLE OF AUTHORITIES

Page

**Cases**

eBay, Inc. v. MercExchange, LLC,
   547 U.S. 388 (2006) .................................................................................................... 13

Flava Works, Inc. v. Gunter,
   689 F.3d 754 (7th Cir. 2012) ....................................................................................... 13

Frerck v. John Wiley & Sons, Inc.,
   850 F. Supp. 2d 889 (N.D. Ill. 2012) ........................................................................... 12

Groupion, LLC v. Groupon, Inc.,
   No. C 11-00870 JSW, 826 F. Supp. 2d 1156, 2011 U.S. Dist. LEXIS 136129, at
   *18-19 (N.D. Cal. Nov. 28, 2011) ............................................................................... 13

Mazurek v. Armstrong,
   520 U.S. 968 (1997) .................................................................................................... 12

Mohanty v. St. John Heart Clinic, S.C.,
   866 N.E.2d 85 (Ill. 2006) ............................................................................................. 13

Original Great Amer. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.,
   970 F.2d 273 (7th Cir. 1992) ....................................................................................... 15

Promatek Industries, Ltd. v. Equitrac Corp.,
   300 F.3d 808 (7th Cir. 2002) ................................................................................. 12, 13

United States Polo Ass'n v. PRL USA Holdings, Inc.,
   800 F. Supp. 2d 515 (S.D.N.Y. 2011) ......................................................................... 13

Wabash Independent Oil Co. v. King & Wills Ins. Agency,
   248 Ill. App. 3d 719 (5th Dist. 1993) .......................................................................... 12

**I.      INTRODUCTION**

Playboy has filed an extraordinary motion which seeks to terminate Play Bev's License Agreement and to force the Defendants to liquidate a business that they have spent years building from scratch. Playboy brings this motion knowing that Play Bev and CBC have already sued in Illinois state court to enjoin Playboy from terminating the License Agreement based upon Playboy's misconduct and prior agreement to extend the license. Playboy, however, refuses to address the merits of the state court lawsuit, and instead, is asking this Court to shut down the Defendants' business based upon an incomplete and self-serving presentation of the facts. Playboy's motion is procedurally and substantively flawed, and should be denied for the following reasons:

First, Playboy's claims should be dismissed or stayed until the earlier-filed state court action is resolved. As discussed in the accompanying motion to dismiss, Play Bev and CBC have already sued Playboy for injunctive relief in state court in order to prevent the improper termination of the License Agreement. Although Playboy contends that the License Agreement has been terminated, the Defendants contend that it remains in effect and that they are authorized to continue using the licensed mark. The state court has already invested significant time and resources in understanding the complicated factual and procedural history underlying this dispute, and will necessarily need to decide whether the License Agreement remains in effect in order to resolve the parties' competing claims. Playboy's complaint creates a substantial risk of inconsistent judgments and will waste significant judicial resources by requiring two different courts to analyze the parties' License Agreement, course of conduct, and rights under Illinois law. Accordingly, this Court should dismiss or stay Playboy's claims since another court has already obtained jurisdiction to resolve the underlying factual dispute.

Second, Playboy has failed to meet its heavy burden of demonstrating that a preliminary injunction is warranted. Although Playboy attempts to characterize the Defendants as a "holdover" licensee, this is not the case. Rather, this is a situation in which Playboy tortiously interfered with the Defendants' distribution network and revenue stream in order to manufacture

an alleged breach of the License Agreement so that it could steal the Defendants' business. Defendants contend that the License Agreement was renewed and that Playboy has an obligation to honor that commitment. Playboy has failed to inform the Court of the voluminous facts that establish its obligation to continue the License Agreement, its prior material breach of the License Agreement, its interference with Play Bev and CBC's distribution network, and its waiver of Play Bev's monetary requirements under the License Agreement. In other words, there are two very different sides to this story and Playboy is not likely to prevail at trial once all facts and relevant evidence are presented.

