**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., a Delaware corporation, ) ) ) Plaintiff, ) ) vs. ) ) PLAY BEVERAGES, LLC, a Delaware limited ) liability company; CIRTRAN BEVERAGE ) CORPORATION, a Utah corporation, and ) CIRTRAN CORPORATION, a Nevada ) corporation, ) ) Defendants. ) | Case No. 13 CV 00826 Judge Robert W. Gettleman |

**DECLARATION OF IEHAB HAWATMEH SUBMITTED IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Iehab Hawatmeh, declare under penalty of perjury as follows

1.  I am the Manager of Play Beverages, LLC ("PlayBev"), a defendant in this action. I am also the President of CirTran Beverages Corporation ("CBC") and CirTran Corporation, both of which are also defendants in this action. I have personal knowledge of the following facts set forth in this declaration, and if called to testify, I would competently testify to them:

2.  PlayBev and CBC are engaged solely in the business development of manufacturing, selling, promoting, and distributing the Playboy Energy Drink which is a non-alcoholic energy drink. The companies do not have any other business purpose. PlayBev and CBC exclusively and solely market the Playboy Energy Drink in certain enumerated territories under a License Agreement between PlayBev and Plaintiff Playboy International, Inc. ("Playboy") dated November 1, 2006, and several amendments thereto. A true and correct copy of the License Agreement is attached as Exhibit A.

3.  PlayBev has granted CBC the exclusive right to manufacture and distribute the Playboy Energy Drink throughout the world, pursuant to an Amended and Restated Exclusive Manufacturing, Marketing and Distribution Agreement. This exclusive arrangement was disclosed

to and approved by Playboy. A true and correct copy of the CBC's agreement is attached as Exhibit B.

4. PlayBev and CBC literally started the business from scratch. Playboy did not have any other energy drinks on the market and did not have any established networks to develop, manufacture or distribute a beverage product. PlayBev and CBC formulated the product from a proprietary blend of ingredients, obtained the necessary government approvals to manufacture and sell the product across a variety of domestic and international markets, and recruited distributors and sub-licensees throughout the world to manufacture, promote, and sell the product. These initial efforts took months to complete and required millions of dollars of capital and manpower.

5. Over the past five years, CBC has employed 20 of full time employees and over 50 of part time employees to develop, promote and market the energy drink. CBC has retained over 30 vendors to assist with the graphics, labeling, packaging, and marketing of product. Our international sub-licensees engage in similar efforts, which I periodically monitor as part of my managerial responsibilities.

6. Playboy has not contributed any money towards the development, manufacture or sale of the Playboy Energy Drink. Instead, its role is to review and supervise PlayBev's operations. Playboy is paid a significant license fee in exchange for the use of its trademark and name, but does not contribute to the manufacturing or marketing of the product. For example, PlayBev and CBC must pay Playboy for use of the bunny costumes, models, sponsorships and the like. We must also donate product to Playboy in order for Playboy representatives to even serve it at events hosted by Playboy, including events at the Playboy mansion. If Play Bev and CBC do not donate the product, then Playboy serves a competing energy drink (such as Red Bull) at its events. Playboy's support of competing products is well-documented in various photographs and web images, and is regular source of frustration for our sub-licensees.

7. PlayBev and CBC have developed expansive distribution channels to distribute, market, and sell the Playboy Energy Drink. They have also developed dozens of point of sale

(POS) merchandise including signs, posters, coasters, neon lights, branded refrigerators, tee-shirts, cigarette lighters and the like. A true and correct copy of the POS brochure is attached as Exhibit C. During the last five years, PlayBev and CBC have successfully grown our network to a point where we have launched the product into more than 30 countries and have obtained distributors for more than 80 countries.

8. The License Agreement provides that the agreement would be effective for up to twenty years, beginning with an initial five year term and renewing for three additional five-year terms thereafter. PlayBev and CBC have relied upon the long-term nature of the license in promoting our product and developing our distribution network.

9. Our distributors must invest a significant amount of time and resources into product marketing and development before they can actually turn a profit. In other words, our distributors cannot just simply place the Playboy Energy Drink on the shelves in a particular country. Rather, PlayBev and CBC must work cooperatively to identify an appropriate distributor, negotiate a distribution agreement, work with local governments and regulatory officials to ensure that the product's formulation and labeling comply with any unique regulatory requirements (such as limits on the amount of caffeine or other manufacturing issues), conduct market research, and advertise and promote the product. Again, these efforts are undertaken by PlayBev and CBC. They are not done by Playboy.

10. Because of the amount of resources and time involved in bringing the product to market, PlayBev and CBC, as well as our distributors, have typically asked for a long-term agreement in order to protect our investment in the product.