Third, Playboy has not identified any irreparable harm that will be incurred if Play Bev and CBC are allowed to continue operating under the License Agreement. The Defendants have continued to use the licensed marks for almost two years while this dispute has been pending. Playboy has not identified <u>any</u> misuse of the marks that would justify a drastic change from the status quo, and in fact, will concede that Play Bev and CBC have built a substantial market for the Playboy Energy Drink in spite of Playboy's conduct. Playboy's sole complaint is that it believes that the Defendants have not paid a sufficient amount of funds to utilize the license – this alleged harm can be addressed through money damages and payment of disputed royalties. It is not irreparable in nature.

Finally, the balance of harms and public interest weigh in favor of denying Playboy's request for a preliminary injunction. The Defendants' business will be completely devastated if an injunction is entered. Play Bev and CBC's entire business operations are dedicated to the production and marketing of the Playboy Energy Drink. If the license is terminated, the companies will be forced to disassociate with the Playboy brand, to shut down their operations, and to surrender their inventory and assets to Playboy. More importantly, the companies will be forced to lay-off over 70 employees and to terminate relationships with approximately 30 vendors who rely upon the Defendants' ongoing business. There is no way to undo the harm that an injunction would cause to the Defendants, their employees, or distribution network, and Playboy's motion should be denied.

## II. STATEMENT OF FACTS

### A. The Development of the Playboy Energy Drink.

This case is part of a larger, ongoing commercial dispute that has been pending for close to two years. Play Bev and CBC are engaged in the business of manufacturing, selling, promoting, and distributing a non-alcoholic energy drink known as the Playboy Energy Drink. Play Bev and CBC market their product in certain territories under a License Agreement between Play Bev and Playboy dated November 1, 2006. Play Bev, in turn, has granted certain manufacturing and distribution rights under the License Agreement to CBC, pursuant to an Amended and Restated Exclusive Manufacturing, Marketing and Distribution Agreement that was approved by Playboy. See Declaration of I. Hawatmeh at ¶¶ 2-3.

Play Bev and CBC have invested significant funds and resources into developing and promoting the Playboy Energy Drink. The two companies literally started their business from scratch, as Playboy did not have any other energy drinks on the market at the time the License Agreement was entered into and did not have any established networks to manufacture or distribute a beverage product. Play Bev and CBC formulated their product from a proprietary blend of ingredients, obtained the necessary government approvals to manufacture and sell the product across international markets, and recruited international distributors to manufacture, promote, and sell the product in several different countries. Id. at ¶ 4.

In contrast, Playboy has not contributed any money towards the development of the Playboy Energy Drink. Although Playboy is paid a significant license fee in exchange for the use of its trademark and name, it does not contribute any resources to the actual manufacturing or marketing of the product. Play Bev and CBC must pay Playboy for use of the bunny costumes, models, and sponsorships used in advertising the product, and must also donate the product for Playboy events. If it does not donate the product, then Playboy frequently serves competing products (such as the Red Bull energy drink) at its events. Id. at ¶ 6.

Play Bev and CBC have developed expansive distribution channels to distribute, market, and sell the Playboy Energy Drink. During the last four years, Play Bev and CBC have successfully grown their network to a point where they have launched the product into more than

3

30 countries and have obtained distributors for more than 80 countries. Play Bev and CBC have sought and obtained Playboy's approval to contract with each of its distributors for purposes of promoting and selling the Playboy Energy Drink, and have provided copies of each distributor's contract to Playboy prior to entering into any agreements with a sub-distributor. Id. at ¶¶ 5, 7.

### B.  Playboy's Extension of the License Agreement and Waiver of Certain Monetary Requirements.

The License Agreement provides that the agreement would be effective for up to twenty years, beginning with an initial five year term and renewing for three additional five-year terms thereafter. See License Agreement (Hawatmeh Decl. Ex. A) at § 1(b). The License Agreement also provides that Play Bev was to pay Playboy a guaranteed royalty and achieve a certain amount of "minimum net sales" for each license year.

Play Bev and CBC relied upon the long-term nature of the license in developing their business, as they were required to invest significant funds in order to develop and promote the product. See Hawatmeh Decl. at ¶ 9. In addition, many of Play Bev and CBC's sub-distributors have requested long-term agreements in order to protect their financial investment in the product. Id. Playboy is aware that the distributors were requesting agreements that extended beyond the duration of the initial five-year license term and has periodically provided letters of assurance to assist Play Bev and CBC in negotiating long-term relationships with their distributors. Id. at ¶¶ 10-11 and Ex. D.