11. Playboy is aware that many of our distributors were requesting agreements that extended beyond the duration of PlayBev's initial five-year license term. I have discussed this issue with Sarah Haney, Playboy's former Vice-President of Global Licensing, on numerous occasions, and she has periodically provided me with letters of assurance and good standing to assist PlayBev and CBC in negotiating long-term relationships with our distributors. True and correct copies of representative examples of these letters of assurance and good standing are

attached as Exhibit D. The manufacturing, distribution and sub-distribution agreements are provided to Playboy for approval, and they contain terms that exceed the initial five year period.

12. The License Agreement provides that PlayBev must pay Playboy a minimum guaranteed royalty and achieve a certain amount of "minimum net sales" for each license year. Despite our best efforts, PlayBev did not achieve its minimum net sales targets although we came extremely close in the fourth year.

13. The minimum net sales provision has never been a market penetration clause. Rather, it was a mechanism for Playboy to capture additional revenue if PlayBev is successful in making sales that exceed the minimum guaranteed royalty. Consequently, Playboy did not declare PlayBev to be in default, and did not seek to terminate the License Agreement for failure to meet minimum net sales. Instead, Playboy represented to me that the minimum net sales provision would not be invoked because Playboy appreciated that PlayBev had made significant progress in developing the market for the Playboy Energy Drink in that it had expanded its distribution territory and revenues.

14. Playboy also agreed to expand PlayBev's territory through subsequent amendments to the Licensing Agreement in 2009, 2010, and 2011, even though PlayBev had failed to achieve its minimum net sales targets. The terms of these agreements also exceeded the initial five-year term under the License Agreement and contemplate sales activity for many years to come.

15. In March 2011, Playboy's Senior Vice-President of Global Licensing, Sarah Haney, met with me and two other PlayBev representatives in Las Vegas, Nevada for purposes of discussing the renewal and modification of the License Agreement. During this meeting, Ms. Haney represented that: (i) Playboy would renew the license for another five years; (ii) Playboy would accept quarterly payments of guaranteed royalties; and (iii) the minimum net sales target would never be an issue from Playboy's perspective as long as continued to develop its Territory and expand its distribution network.

16. Ms. Haney later confirmed Playboy's commitment to renew the license and to accept quarterly payments in writing in an email to me dated March 23, 2011. A true and correct copy of this email is attached as Exhibit E.

17. Although Playboy worked cooperatively with PlayBev for four years to allow PlayBev to develop and market the Playboy Energy Drink Product line, Playboy abruptly changed its practices when a new management team took over in the spring of 2011. On April 1, 2011, Ms. Haney sent me an email in which she attempted to renege on Playboy's prior agreement to accept quarterly license payments and demanded the immediate full $2 million advanced payment of the guaranteed royalty. A true and correct copy of Ms. Haney's April 1, 2011 email is attached as Exhibit F.

18. This e-mail was a complete surprise to me. PlayBev had relied upon the renewal and agreed-upon quarterly payment structure in collecting funds from sub-distributors and investors, as well as growing the business in the territories recently granted to PlayBev by Playboy.

19. During the course of our litigation with Playboy, I have since learned that Playboy's management had begun working with Jimmy Esebag and Ron Coopersmith during the spring of 2011 in order to replace PlayBev as the exclusive licensee for the Playboy Energy Drink. At the time Playboy was engaged in this conduct, both Mr. Esebag and Mr. Coopersmith were under contract with PlayBev and were being compensated by PlayBev to provide assistance in promoting our products and distribution network. Thus, any activity by Mr. Esebag or Mr. Coopersmith to assist a competitor would have been a violation of their contracts.

20. During the course of our litigation, I have also learned that Playboy was considering a company known as Redi FZE as potential replacement for PlayBev. At the time of these communications, Redi FZE was an active distributor for CBC and was subject to a non-circumvention agreement.

21. In June 2011, Redi FZE informed me that it would not make its required $1 million royalty payment because our license was supposedly in bad standing. The timing of Redi FZE's default was detrimental to our entire business operations since Redi FZE's payment was due to

CBC at approximately the same time as PlayBev's minimum guaranteed royalty payment to Playboy. I intended to use Redi FZE's payment to pay Playboy for the license period running from April 2011 to March 2012. Consequently, Redi FZE's default compromised PlayBev's ability to meet its payment obligations to Playboy which I later learned was a direct result of Playboy's interference with our distribution.

22. CBC has obtained a default judgment against Redi FZE for the outstanding royalty and has terminated Redi FZE as a sub-distributor. I requested Playboy's assistance in stopping Redi FZE and other unauthorized companies from using the Playboy mark since Playboy has the unilateral right (and obligation) under the License Agreement to police its mark. Playboy, however, refused to bring claims against Redi FZE for unauthorized use of the Playboy marks and has also failed to take any action against other companies that are improperly using the Playboy mark in connection with competing energy drinks in the territories exclusively granted to PlayBev. This has been going on for over eighteen months, and it continues today. A true and correct copy of a representative example of an unauthorized use is attached hereto as Exhibit G.