Play Bev did not achieve its minimum net sales targets during its initial license term, and was expressly excused from this obligation. In particular, Playboy represented to Play Bev that the minimum net sales provision would not be invoked because Play Bev had made significant progress in developing the market for the Playboy Energy Drink by expanding its distribution territory and revenues. Id. at ¶ 12. Accordingly, Playboy did not declare Play Bev to be in default, and instead, rewarded Play Bev with an expanded territory through amendments to the Licensing Agreement in 2009, 2010, and 2011. Playboy also issued additional letters of assurance which represented that Play Bev's license was in good standing. Id. at ¶ 13-14.

4

In March 2011, Playboy specifically agreed to renew the License Agreement and to accept quarterly payments of the guaranteed royalty fee. Among other things, Playboy Senior Executive Sarah Haney represented to Play Bev's representatives in a meeting taking place in Las Vegas, Nevada that: (i) Playboy intended to renew the license prior to the expiration of the initial term; (ii) Playboy would accept quarterly payments of guaranteed royalties; and (iii) the minimum net sales target would never be an issue from Playboy's perspective as long as Play Bev continued to develop its Territory and expand the distribution network. Id. at ¶ 15. Ms. Haney then confirmed Playboy's commitment to renew the license and to accept quarterly payments in writing in an email dated March 23, 2011 in which she stated:

<u>We'll issue the renewal documentation with quarterly payment schedule</u>. See Hawatmeh Decl. Ex. E. (emphasis added); see also Haney Deposition Proffer.

### C. Playboy's Failure to Honor its Agreement and Attempts to Steal Play Bev and CBC's Business.

Unfortunately, Playboy abruptly changed its business practices when a new management team took over in the spring of 2011. On April 1, 2011, Ms. Haney sent an email to Play Bev in which she reneged on Playboy's prior agreement to accept quarterly license payments and demanded the full $2 million guaranteed royalty owing under the agreement. See Hawatmeh Decl. Ex. F. Playboy's demand came as a complete shock to Play Bev, which had relied upon the renewal and agreed-upon quarterly payment structure in collecting funds from sub-distributors and investors. Id. at ¶ 18.

Unbeknownst to Play Bev, Playboy's management had already decided that it would not renew its License Agreement with Play Bev because it was working towards securing an alternative licensee to take over the Defendants' distribution network. Playboy also began working with Jimmy Esebag and Ron Coopersmith (both of whom were under contract with Play Bev) in order to recruit an alternative licensee. Id. at ¶ 19. Playboy, however, did not disclose its intent to terminate to Play Bev or CBC, but instead, continued to demand pre-payment of future royalties through April 2012. See Benevento Decl. Ex. A.

5

By April of 2011, Mr. Esebag secretly reported to Playboy that he had located two potential alternative licensees to replace Play Bev as the exclusive licensee for the Playboy Energy Drink: (i) an entity located in the United Kingdom known as Redi FZE, which was an active distributor of CBC and subject to a non-circumvention agreement; and (ii) an unknown group of individuals who were referred to internally by Mr. Esebag and Playboy as "the Russians." See Benevento Decl. Exs. B-C. Playboy did not disclose to Play Bev that it had entered into negotiations with these replacement licensees, and in fact, continued to encourage Play Bev to invest additional funds and resources into its distribution network. Indeed, internal e-mails between Playboy representatives confirm that Playboy was simultaneously encouraging Play Bev to make the guaranteed royalty payment to secure its license through April 2012 even though Playboy had already authorized Mr. Esebag to proceed forward with the Russian group. One email states:

> I am going to send Iehab an email putting him on notice that despite his proposed payment schedule, we require $2m MG payment that was due 4/1 by noon on Tuesday. If he comes through, great. If he doesn't (and nobody thinks he will) we can either terminate or if Jimmy's deal falls through offer him some sort of extension.

See Benevento Decl. Ex. D.