23. On July 14, 2011, Playboy sent a notice to our distributors in which it declared that PlayBev was in breach of its agreement and that Playboy was in the process of having the License Agreement terminated. A copy of this notice is attached as Exhibit H.

24. Our distributors have also reported that Mr. Esebag is responding to their inquiries to Playboy, and that he is holding himself out as being "in charge of the Playboy Energy Drink License."

25. Playboy's communications were unsolicited and disruptive to our distributor network. Our South American distributor immediately began withholding payments, citing Mr. Esebag's statements as its basis for doing so. Other distributors have subsequently followed suit, and have cancelled orders or refused to pay royalties as a result of the cloud over our license, which has significantly impeded our cash flow. Consequently, I sought the protection of the U.S. Bankruptcy Court under Chapter 11 to help PlayBev reorganize its business and address the damages caused to its operations by Playboy.

26. The initial five year term of the twenty year License Agreement was up on March 31, 2012. While Playboy refused to honor its commitment to renew the License Agreement for the next five years as it represented it would do in March 2011, the parties formally extended the License Agreement on two separate occasions in order to accommodate the negotiation of a new License Agreement. PlayBev and CBC continued to use the Playboy marks throughout this time without incident or payment.

27. Although PlayBev believes its twenty year license is still valid and effective, it wanted to work with Playboy to reach a compromise of its claims while it restructured PlayBev under Chapter 11. To that end, Playboy and PlayBev negotiated a form of new license agreement in which PlayBev would have obtained the right to sell the energy drink for another five years for an upfront fee of $2 million. The arrangement was subject to the Bankruptcy Court and creditors' approval under Chapter 11. Unfortunately, that form of agreement would have substantially altered PlayBev's territories, product base, and other marketing rights, and was not acceptable to our investors in light of Playboy's past and present wrongful conduct. Additionally, certain unsecured creditors used the negotiations with Playboy as a basis to leverage additional concessions against PlayBev. These concessions would have added an additional $7.5 million of debt to PlayBev. Consequently the proposed new License Agreement was withdrawn.

28. Playboy's effort to obstruct PlayBev and CBC's market development has not changed. In recent months, Playboy has refused to approve a number of marketing events and promotions that were critical to our product development. Playboy is also actively supporting competing products, such as the Hell Energy Drink, Rockstar Energy Drink, and South Beach Energy Drink.

29. On October 15, 2012, Playboy provided written notice that it now considers the License Agreement to be expired and that PlayBev has no continuing license rights. Playboy has

7

refused to negotiate any further extensions of the License Agreement or to accept $500,000 quarterly payments for the right to use the mark. It has also refused to engage in any further negotiations with PlayBev.

30. Playboy seeks an order that would essentially terminate the License Agreement. Termination of the License Agreement would completely devastate our business. PlayBev and CBC were formed to market, manufacture and distribute the Playboy Energy Drink, and all our employees are dedicated to this purpose. If our license is terminated, we will be entirely disassociated from the Playboy brand and will be forced to liquidate all of our product and operations, and to lay off all of our employees who have worked to develop and market the Playboy Energy Drink. In contrast, Playboy will end up with all the rights to the energy drink, including the formulation, labeling, trade dress, goodwill, distribution channels and other property even though it has not paid a penny to develop, create or maintain any of the assets.

31. PlayBev and CBC had projected at least $20 million to $25 million in profits over the next five years from sales of the Playboy Energy Drink. If the license is terminated, we will have no opportunity to recoup our investment in the business and will likely be exposed to collateral litigation from distributors and vendors who relied upon the long-term nature of the license agreement and Playboy's letters of assurance.

32. PlayBev believes that its License Agreement has been renewed. However, PlayBev is reluctant to tender additional funds to Playboy in light of Playboy's public statements that the license has been terminated. PlayBev is prepared to deposit the quarterly royalty payments into the Court until the parties' resolve their legal differences.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of March, 2013 at Salt Lake City, Utah.

_____

Iehab Hawatmeh

**CERTIFICATE OF SERVICE**

I, Michael P. Conway, an attorney, hereby certify that on March 5, 2013, I caused a true and complete copy of the foregoing **DECLARATION OF IEHAB HAWATMEH SUBMITTED IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** to be served by Electronic Mail Transmission via ECF as to Filing Users upon the following:

> M. David Weisman
> Mpoli Simwanza-Johnson
> KATTEN MUCHIN ROSENMAN LLP
> 525 West Monroe Street
> Chicago, IL 60661
> (312) 902-5200
> david.Weisman@kattenlaw.com
> msjohnson@kattenlaw.com
>
> Melissa Caren Rose Mclaughlin
> Richard James Frey
> Venable LLP
> 2049 Century Park East
> Suite 2100
> Los Angeles, CA 90067
> (310) 229-9900
> mcmclaughlin@venable.com
> rfrey@venable.com

                                           s/ Michael P. Conway
                                           Michael P. Conway