Likewise, Playboy executives Alex Vaickus and Judy Kawal's emails state:

> I would only agree to the first two payments, and keep the remainder due on or about May 6th. During that time frame, we can assess the reality of the Russians.
> \*\*\*
> I understand Iehab is with Jimmy today. Maybe call him and see what we can get from him. :)

Id. at Exs. E-F.

According to Playboy e-mails authored in May 2011, Playboy was interested in Mr. Esebag's alternative licensees because at least one of the groups was willing to pay a larger guaranteed royalty payment than that provided by Play Bev under the License Agreement. Among other things, Playboy's emails state:

> *Mr. Grindel to Ms. Haney*:
> I am confused … Is there another Player that is interested in the Product Category, or why is Jimmy so eager to default Play Bev – isn't this his deal?

6

> *Ms. Haney to Mr. Grindel*:
> Yes – Play Bev is his deal but he also has a group that's prepared to spend $5m/year in MG (vs. Play Bev's $2m). He's angling to terminate in favor of this other group.

Id. at Ex. G.

Significantly, Playboy's emails also make clear that Playboy planned to declare Play Bev in default <u>even if it paid the $1.8 million that Playboy had demanded</u>. Emails authored by Ms. Haney and Mr. Esebag outline this strategy as follows:

> *From Ms. Haney*:
> In order to terminate Play Bev immediately we'll need a sales report. Otherwise we have to default them and give them 10 days to cure by paying the $1.8 m they owe. My suggestion would be to tell the british guys that we want to move forward with them and will need 2 weeks to run credit and security once they provide their company info.
> \*\*\*
> *Mr. Esebag to Ms. Haney*:
> So if he cure we [expletive] right?
>
> *Mr. Haney to Mr. Esebag*:
> Yes. Doesn't seem very likely though.
>
> *Mr. Esebag to Ms. Haney*:
> Is there any other way??? Like minimum sale.

Id. at Exs. H-I.

### D.   Playboy Interferes with the Defendants' Distribution Network and Ability to Perform Under the Modified Payment Schedule.

By May 2011, Playboy had entered into formal negotiations with Redi FZE, one of CBC's British distributors, in order to have Redi FZE replace Play Bev as the exclusive licensee for the Playboy Energy Drink. Playboy's negotiations with Redi FZE were also facilitated by Messrs. Esebag and Coopersmith, who remained under contract with Play Bev. Id. at Ex. J.

Importantly, Playboy, Redi FZE, Esebag, and Coopersmith <u>all knew and understood</u> that Redi FZE was still under contract at the time of their negotiations and knew that Redi FZE's distribution contract contained a non-circumvention provision which prohibited this activity. Moreover, both Playboy and Redi FZE knew that it was actionable for Redi FZE and Playboy to enter into negotiations while the License Agreement remained in effect. An internal email

7

authored by Playboy representative Judy Kawal to executives Markus Grindel, Ana Cashman, and Jennifer Kelly on May 23, 2011 acknowledges the legal risk as follows:

> I just spoke with Redi Fze who advised their lawyer in the US will not allow them to execute the NDA [Non-Disclosure Agreement] until we have terminated the contract with Play Beverages because it is considered torturous (?) and Play Bev could sue everyone. Is this true?

Id. at Ex. K. Playboy and Redi FZE, however, commenced negotiations anyway and began exchanging draft license agreements on May 26, 2011 – just three days after Redi FZE's counsel had warned them that such conduct would be tortious. Id. at Ex. L.

Playboy anticipated that Redi FZE would take over the expansive distribution network that had been constructed by Play Bev and CBC from scratch, and in fact, encouraged Redi FZE to do so. In an e-mail exchange between Redi FZE's counsel and Playboy executive Judy Kawal dated June 1, 2011, Ms. Kawal aptly stated in all capital letters:

> AS ADVISED, THE TERMINATION OF THE PLAY BEVERAGES AGREEMENT WILL OCCUR UPON CONFIRMATION FROM YOUR CLIENT THAT THEY ARE IN A POSITION TO FINALIZE THE AGREEMENT WITH PLAYBOY.
> \*\*\*
> AS PLAYBOY IS NOT A PARTY TO THE DISTRIBUTION AGREEMENTS BETWEEN PLAY BEVERAGES AND ITS DISTRIBUTORS (AS YOU ARE AWARE SINCE YOUR CLIENT IS THEIR CURRENT UK DISTRIBUTOR), WE ARE NOT PRIVY TO THE LANGUAGE IN THOSE AGREEMENTS. WE CAN REQUIRE THEM TO IMMEDIATELY TERMINATE THEIR EXISTING AGREEMENTS AND WE CAN PROVIDE YOUR CLIENT WITH THE CONTACT INFORMATION SO THAT THEY CAN BE IN DIRECT CONTACT TO WORK OUT THEIR OWN ARRANGEMENT.

Id. at Ex. M.

Playboy is also believed to have been working closely with Redi FZE in order to assist that distributor in breaching its distribution contract. In particular, Playboy's correspondence suggests that Redi FZE's counsel had been in contact with Playboy representative Judy Kawal during the Spring of 2011 to solicit her cooperation in pursuing a lawsuit in Third District Court in Salt Lake County. Redi FZE then used Ms. Kawal's representations as a pretext for withholding approximately $1 million in royalty payments. See Hawatmeh Decl. at ¶ 21. Redi FZE's failure to make its required $1 million royalty payment was detrimental to Play Bev and CBC's business operations, since Redi FZE's payment was due at approximately the same time

8

as Play Bev's guaranteed royalty payment to Playboy. Consequently, Redi FZE's default directly compromised Play Bev's ability to meet its payment obligations to Playboy since it deprived Play Bev of the very funds that were allocated to the royalty payment. Id. CBC has since obtained a judgment against Redi FZE for the outstanding royalty and has terminated Redi FZE as a sub-distributor. Playboy, however, refuses to bring claims against Redi FZE for its unauthorized holdover use of the Playboy marks. Id. at ¶ 22.

Playboy also engaged in direct communications with distributors and sub-licensees for purposes of obstructing Play Bev and CBC's efforts to obtain royalties that were needed to satisfy monetary obligations to Playboy under the License Agreement. While the full extent of Playboy's activities are not yet known, internal Playboy correspondence demonstrates that Playboy had attempted to compile a worldwide list of international distributors in order to send notice to the distributors that Playboy would be declaring Play Bev in breach of its agreement. See Benevento Decl. Exs. N-O. In addition, Playboy actually sent a notice to distributors on July 14, 2011 in which it declared that Playboy was in the process of having the License Agreement terminated. Id. at Ex. P. Playboy also authorized Mr. Esebag to respond to inquiries from distributors, to hold himself out as an agent or representative of Playboy and to represent that he was "in charge of the Playboy Energy Drink License." See Hawatmeh Decl. at ¶ 24.

Playboy's communications were unsolicited and disrupted Play Bev and CBC's business operations and distributor network. At least one of South American distributor immediately began withholding payments, citing Mr. Esebag's statements as its basis for doing so. Other distributors subsequently followed suit, and have cancelled orders or refused to pay royalties as a result of the cloud over the product license. Id. at ¶ 25.

The initial term of the License Agreement expired on March 31, 2012. While Playboy refused to honor the renewal term of the License Agreement as it represented it would do, the parties have formally extended the License Agreement on two separate occasions in order to accommodate the negotiation of a new License Agreement. Play Bev has not excused Playboy

9

from its obligation to renew the License Agreement, and Play Bev and CBC have continued to use the Playboy marks throughout this time without incident. Id. at ¶ 26-27, 32.

Unfortunately, Playboy's effort to obstruct Play Bev and CBC's market development has not changed. In recent months, Playboy has refused to approve a number of marketing events that were critical to Play Bev's product development. Playboy is also actively supporting competing products, such as the Hell Energy Drink, Rockstar, and South Beach Energy Drink. Playboy has also refused to police its mark and has allowed terminated distributors such as Redi FZE to use the mark without paying royalties. Playboy's conduct has substantially compromised Play Bev and CBC's ability to recruit new distributors and has caused existing distributors to lose confidence in Playboy's commitment to the product and brand. Id. at ¶ 28.

### E. Play Bev and CBC's Illinois Lawsuit.

On October 15, 2012, Playboy provided written notice that it now considers the License Agreement to be expired and that Play Bev has no continuing license rights. Defendants dispute Playboy's position and contend that the License Agreement is a twenty-year agreement, and that Playboy was obligated to renew the second, five-year term of the agreement as previously represented. Playboy, however, will not participate in any further discussions. Id. at ¶ 29.

On October 25, 2012, Play Bev and CBC filed a lawsuit against Playboy and others in Illinois state court after receiving notice from Playboy that the License Agreement would not be renewed. Importantly, the Illinois lawsuit contains a claim for injunctive relief to prevent Playboy from terminating the license during the pendency of the lawsuit. The Illinois Complaint further alleges that Playboy has an obligation to renew the License Agreement in good faith and that Play Bev and CBC will be irreparably harmed if Playboy is allowed to terminate the agreement. See Illinois First Amended Complaint, (Benevento Decl. Ex. Q) at ¶¶ 58-60.

The termination of the License Agreement would completely devastate Play Bev and CBC's business and distribution networks. Play Bev and CBC were formed to market, manufacture and distribute the Playboy Energy Drink and all of its employees are dedicated to this purpose. If the license is terminated, the companies will become entirely disassociated from

the Playboy brand and will be forced to liquidate all of their product and operations, to lay off approximately 70 employees who have worked to develop and market the Playboy Energy Drink, and to terminate relationships with approximately 30 vendors. See Hawatmeh Decl. at ¶¶ 30-31. Play Bev and CBC have estimated that they would lose approximately $20 million to $25 million in lost profits over the next five years alone and that they would be exposed to collateral litigation from distributors and vendors who relied upon the long-term nature of the license agreement and Playboy's letters of assurance. Play Bev and CBC are unable to quantify the loss of goodwill and non-economic harm that will be incurred if the license is terminated. Id.

### III. ARGUMENT

#### A. Playboy's Claims Should be Dismissed or Stayed Until the Illinois State Court has an Opportunity to Decide the Underlying Facts.

This Court should dismiss or stay Playboy's complaint because the same substantive claims are already being litigated in an earlier-filed case pending in state court. As discussed above, Defendants previously sued Playboy for injunctive relief in order to prevent the improper termination of the Defendants' license. In order to resolve that dispute, the state court will necessarily need to decide whether the License Agreement remains in effect and whether the Defendants have an ongoing right to market the Playboy Energy Drink. Playboy's complaint creates a substantial risk of inconsistent judgments and will waste significant judicial resources by requiring two different courts to analyze the parties' License Agreement, the parties' course of conduct, and Defendants' rights under Illinois law. Accordingly, this Court should dismiss or stay Playboy's claims since another court has already obtained jurisdiction to resolve the predicate factual and legal issues in dispute. Defendants have filed a separate motion to dismiss Playboy's complaint which fully addresses the legal grounds for dismissal.

#### B. Playboy Has Not Met its Burden of Demonstrating that a Preliminary Injunction is Warranted.

Playboy's motion should further be denied because Playboy has failed to establish the necessary grounds for a preliminary injunction that would significantly and permanently alter the status quo. The federal courts have recognized that a preliminary injunction is "an extraordinary

remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Frerck v. John Wiley & Sons, Inc., 850 F. Supp. 2d 889, 891 (N.D. Ill. 2012) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). "A party seeking a preliminary injunction is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted." Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir. 2002). If the movant meets that standard, the court then also must consider whether the injunction would harm the enjoined party and/or the public. Id. In this instance, Playboy has not established any of these elements.

### 1. Playboy is Unlikely to Prevail on the Merits.

In its opening papers, Playboy contends that it is likely to prevail on the merits because the Defendants continue to use Playboy's marks after the expiration of the License Agreement. See Playboy's Motion at 10-11. This is not the case. Although Playboy contends that the License Agreement has terminated, Play Bev and CBC contend that the license remains in effect and that Playboy is prohibited from terminating the agreement in light of its prior representations and misconduct. Play Bev and CBC have previously sued in state court to enforce their ongoing right to use the trademarks, and there are significant factual disputes which prevent the Court from summarily concluding that Playboy will prevail at trial.

Simply stated, this is not a situation in which a holdover licensee has continued to use the mark after the expiration of an agreement. Rather, this is a case in which Playboy has tortiously interfered with the Defendants' license rights, distribution network, and revenue stream for purposes of manufacturing a breach of the License Agreement in order to declare the Defendants in default and take over the distribution network. Defendants further contend that Playboy had previously agreed – in writing – to renew the License Agreement for another term in an email authored by its Vice-President of Global Licensing.[1] Thus, there are significant issues of fact

---

[1] Illinois law allows a party to rely upon the statements of an agent who acted with apparent authority of the company, and Play Bev and CBC relied upon this agreement in developing their distribution network, in contracting with new distributors, and in investing in their product line. See Wabash Independent Oil Co. v. King & Wills Ins. Agency, 248 Ill. App. 3d 719, 723-24 (5th Dist. 1993) (finding principal liable for acts of apparent agent).

12

concerning whether the License Agreement remains in effect, whether Playboy is estopped from terminating in light of its prior representations and misconduct, and whether the Defendants' alleged breaches should be excused by Playboy's prior material breach of the parties' agreement.[2]

Under these circumstances, Playboy cannot demonstrate that it is likely to prevail at trial since there are significant factual disputes regarding the Defendants' ongoing right to use the licensed marks. Accordingly, the Court should deny Playboy's request for a preliminary injunction until the finder-of-fact has a full opportunity to hear all material evidence relevant to the parties' competing claims.

### 2. Playboy Will Not Be Irreparably Harmed by the Continuation of the License During the Pendency of the Litigation.

Playboy's motion should further be denied because it has not demonstrated irreparable harm. The Illinois federal courts have previously recognized that injunctive relief is an extraordinary remedy and that a party seeking an injunction must demonstrate that there is no adequate remedy at law if an injunction is not entered. Promatek, 300 F.3d at 811. More importantly, the federal courts have recently recognized that irreparable harm is no longer presumed in a trademark case even if the mark holder establishes a likelihood of success on the merits. Flava Works, Inc. v. Gunter, 689 F.3d 754, 755 (7th Cir. 2012) (citing eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006).[3] Instead, a plaintiff must still demonstrate that it cannot be compensated through money damages unless an injunction is entered.

Here, Playboy has not identified any reason why it would be irreparably harmed by Play Bev and CBC's routine use of the licensed mark while this litigation is pending. Play Bev and

---

[2] Under Illinois law, a party's prior material breach of a contract may excuse the injured party's performance and give rise to certain remedies." See, e.g., Mohanty v. St. John Heart Clinic, S.C., 866 N.E.2d 85, 95 (Ill. 2006) ("Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations.").

[3] See also Groupion, LLC v. Groupon, Inc., No. C 11-00870 JSW, 826 F. Supp. 2d 1156, 2011 U.S. Dist. LEXIS 136129, at *18-19 (N.D. Cal. Nov. 28, 2011) (in a trademark case, declining to apply presumption); United States Polo Ass'n v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (concluding that "the presumption of irreparable injury in trademark cases is no longer appropriate").

13

CBC have consistently used the mark for the last five years without incident and have continued to promote and develop the Playboy Energy Drink brand through the duration of their license. Playboy has not identified any misuse use of Playboy's marks that would dilute the marks from the perspective of the consuming public, and there cannot be any dilution since there are no other distributors that rely upon the mark to market a Playboy-branded energy drink. Instead, Playboy's harm is strictly monetary in nature – it alleges that Play Bev has failed to pay the full amounts owing under the license agreement and the license should be terminated as a result. This dispute can be addressed by economic damages or payment of disputed royalties.

Moreover, Playboy has not identified any imminent injury that would require extraordinary relief at this late juncture. Playboy is claiming that Play Bev has been in monetary default under the License Agreement for over two years, yet it has never taken <u>any</u> action during that time to stop Play Bev or CBC's ongoing use of the license. Although Play Bev and CBC acknowledge that Play Bev was in bankruptcy reorganization for a period of time, CBC has <u>never</u> been in bankruptcy and Playboy could have moved to enjoin its ongoing use of the trademark. Likewise, Playboy is a named beneficiary under CBC's sub-distribution agreements, and could have terminated any rogue sub-distributor at any time. Playboy, however, did not do so because it is financially benefitted from Play Bev and CBC's ongoing development of the product distribution network and brand.

Nothing has changed between the parties during the last two years that would require an abrupt termination of the license or deviation from the status quo. Playboy can be adequately compensated through money damages for any alleged failure to pay, and Play Bev and CBC will continue to use the trademark consistently with their practices over the last two years. Thus, Playboy has failed to establish this necessary element.

> **3. The Balance of Harms and Public Interest Weigh Against the Issuance of an Injunction.**

For similar reasons, the balance of harms and public policy disfavor an injunction. If the License Agreement is terminated, it will completely devastate Play Bev and CBC's businesses.

Play Bev and CBC were formed to market, manufacture and distribute the Playboy Energy Drink and all of their employees are dedicated to this purpose. If the license is terminated, the companies will become entirely disassociated from the Playboy brand, will be forced to liquidate all of their product and operations, and will be forced to lay off the employees who have worked to develop and market the Playboy Energy Drink. The companies will also be exposed to collateral litigation from sub-distributors and vendors who relied upon the long-term duration of the license and Playboy's stated intent to renew in entering into their contracts. In short, Play Bev and CBC's businesses will end if the License Agreement is terminated.

In contrast, the harm to Playboy will be minimal if the license is continued during the pendency of the parties' litigation. Playboy does not contribute any resources to the manufacturing or marketing of the Playboy Energy Drink, and its sole contribution to this business relationship is to sell its mark in exchange for a significant fee. Play Bev and CBC were fully prepared to comply with their agreement prior to Playboy's interference and do not intend to deviate from their past use of the mark. Accordingly, the Court should <u>maintain</u> the status quo while this lawsuit is pending, and deny Playboy's request for a preliminary injunction.

Finally, public policy weighs against the entry of a preliminary injunction. Equitable remedies, such as a preliminary injunction, are not available to a party that acts with unclean hands. <u>See</u> <u>Original Great Amer. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.</u>, 970 F.2d 273, 282 (7th Cir. 1992) (reversing preliminary injunction in favor of a party with unclean hands). In this case, Playboy has obstructed the Defendants' ability to perform under the License Agreement by intentionally interfering with the Defendants' distribution network and anticipated revenue stream. Playboy should not be allowed to benefit from its wrongful conduct, and should not be permitted to approach the Court in equity when it has acted in bad faith. As such, the request for an injunction should be denied.

## IV.     CONCLUSION

For the reasons set forth above, Defendants request that Playboy's motion for preliminary injunction be denied. In the event the Court is inclined to consider injunctive relief, the

Defendants request an evidentiary hearing in order to present evidence concerning their ongoing right to use the licensed marks.

Dated: March 5, 2013

Respectfully submitted,

PLAY BEVERAGES, LLC, CIRTRAN BEVERAGE CORPORATION, and CIRTRAN CORPORATION

By: _____
One of Their Attorneys

Michael P. Conway
Patrick Castle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
(312) 704-7700

Bryon J. Benevento (*pro hac vice* pending)
Kimberly Neville (*pro hac vice* pending)
DORSEY & WHITNEY LLP
Kearns Building
136 South Main Street
Suite 1000
Salt Lake City, UT 84101-1685
(801) 933-7360

## CERTIFICATE OF SERVICE

I, Michael P. Conway, an attorney, hereby certify that on March 5, 2013, I caused a true and complete copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** to be served by Electronic Mail Transmission via ECF as to Filing Users upon the following:

>M. David Weisman
>Mpoli Simwanza-Johnson
>KATTEN MUCHIN ROSENMAN LLP
>525 West Monroe Street
>Chicago, IL 60661
>(312) 902-5200
>david.Weisman@kattenlaw.com
>msjohnson@kattenlaw.com

>Melissa Caren Rose Mclaughlin
>Richard James Frey
>Venable LLP
>2049 Century Park East
>Suite 2100
>Los Angeles, CA 90067
>(310) 229-9900
>mcmclaughlin@venable.com
>rfrey@venable.com

>s/ Michael P. Conway
>Michael P. Conway