# EXHIBIT A



## INDEX TO PLAY BEVERAGES, LLC
## PRODUCT LICENSE AGREEMENT

**THE SCHEDULE**

PARAGRAPH                                                                    PAGE NO.

1.   GRANT OF LICENSE
     a.   Grant                                                               6 - 9
     b.   Term                                                                9 - 10
     c.   License Year and License Quarter                                    10
     d.   Territory                                                           10
     e.   Minimum Net Sales                                                   10 - 11

2.   COVENANTS OF LICENSEE
     a.   Use                                                                 11 - 12
     b.   Best Efforts
          (i)    Maintaining Goodwill                                         12
          (ii)   Distribution Channels                                       12
     c.   Royalties
          (i)    Guaranteed Royalties                                        12 - 13
          (ii)   Earned Royalties                                           13
          (iii)  Interest                                                     13
          (iv)   Letter of Credit                                            13
     d.   Statements and Payments                                            13 - 14
     e.   Records and Audit                                                   14 - 15
     f.   Expenses of Conducting Examinations                                15
     g.   Product Quality                                                    15
     h.   Approval of Products and the Materials                             15 - 17
     i.   Title and Protection and Preservation
          of the Playboy Properties                                          17 - 18
     j.   Right to Subcontract, Licensee Financial Statements
          and Lists of Sources and Accounts                                  18 - 19
     k.   Inventory                                                          19
     l.   Playboy Properties and Non-Competitive Brands                      19 - 20
     m.   Indemnification and Product
          Liability Insurance                                                20 - 21
     n.   Advertising Expenditures, Advertising Plans and Public Relations   21 - 22

3.   ADDITIONAL COVENANTS OF THE PARTIES
     a.   Reservation of Rights                                              22
     b.   Certain Sales                                                      22

4.   TITLE AND PROTECTION
     a.   Indemnification by Licensor                                        22 - 23
     b.   Enforcement                                                        23

5.   RELATIONSHIP BETWEEN THE PARTIES
     a.   No Joint Venture                                                   23
     b.   Assignment                                                         23 - 24

INDEX TO PLAY BEVERAGES, LLC
PRODUCT LICENSE AGREEMENT

(Continued)

| | | | |
|---|---|---|---|
| 6. | SUBLICENSING | | 24 |
| 7. | DEFAULTS AND RIGHTS OF TERMINATION | | |
| | a. | Defaults and Right to Cure | 24 |
| | b. | Bankruptcy or Assignment for Creditors, Business Discontinuance | 24 - 25 |
| | c. | Loss of Trademark Rights | 25 |
| | d. | Qualified Auditor's Report | 25 |
| | e. | Cross-Default | 25 |
| 8. | EXPIRATION OR TERMINATION | | |
| | a. | Effect of Expiration or Termination | 25 |
| | b. | Reserved Rights | 25 |
| | c. | Continued Sales After Expiration or Termination | 25 - 26 |
| | d. | Inventory After Expiration or Termination | 26 |
| | e. | Equitable Relief and Legal Fees | 26 - 27 |
| | f. | Termination Fee | 27 |
| 9. | NOTICES | | |
| | a. | Effectiveness | 27 |
| | b. | Address Change | 28 |
| 10. | CONFIDENTIAL INFORMATION | | 28 |
| 11. | SEVERABILITY | | 28 |
| 12. | CONSENTS AND APPROVALS | | 28 |
| 13. | APPLICABLE LAW | | 28 |
| 14. | NO BROKER | | 29 |
| 15. | CONSTRUCTION | | 29 |
| 16. | SURVIVABILITY | | 29 |
| 17. | RIGHTS CUMULATIVE | | 29 |
| 18. | ENTIRE AGREEMENT | | 29 |

THE SCHEDULE referred to in the Agreement made as of November 1, 2006.

S.1.    LICENSOR:    PLAYBOY ENTERPRISES INTERNATIONAL, INC.
    680 North Lake Shore Drive
    Chicago, IL 60611

S.2.    LICENSEE:    PLAY BEVERAGES, LLC
    c/o Goldring, Hertz and Lichtenstein
    450 Roxbury, 8th Floor
    Beverly Hills, CA 90210
    Contact:    Mr. Ken Hertz
    Telephone:    310 248 3107
    Email:    ken@ghlh.com

S.3.    THE TRADEMARKS:

    PLAYBOY and RABBIT HEAD DESIGN (as depicted in Exhibit A attached hereto and
    made a part hereof).

    THE IMAGES:

    Certain images from Licensor's art and photo archives, which are approved in advance in
    writing by Licensor on a case-by-case basis. Although Licensee may submit to Licensor
    its request to use certain images, the specific images to be added to the Agreement will
    be granted in Licensor's sole discretion, based on appropriateness for the Products,
    Licensor's current strategic or business plan and availability of rights.

S.4.    THE TYPE OF LICENSE:

    Exclusive, except as set forth in Paragraph S.5. below and Paragraph 1.a.(iii) of the
    Agreement.

S.5.    THE USE OF THE PLAYBOY PROPERTIES:

    Design, manufacture, advertise, promote, sell and distribute the Products (either directly
    itself or through distributors) to or through: (i) Playboy-branded retail stores, which rights
    shall be non-exclusive and subject to the provisions of Paragraph 1.a.(iii)(c) and
    Paragraph 1.a.(iv) of the Agreement, mass retail stores, supermarkets, convenient
    stores, wholesale retail outlets such as Costco, discount beverage outlets and specialty
    stores (i.e. physical stores) located in the Territory (which may or may not have their own
    "E-Commerce Web Site" (as such term is defined in Paragraph 1.a.(iii) of the
    Agreement)); (ii) non-Playboy branded catalogs; (iii) "E-tailers" (as such term is
    hereinafter defined) which will promote the availability of the Products via such E-tailers'
    E-commerce Web Sites and which will fulfill orders for the Products placed through such
    E-commerce Web Sites to, and only to, those addresses located in the Territory; and (iv)
    an E-commerce Web Site owned or controlled by either Licensee or any such distributor
    which will promote the availability of the Products via such E-commerce Web Site and
    which will fulfill orders for the Products placed through such E-commerce Web Site to,
    and only to, those addresses located in the Territory. "E-tailers" shall mean any entity
    engaged in the promotion and sale of the Products whose primary means of promotion,
    sale or distribution of the Products is via an E-commerce Web Site. All rights granted
    under the License shall be subject to the terms and conditions of the E-commerce
    Guidelines attached hereto as Exhibit B and made a part hereof. In the event Licensee,
    or any affiliated or third-party distributor of Licensee's, fails to adhere to the terms and

Case 11-26046 Doc 22-2 Document 21-1 Filed 07/01/11 Entered 07/01/11 16:24:01 Desc Exhibit
A   Part 2   Page 6 of 28   Page 43 of 50   Page ID #:302

Case 11-26046   Doc 16-1   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
Exhibit 1   pt. 1   Page 5 of 27

conditions of the E-commerce Guidelines, Licensor may deem such failure to be an incurable default under the terms and conditions of the Agreement. Licensee may not sell and distribute the Products to or through duty-free outlets as duty-free avenues of distribution are not included in the definition of such physical stores.

S.6.     THE PRODUCTS:

Non-alcoholic energy drinks and water. Additional products may be added as Products under this Paragraph S.6. only upon Licensor's prior written approval and subject to the provisions of an amendment to this Agreement signed by both Licensee and Licensor.

S.7.     THE TERRITORY:

Australia, Benelux, Brazil, Canada, Chile, China, Denmark, France, Germany, Greece, Hong Kong, Ireland, Israel, Italy, Japan, Korea, Lebanon, Mexico, New Zealand, Norway, Peru, Philippines, Portugal, Russia, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, United Arab Emirates, United Kingdom and the United States and the United States' territories and possessions; provided, however, that only Products bearing the RABBIT HEAD DESIGN Trademark may be advertised, promoted, sold and/or distributed in Chile and Japan.

S.8.     THE COMMENCEMENT DATE:

November 1, 2006

S.9.     THE EXPIRATION DATE:

March 31, 2012; subject to the Renewal Term in Paragraph 1.b.(ii) and the termination provisions set forth in the Agreement.

S.10.     THE MINIMUM NET SALES:

| License Year | Amount |
|---|---|
| LY 1 (11/01/06 – 03/31/08) | U.S.$10,000,000 |
| LY 2 (04/01/08 – 03/31/09) | U.S.$10,000,000 |
| LY 3 (04/01/09 – 03/31/10) | U.S.$10,000,000 |
| LY 4 (04/01/10 – 03/31/11) | U.S.$10,000,000 |
| LY 5 (04/01/11 – 03/31/12) | U.S.$10,000,000 |

S.11.     GUARANTEED ROYALTIES:

| License Year | Amount |
|---|---|
| LY 1 (11/01/06 – 03/31/08) | U.S.$1,000,000 |
| LY 2 (04/01/08 – 03/31/09) | U.S.$1,000,000 |
| LY 3 (04/01/09 – 03/31/10) | U.S.$1,000,000 |
| LY 4 (04/01/10 – 03/31/11) | U.S.$1,000,000 |
| LY 5 (04/01/11 – 03/31/12) | U.S.$1,000,000 |

S.12.    EARNED ROYALTIES:

Ten percent (10%) of "Net Sales" (as defined in Paragraph 2.d.(ii) and subject to the provisions of Paragraph 3.b.(ii)) of the Products. In the event Licensee marks down its standard invoice price for any Product in excess of thirty percent (30%), Earned Royalties on such sales will be computed as if such invoice price was marked down not more than thirty percent (30%).

S.13.    THE ADDRESS WHERE BOOKS KEPT: See Paragraph S.2. above.

S.14.    EUROPEAN UNION:

a.    Within member states of the European Community (the "EU"), rights or obligations created or imposed by the License and this Agreement may not be exercised or enforced in a manner contrary to EU Law.

b.    Licensee may not solicit orders from outside the Territory nor engage in any commercial or promotional activities with respect to the Products outside the Territory, the right of any purchaser of the Products within the Territory to export the Product purchased to other member states of the EU staying unaffected.

c.    Limitation of the exercise of rights or the enforcement of obligations due to EU Law or the provisions of the foregoing subparagraphs shall not affect the validity or enforceability of any other rights and obligations under this Agreement.


PLAY BEVERAGES, LLC                    PLAYBOY ENTERPRISES
(LICENSEE)                             INTERNATIONAL, INC.
                                       (LICENSOR)

By: _____         By: _____
        DBD MEMBRAIN, LLC
Title: AUTHORIZED SIGNER              Title: President, Global Licensing & Exec. VP

Date: NOVEMBER 30, 2006               Date: 12/13/06

Case: 12-26046 Doc 29-2 Filed 07/01/11 Entered 11/11/11 17:21:01 Desc Exhibit
Case 12-26046-99-CI-1 Document 21-1 Filed 12/28/12 Page 45 of 50 Page ID #:304
A Part 2 Page 8 of 28

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 7 of 27

## LICENSE AGREEMENT

This Agreement is made as of November 1, 2006, by and between the corporation described in Paragraph S.1. of the Schedule attached hereto and made a part hereof (hereinafter referred to as "Licensor") and the corporation described in Paragraph S.2. of the Schedule (hereinafter referred to as "Licensee").

### RECITALS

WHEREAS, Licensor has certain rights in and to the trademark PLAYBOY and other trademarks identified in Paragraph S.3. of the Schedule and as depicted in Exhibit A (hereinafter collectively referred to as the "Trademarks") and to certain images from Licensor's photo or art archives (the "Images"). The Trademarks and Images may sometimes be collectively referred to as the "Playboy Properties;"

WHEREAS, Licensee recognizes that the Playboy Properties have been widely used in, on, for or in connection with:

a. an internationally distributed magazine (<u>PLAYBOY</u>) and related publications and printed materials published by Licensor or its subsidiaries, affiliates or licensees;

b. advertising, promotion, publicity, broadcasting, telecasting and related uses in diverse businesses by Licensor or its subsidiaries or affiliates; and

c. the manufacture, advertising, promotion, sale and distribution worldwide of a broad range of consumer products, including, but not limited to, jewelry, clothing, footwear, leather goods, audio and visual recordings, and personal health and home articles and accessories;

WHEREAS, the parties hereto desire that Licensor grant to Licensee a license to use the Playboy Properties in the design, manufacture, advertising, promotion, sale and distribution of the "Products" (as defined in Paragraph 1.a.(i) hereof);

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is mutually agreed as follows:

1.     <u>GRANT OF LICENSE</u>.

    a.     <u>Grant</u>:

        (i)     Upon and subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee, and Licensee hereby accepts, the right, license and privilege specified in Paragraph S.4. of the Schedule to use the Playboy Properties in connection with, and only with, the use specified in Paragraph S.5. of the Schedule on and in connection with specifically designated and approved articles of merchandise specified in Paragraph S.6. of the Schedule (hereinafter collectively referred to as the "Products") in the territory specified in Paragraph S.7. of the Schedule (hereinafter referred to as the "Territory"). Such right, license and privilege is hereinafter referred to as the "License." It is understood and agreed that while the manufacture of the Products may take place outside the Territory, none of the Products may be advertised, promoted, sold or distributed outside the Territory by Licensee except as set forth in Paragraph S.14. of the Schedule attached hereto.

        (ii)     Nothing contained in this Agreement shall prevent Licensor (on behalf of itself and its subsidiaries and affiliated companies) from doing any or all of the following: (a) using or granting one or more others the right or license to use the Playboy Properties on or in connection with the Products in any area of the world other than the Territory or in the Territory through duty free outlets or on or in connection with any services or goods

other than the Products in any or all area(s) of the world including the Territory; and/or (b) manufacturing or having manufactured in the Territory the Products for sale outside the Territory.

(iii)     Anything in this Agreement to the contrary notwithstanding, Licensor (on behalf of itself and its subsidiary and affiliated companies) reserves: (a) the right to produce or have produced the Products to be used in the Territory specifically for promotional and advertising purposes and not for sale; (b) the right to produce or have produced any or all of the Products for the advertisement, promotion, sale and distribution, in the Territory, through direct marketing channels or sales (including, but not limited to, direct mail, catalog houses, home shopping programs, infomercials and the like), premium sales, incentive sales, home party plans or through any other means now known or hereafter available; (c) the right to produce or have produced by any third party the Products or similar products to be advertised, sold and distributed through a Playboy-branded retail store located in the Territory; or (d) the right to produce or have produced any or all of the Products for the advertisement, promotion, sale and distribution in the Territory of any or all of the Products in the Territory, via any E-commerce Web Site or via "Mobile Commerce," which shall mean transactions conducted by Licensee on one or more mobile telecommunications networks exclusively within the Territory and exclusively via the language of each country of the Territory in "Mobile Device" presentations associated with the Playboy Properties. "Mobile Device" means a mobile, wireless device existing as of the Commencement Date or developed thereafter that (i) is intended to be mobile and not commonly used at a fixed location; and (ii) is capable of receiving voice, data, and/or video communications. The definition of "Mobile Device" includes, without limitation, personal digital assistants (PDAs), pagers, mobile phones and other devices receiving communications via wireless fidelity (wi-fi) network and, for the avoidance of doubt, excludes all non-mobile television devices or other devices that function as a receiver or set-top box for a television-type broadcast or other signal, fixed display device or fixed monitor. "E-Commerce Web Site" shall mean promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successors. "TCP/IP Protocol" (which stands for Transmission Control Protocol/Internet Protocol) shall mean the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets. "TCP/IP Successors" shall mean programs, languages, protocols or other technical means that are being developed or that have yet to be developed which are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks. Any Products advertised, promoted, sold or distributed by Licensor or its subsidiary or affiliated companies for the purposes set forth in subparagraphs (b), (c) and (d) above shall be obtained only from Licensee at the lowest prices offered to other purchasers of the Products ordering similar quantities; provided, however, that in the event Licensee cannot fulfill Licensor's orders (or the orders of Licensor's subsidiary or affiliated companies) for the Products at such low prices or in the quantities or within the time frames needed, Licensor (or its subsidiary or affiliated companies) may seek fulfillment of the relevant orders through one or more third parties without liability or obligation to Licensee.

(iv)     Licensee acknowledges that there are a number of authorized Playboy-branded stores in various countries around the world. In the event the licensees for any such Playboy-branded stores wish to purchase any of the Products from Licensee or its distributors for sale through the Playboy-branded stores, Licensee may fulfill such orders subject to the provisions of this Paragraph 1.a.(iv). While fulfillment of such orders may consist of Licensee or its distributors shipping the Products outside of the Territory, such shipments of the Products to such authorized Playboy-branded stores outside of the Territory will not be a violation of the Territory restrictions set forth in this Agreement; provided, however, that (a) Licensee may not solicit such orders outside of the Territory; (b) Licensee must report such sales separately on the "Statements;" (c) Licensee will include such sales in the calculation of "Net Sales" for the purpose of computing

"Minimum Net Sales" and "Earned Royalties;" and (d) Licensee must notify Licensor in advance in writing of any such order and must obtain Licensor's prior written approval to fulfill such orders. Further, in the event Playboy has opened or opens, itself or through a third party, a Playboy-branded store in the Territory, the licensee for such Playboy-branded store in the Territory may source the Products or similar products through any third party anywhere in the world and sell such Products or similar products through such Playboy-branded store in the Territory and such sourcing and selling will not be a violation of the License.

(v)     Anything in this Agreement to the contrary notwithstanding, Licensee shall have no right through the License to open or operate a free-standing retail store using the Playboy Properties or any of Licensor's other intellectual property on or in connection with such store or the signage for such store.

(vi)    Anything in this Agreement to the contrary notwithstanding, Licensee will, not later than September 30, 2007, secure a creditworthy, financially sound guarantor that will guarantee the performance of Licensee's duties and obligations, including, but not limited to, Licensee's financial obligations, under this Agreement; provided, however, that (a) such guarantor will be subject to Licensor's prior reasonable approval not to be unreasonably withheld; and (b) such guarantor will properly execute and send to Licensor, within not more than ten (10) days of Licensor's approval of such guarantor, an undertaking in the form and content as that attached hereto as Exhibit C and made a part hereof. In order for Licensor to determine whether or not such guarantor is acceptable, Licensee will provide Licensor with:

(a)     the proposed guarantor's audited financial statements for the two (2) most recently completed fiscal years;

(b)     the proposed guarantor's interim financial statements for the current fiscal year;

(c)     if the guarantor is a private company, information about the principals as directed by Licensor; and

(d)     such other information as Licensor may reasonably request.

Notwithstanding the foregoing, Licensee's proposed guarantor shall be conclusively deemed creditworthy and financially sound, provided that such proposed guarantor (i) has a median credit score of 70 or higher, as reported by Dun & Bradstreet, Experian Business, Equifax Business and Business Credit USA, as of September 30, 2007, in the event that such guarantor is a business, or a medial credit score of 720 or higher, as reported by Experian, Equifax and TransUnion, in the event that such guarantor is an individual; and (ii) has had a net worth (pursuant to the audited financial statements provided to Licensor, prepared in accordance with Generally Accepted Accounting Principles) of at least Five Million Dollars ($5,000,000) during each of the previous two (2) financial reporting years. Anything in this Agreement to the contrary notwithstanding, while the proposed guarantor may be conclusively deemed creditworthy and financially sound, such proposed guarantor will be subject to Licensor's security due diligence and will not be approved unless and until such proposed guarantor clears such security-related due diligence in Licensor's reasonable opinion.

In the event that Licensee fails to provide such information or to obtain a guarantor that is approved by Licensor as set forth above, then Licensor will have the right to terminate the Agreement upon written notice; provided, however, that (i) such termination may not be effective any earlier than March 31, 2008; and (ii) Licensee will remit to Licensor, within not more than ten (10) days of the date of Licensor's notice of termination, a termination fee in the amount of U.S.$250,000, which will be over and above any other amount that may be due and payable to Licensor under the Agreement. For purposes of

clarification, Licensor's right to terminate the Agreement as set forth above in this Paragraph 1.a.(vi) will not be deemed to take away any of Licensor's other rights under the Agreement, including, but not limited to, Licensor's right to terminate the Agreement due to another default by Licensee pursuant in accordance with the provisions of this Agreement.

b.    <u>Term</u>:

   (i)    The term of the License and this Agreement (hereinafter referred to as the "Term") shall commence on the date specified in Paragraph S.8. of the Schedule (hereinafter referred to as the "Commencement Date") and shall expire at midnight, Chicago time, on the date specified in Paragraph S.9. of the Schedule (hereinafter referred to as the "Expiration Date"), unless sooner terminated by operation of law or as provided in this Agreement.

   (ii)    On the conditions that: (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including the timely payment of all amounts required under this Agreement; (b) the Minimum Net Sales have been met or exceeded for each License Year of this Agreement; (c) Licensor has provided, not later than February 1, 2012, its written approval for the Agreement to renew as set forth in this Paragraph 1.b.(ii), then this Agreement will renew for five (5) additional License Years commencing on April 1, 2012 and ending at midnight, Chicago time, on March 31, 2017 on the same terms and conditions of this Agreement except that (y) the Minimum Net Sales for each License Year of the "Renewal Term" will be U.S.$20,000,000; and (z) the Guaranteed Royalties for each License Year of the "Renewal Term" will be U.S.$2,000,000. Anything in this Agreement to the contrary notwithstanding, in the event that Licensee becomes non-compliant with the terms and conditions of this Agreement after its receipt of Licensor's notice approving the renewal of this Agreement as set forth in this Paragraph 1.a.(ii), or in the event that Licensor does not provide its written approval as set forth above, then this Agreement will not be renewed as set forth in this Paragraph 1.a.(ii) and Licensor shall be free to pursue such licensing opportunities without obligation or liability to Licensee. For ease of reference, such five-year renewal term will be referred to herein as the "Renewal Term" but all the terms and conditions applicable to "Term" shall be deemed applicable to the Renewal Term except to the extent that the terms and conditions of the Renewal Term shall differ from the terms and conditions of this Agreement, in which case the terms and conditions of the renewal of this Agreement shall control as to the Renewal Term.

   (iii)    On the conditions that: (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including the timely payment of all amounts required under this Agreement; (b) the Minimum Net Sales have been met or exceeded for each License Year of this Agreement; (c) Licensor has provided, not later than February 1, 2017, its written approval for the Agreement to renew as set forth in this Paragraph 1.b.(ii), then this Agreement will renew for five (5) additional License Years commencing on April 1, 2017 and ending at midnight, Chicago time, on March 31, 2022 on the same terms and conditions of this Agreement except that (x) there will be no conditional automatic renewal following March 31, 2022; (y) the Minimum Net Sales for each License Year of the "Second Renewal Term" will be the greater of U.S.$40,000,000 or the amount of the Net Sales actually achieved in License Year 10; and (z) the Guaranteed Royalties for each License Year of the "Second Renewal Term" will be the greater of U.S.$4,000,000 or the amount of the Guaranteed Royalty plus the amount of the Earned Royalty due and payable in License Year 10. Anything in this Agreement to the contrary notwithstanding, in the event that Licensee becomes non-compliant with the terms and conditions of this Agreement after its receipt of Licensor's notice approving the renewal of this Agreement as set forth in this Paragraph 1.a.(iii), or in the event that Licensor does not provide its written approval as set forth above, then this Agreement will not be renewed as set forth in this Paragraph 1.a.(iii) and Licensor shall be free to pursue such licensing opportunities without obligation or liability to Licensee. For ease of

Case: 11-26046 Doc 29-2 Filed 07/01/11 Entered 11/01/11 17:26:01 Desc Exhibit
A Part 2 Page 12 of 28 Page 49 of 50 Page ID #:308

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 11 of 27

reference, such five-year renewal term will be referred to herein as the "Second Renewal Term" but all the terms and conditions applicable to "Term" shall be deemed applicable to the Second Renewal Term except to the extent that the terms and conditions of the Second Renewal Term shall differ from the terms and conditions of this Agreement, in which case the terms and conditions of the renewal of this Agreement shall control as to the Second Renewal Term.

    c.    <u>License Year and License Quarter</u>:

        (i)    For all purposes under this Agreement, a "License Year" shall be each twelve (12) consecutive calendar month period commencing on each April 1st of the Term and ending at midnight, Chicago time, on each following March 31st of the Term, except that the first License Year will be the seventeen (17) consecutive calendar months commencing on the Commencement Date and ending at midnight, Chicago time, on March 31, 2008. If the expiration or termination of the License and this Agreement is effective other than at the end of any such seventeen (17) or twelve (12) month period, then the final period of less than seventeen (17) or twelve (12) months ending on the effective date of such expiration or termination shall be deemed to be a License Year.

        (ii)    For all purposes under this Agreement, a "License Quarter" shall be the first five (5) consecutive calendar months of the first License Year and each succeeding three (3) month period of the first License Year and each License Year thereafter, and if the expiration or termination of the License and this Agreement is effective other than at the end of a License Year, then the final period of less than five (5) or three (3) months ending on the effective date of such expiration or termination shall be deemed to be a License Quarter.

    d.    <u>Territory</u>: The License shall extend only to the Territory, and the use by Licensee of the Playboy Properties shall be confined to the Territory. Licensor shall have the right, but not the obligation, to terminate this Agreement by deeming any sales or distribution of the Products or use of the Playboy Properties by Licensee outside of the Territory to be an incurable default under this Agreement. Such sales of the Products or use of the Playboy Properties shall include any sales of the Products in the Territory for resale outside of the Territory. Within member states of the EU, however, Paragraph S.14. of the Schedule attached hereto is applicable. Licensee shall be free at all times during the Term to submit to Licensor a proposal to add additional countries to the Territory, but Licensor shall be under no obligation to agree to such proposal. In the event Licensor receives a bona fide offer to sell and distribute the Products to any country outside of the Territory and Licensor, in its sole discretion elects to accept such offer, it will first notify Licensee that Licensor desires to pursue such offer. Licensee must notify Licensor, within five (5) business days of receipt of Licensor's notice, of its decision whether or not to pursue negotiations with Licensor for such rights. In the event Licensee decides, in its sole discretion, not to pursue such negotiations with Licensor, Licensor may pursue such opportunity without obligation or liability to Licensee. In the event Licensee decides, in its sole discretion, to pursue such opportunity, Licensor will negotiate in good faith with Licensee for such rights. If, within thirty (30) days after Licensor's receipt of Licensee's decision to enter into such negotiations, Licensor and Licensee have not concluded an agreement, it will be conclusively presumed that the parties cannot reach an agreement and Licensor will be free to pursue such opportunities without obligation or liability to Licensee.

    e.    <u>Minimum Net Sales</u>: Notwithstanding anything in this Agreement to the contrary, if Licensee's "Net Sales" (as defined in Paragraph 2.d.(ii) hereof) in any License Year are less than those specified in Paragraph S.10. of the Schedule for such License Year (hereinafter referred to as the "Minimum Net Sales"), then Licensor shall have the right to either: (i) declare the License to be non-exclusive, thereby giving Licensor the rights to design, manufacture, advertise, promote, sell and distribute the Products in competition with Licensee or otherwise grant any or all of such rights to one or more other parties; or (ii) terminate the License and this Agreement by deeming the failure to attain the Minimum Net Sales to be an incurable default under this Agreement. Such declaration or termination: (a) shall be immediately effective upon

Case 2:12-20046590 Doc 29-2 Filed 07/01/11 Entered 07/01/11 12:24:01 Desc Exhibit
A Part 2 Page 13 of 28 Page 50 of 50 Page ID #:309
Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 12 of 27

the receipt by Licensee of written notice from Licensor which shall be sent no later than forty-five (45) days after Licensor's receipt of the "Statement" (as defined in Paragraph 2.d.(i) hereof) for the end of each License Year and which evidences such shortfall; and (b) shall have no effect upon the amounts due and payable to Licensor for periods prior to or after such declaration or termination.

2.  **COVENANTS OF LICENSEE.**

   a.   Use:

      (i)   Subject to Licensor's prior approval as hereinafter required, Licensee shall commence bona fide commercial sales of the Products as soon as practicable after the Commencement Date, but in no event later than April 1, 2007. If Licensee fails to commence such sales by such date, Licensor may treat such failure as a default under this Agreement. In the event during any License Year, Licensee has not on a regular and ongoing basis: (y) sold and distributed one or more of the Products within all categories of the Products under Paragraph S.6. of the Schedule; or (z) sold and distributed the Products in all countries of the Territory, then Licensor shall have the right to delete, from the Schedule upon not less than thirty (30) days' prior written notice to Licensee, any Products which, any Product category from which, or any country to which Licensee has not so sold and distributed. In the event that all Products are deleted from the Schedule or all countries are deleted from the Territory, then the License and this Agreement will automatically terminate due to an incurable default. For purposes of clarification, the sales discussed in this Paragraph 2.a.(i) are bona fide commercial sales, which are volume sales to the distribution channels listed in Paragraph S.5. of the Schedule for sale or distribution to consumers and will specifically exclude sample sales to distributors or wholesalers.

      (ii)   Licensee shall not cause or authorize any use of the Playboy Properties in any area of the world outside the Territory and shall not knowingly manufacture, sell or otherwise deal with or distribute any of the Products on behalf of or to any individual or entity that Licensee believes or has reason to believe intends or intend or is or are likely to sell, deal with or distribute any of the Products in any way outside the Territory. Within member states of the EU, however, Paragraph S.14. of the Schedule attached hereto is applicable. Licensee shall ensure that all of its distributors, whether affiliated or third-party, to which Licensee sells or through which Licensee otherwise moves any Products are aware of all Territory restrictions on the use of the Playboy Properties and the distribution of the Products and shall obtain an executed "Distributor Contract" (as defined in Paragraph 2.j.(ii) hereof) from all of its third-party distributors as set forth in Paragraph 2.j.(ii) hereof. Licensee shall immediately notify Licensor should Licensee become aware that any of its distributors, whether third-party or affiliated, have distributed or dealt with the Playboy Properties or Products in any way outside the Territory.

      (iii)   Licensee warrants and represents that it has and will continue to have throughout the Term and the "Sell-Off Period" (as defined in Paragraph 8.c. hereof) the legal right and authority to enter into this Agreement and to assume and perform its duties and obligations hereunder and that there is or are no, and Licensee shall not enter into during the Term and the Sell-Off Period any, contract, agreement or understanding with any individual or entity which would in any way restrict or prevent Licensee from the performance of its duties and obligations under this Agreement.

      (iv)   Licensee shall be responsible for obtaining, at its own expense, any and all licenses, permits and approvals (including governmental and all other licenses, permits and approvals) necessary for Licensee to: (a) design, manufacture, advertise, promote, sell and distribute the Products; (b) pay "Guaranteed Royalties" (as defined in Paragraph 2.c.(i) hereof), "Earned Royalties" (as defined in Paragraph 2.c.(ii) hereof) and taxes; and (c) fulfill any and all other duties and obligations and exercise the rights of

Case 2:11-26046590-Doc 29-2 Filed 07/01/11 Entered 07/01/11 17:21:01 Desc Exhibit
A Part 2 Page 14 of 28 Filed 12/28/12 Page 1 of 69 Page ID #:310
Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 13 of 27

Licensee under this Agreement. In the event Licensee is unable, for any reason, to obtain prior to the Commencement Date or maintain throughout the Term all of such licenses, permits or approvals, then Licensor shall have the right to either (i) delete from the Territory any country in which Licensee has not obtained or maintained all necessary licenses, permits, patents, approvals or permissions; or (ii) terminate the License and this Agreement by deeming the failure to obtain the necessary licenses, permits, patents, approvals or permissions to be an incurable default under this Agreement. Licensee warrants and represents that the Products are safe for the use for which they are being marketed, sold or distributed and have been tested and approved by the FDA and/or the relevant governing bodies.

(v)     Licensee will take all necessary actions to ensure that all aspects of its obligations in connection with this Agreement comply with all applicable federal and state and local laws, rules and regulations, including, without limitation, the CAN-SPAM Act of 2003. Licensee will not create, initiate, transmit or otherwise participate in the creation, initiation or transmission of any unsolicited bulk email in connection with the Products. In addition, Licensee will comply with all applicable state and federal laws governing privacy, technology, software and trade secrets.

b.     <u>Best Efforts</u>:

(i)     <u>Maintaining Goodwill</u>:  Licensee recognizes that the Trademarks are associated with Licensor on a worldwide basis and, therefore, Licensee shall, throughout the Term and the Sell-Off Period, constantly use its commercially reasonable efforts in the advertising, promoting, selling, distributing and in all other dealing with or disposal of the Products to protect the good name and goodwill associated with the Trademarks and Licensor, and to obtain the greatest Net Sales throughout the entire Territory and the entire Term and the Sell-Off Period. Should Licensee take any action which negatively affects or impacts the good name, goodwill or reputation of Licensor, Licensor may deem such to be an incurable default by Licensee under this Agreement.

(ii)     <u>Distribution Channels</u>: Licensee acknowledges and agrees that the sale of the Products in certain types of stores or through certain types of web sites can negatively affect the reputation and the value of the Playboy Properties, as some types of stores or web sites are perceived by the public as having lower quality products than other types of stores regardless of whether the products or their prices are the same. Licensee agrees that it will sell and distribute the Products only to those stores or web sites that are generally perceived by the public as good quality stores or web sites by virtue of their reputations for quality products and by their providing certain service amenities associated with good quality stores, which may include without limitation the availability of any or all of the following: customer service desks; knowledgeable, regular, full-time service representatives; and provision for the return of products. Licensee and Licensor agree that warehouse outlets, deep discount chains and other similar channels are generally perceived by the public as having lower quality products and will therefore not be considered acceptable channels of sale and distribution of the Products under this Agreement. Licensor and Licensee agree to reasonably attempt to settle all differences of opinion as to whether or not a specific store or chain of stores is an acceptable channel for the sale and distribution of the Products, but Licensor's decisions in this matter shall govern and control. Licensee shall be responsible for and shall assume and pay for all costs and expenses related to Licensee's design, manufacture, advertising, promotion, sale and distribution of the Products.

c.     <u>Royalties</u>:

(i)     <u>Guaranteed Royalties</u>:  Licensee will pay to Licensor or its designee guaranteed minimum royalties (hereinafter referred to as "Guaranteed Royalties") in the amount and for each License Year specified in Paragraph S.11. of the Schedule. Guaranteed Royalties for each such License Year shall be paid in full on or before the

first day of each such License Year, except that the Guaranteed Royalties for License Year 1 will be payable in the following increments that will be due on or before the following dates:

| Amount | Date Due |
|---|---|
| U.S.$250,000 | December 1, 2006 |
| U.S.$750,000 | January 31, 2007 |

Under no circumstances whatsoever will Licensor return to Licensee all or any part(s) of Guaranteed Royalties, except as provided in Paragraph 8.b. hereof.

(ii)    Earned Royalties:    Licensee shall pay to Licensor or its designee royalties (hereinafter referred to as "Earned Royalties") in the amount equal to the amount calculated according to Paragraph S.12. of the Schedule, but only to the extent that for each License Year such calculated amount exceeds Guaranteed Royalties for such License Year. Earned Royalties shall be payable in accordance with the terms and conditions of Paragraph 2.d. hereof.

(iii)    Interest:    Each sum, including, but not limited to, Guaranteed Royalties and Earned Royalties, that shall not be paid on the due date by Licensee shall bear interest from such due date until the date on which such sum is paid in full at an amount equal to two percent (2%) over the prime rate of interest as established by JP Morgan Chase on the date such sums should have been paid.

(iv)    Letter of Credit:    If, during any License Year, Licensee fails to make any timely payment of any amounts due under this Agreement, Licensor will have the right to require Licensee to deliver to Licensor an Irrevocable Stand-By Letter of Credit (the "Letter of Credit") in favor of Licensor confirmed and advised through a U.S. bank designated by Licensor and on terms and in the form and content as directed by Licensor in the amount of any and all unpaid and payable amounts for the remainder of that License Year. Licensee will have ten (10) days from the date of Licensor's demand for a Letter of Credit within which to comply with such requirement. Additionally, Licensee will deliver to Licensor a new Letter of Credit for each subsequent License Year in the amount of all Guaranteed Royalties due for that License Year. Licensor must receive the new Letter of Credit not less than thirty (30) days before the start of each such subsequent License Year. Licensor will have the right, at any time, to draw upon such Letter of Credit if Licensee fails to make any payments as provided for under this Agreement. All costs and expenses associated with such Letter of Credit, including, but not limited to, opening, amending and drawing fees, will be borne by Licensee. Licensee's failure to provide Licensor with a Letter of Credit as herein above provided shall be an incurable default under this Agreement.

d.    Statements and Payments:

(i)    Within forty-five (45) days after each License Quarter and the conclusion of the Sell-Off Period, or within ten (10) days after the date of Licensor's written request, Licensee shall furnish to Licensor or its designee a complete and accurate statement in a format acceptable to Licensor and certified to be true by the Chief Financial Officer of Licensee (hereinafter referred to as the "Statement") showing for such License Quarter and the License Year through such period or for the Sell-Off Period:  (a) a listing of Licensee's accounts and the accounts of Licensee's affiliated and third-party distributors in the Territory and the units and description of all of the Products sold and distributed to each such account or otherwise disposed of by Licensee or by Licensee's affiliated and third-party distributors; (b) the computations of Net Sales (as hereinafter defined) on all such sales; (c) the computation of the Earned Royalties and the amount of Earned Royalties due and payable; and (d) the advertising and promotion expenditures made by Licensee pursuant to Paragraph 2.n. hereof and the details of all such expenditures, supported by copies of vouchers and copies of all advertising for or relating to the period

Case 2:12-cv-10599-SJO-E  Document 2-2  Filed 12/26/12  Page 3 of 69  Page ID #:312
Case 11-26046  Doc 29-2  Filed 07/01/11  Entered 07/01/11 17:27:01  Desc Exhibit A  Part 2  Page 16 of 28
Case 11-26046  Doc 16-1  Filed 06/27/11  Entered 06/27/11 17:30:57  Desc Exhibit
Exhibit 1  pt. 1  Page 15 of 27

covered by such Statement. When, during any License Year, the amount of Guaranteed Royalties for such License Year has been exceeded by the amount calculated according to Paragraph S.12. of the Schedule for such License Year, Licensee shall commence payment of Earned Royalties. Licensee shall pay all accrued and unpaid Earned Royalties by remittance accompanying each of the Statements.

(ii) As used in this Agreement, the term "Net Sales" means the invoice price charged by Licensee for the Products less (x) refunds, credits and allowances actually made or allowed to customers for returned Products; (y) customary trade discounts (including anticipations) afforded to and actually taken by customers against payment for the Products; and (z) taxes assessed on sales (only where applicable).

(iii) Licensee will not sell the Products in a way which would cause serious harm to Licensor and Licensor's business activities, particularly the goodwill and image of the Trademarks.

(iv) If Licensee sells any of the Products to any individual or entity that is directly or indirectly owned or controlled by Licensee or is under common ownership with Licensee, in whole or in part, the invoice price used to compute Net Sales hereunder shall be the invoice price that would have been charged to an unrelated purchaser in an arm's-length transaction for such Products.

(v) (a) Payments Licensee is required to make by the terms of this Agreement shall be made by wire transfer in United States Dollars through a bank specified by Licensor. Any and all costs associated with the wire transfer payments shall be borne by Licensee. No deduction shall be made for income or other taxes without Licensor's written permission, unless Licensee is compelled to do so by law; in which case Licensee shall provide Licensor with evidence that such tax has been paid in the proper amount. Licensee shall give due notice to Licensor of any such proposed deductions. Licensee shall make no further deductions without prior approval from Licensor based on satisfactory documentation presented by Licensee to Licensor. In the event payments in the manner provided in this Paragraph 2.d. shall become impossible or illegal by reason of the action of governmental authority, then, at Licensor's option, this Agreement may be terminated; and whether or not Licensor exercises such option, while such restrictions remain in effect, all payments due Licensor shall be made to an account in the Territory, or elsewhere where permitted by law, to be designated by Licensor.

(b) In determining the proper rate of exchange to be applied to the payments due hereunder, it is agreed that:

(1) Licensee shall calculate Earned Royalties on a calendar month basis in local currency (with each such month considered to be a separate accounting period for the purpose of computing Earned Royalties);

(2) Licensee shall compute a conversion rate of each such monthly totally into United States currency utilizing the mid-range rates as quoted by Reuters and other sources as published in the Wall Street Journal on the last business day of each relevant calendar month; and

(3) The converted amounts (in U.S. currency) shall be added together on a cumulative basis and will be reflected in the statement required under Paragraph 2.d. hereof.

e. Records and Audit: Licensee shall: (i) keep accurate books of account and records (including but not limited to utilization of consecutively numbered invoices which reconcile to each Statement and Licensee's general ledger) covering all transactions relating to or arising out of the License and this Agreement (which books and records shall be maintained

Case 2:12-cv-10590-SJO-E Document 21 Filed 12/24/12 Page 4 of 69 Page ID #:313
Case 11-26046 Doc 29-2 Filed 07/01/11 Entered 07/01/11 17:21:01 Desc Exhibit A Part 2 Page 17 of 28

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit Exhibit 1 pt. 1 Page 16 of 27

separately from Licensee's documentation relating to other items manufactured or sold by Licensee); and (ii) permit Licensor or its nominees, employees, agents or representatives to have full access to such books and records in order to inspect such books and records at all reasonable hours of the day, to conduct an examination of and to copy (at Licensor's expense), all such books and records. Licensee shall maintain in good order and condition all such books and records for a period of two (2) years after the expiration or termination of the License and this Agreement or, in the event of a dispute between the parties hereto, until such dispute is resolved, whichever date is later, and such books and records shall be kept at the address stated in Paragraph S.13. of the Schedule, except as such address may be changed from time to time in accordance with Paragraph 9.b. hereof. Receipt or acceptance by Licensor of any Statement furnished pursuant hereto or any sums paid by Licensee hereunder shall not preclude Licensor from questioning the correctness thereof at any time, and if one or more inconsistencies or mistakes are discovered by Licensor in such Statement, it or they shall be rectified in an amended Statement received by Licensor no later than ten (10) days after the date of receipt by Licensee of notice of that which should be rectified.

f.    Expenses of Conducting Examinations: If any inspection or examination referred to in Paragraph 2.e. above discloses, or Licensor or Licensee otherwise discovers, an underpayment of Earned Royalties, the amount of such underpayment shall be paid by Licensee to Licensor no later than thirty (30) days after receipt of notice or knowledge thereof by Licensee. In the event of such an underpayment by Licensee in excess of nine percent (9%) in any two (2) License Years, then Licensor may elect to treat such occurrence as an incurable default by Licensee under this Agreement upon the second occurrence. If such inspection or examination by a third-party auditor: (i) discloses or Licensor or Licensee otherwise discovers an overpayment of Earned Royalties (or, pursuant to Paragraph 8.b. hereof, an overpayment of Guaranteed Royalties), the amount of such overpayment shall be credited against future payment of any or all of the Guaranteed Royalties and Earned Royalties or, in the event of the expiration or termination of the License and this Agreement and there is or are no such future payments, such amount shall be paid by Licensor to Licensee not later than thirty (30) days after the discovery thereof by Licensor, subject to Licensor's rights of setoff, recoupment and counterclaim; or (ii) reveals that for the period covered by such inspection or examination there is an error of ten percent (10%) or more in the Earned Royalties previously reported on the Statement(s) as being due from Licensee, all expenses involved in the conducting of such inspection or examination shall be borne by Licensee. Licensee shall pay to Licensor the amount of such expenses no later than ten (10) business days after Licensee's receipt of Licensor's invoice therefore. If such error is less than ten percent (10%), such expenses shall be borne by Licensor.

g.    Product Quality:  Licensee hereby warrants and agrees that the Products designed, manufactured, advertised, promoted, sold or distributed under this Agreement shall bear the Playboy Properties faithfully produced and shall meet the high standards of quality, workmanship, material, design, size, color and style established by Licensor from time to time and in accordance with the terms and conditions of this Agreement. Licensee will not knowingly or negligently cause or authorize any or all of the Products not conforming to this Agreement to be sold or distributed, as doing so may adversely affect Licensor's goodwill in the Trademarks and any such non-conforming Products shall be destroyed at Licensee's expense. All of the Products shall conform to and comply with, in all respects, all federal, state and local laws, rules and regulations governing the design, quality, labeling and safety of such Products. Licensee shall not cause, condone or authorize: (i) the use of any substandard or offensive materials in or in connection with any of the Products; (ii) any violation of any federal, state or local law or regulation, including, but not limited to, provisions thereof imposing advertising standards or requiring trade or content description of the Products; or (iii) the use of the Playboy Properties or any other word, device or symbol associated in any way with any or all of Licensor and its subsidiaries and affiliates in connection with any product or activity that is not the subject of the License and this Agreement.

h.    Approval of Products and the Materials:

(i)     Licensee understands and agrees that each of the Products and any other items bearing the Playboy Properties or intended for use in connection with the Products (hereinafter collectively referred to as the "Materials") must be approved in advance by Licensor. The Materials include, but are not limited to, photography, cartons, containers, labels, wrappers, packages and other inner and outer packaging materials, fixtures, displays, artwork and printing, advertising, sales, marketing and promotional materials. Licensee shall, at its own expense, submit to Licensor or its designee for written approval, samples of each of the Products and the Materials at each stage of development thereof, which shall include, but not be limited to: (a) an initial sketch or photograph; (b) a sample prototype or equivalent acceptable to Licensor; and (c) two final production-quality samples of that which will be mass produced or manufactured. Licensee must obtain Licensor's written approval of each stage of development before proceeding to the next stage, and in no event shall Licensee commence or permit the mass manufacture, advertising, promotion, sale or distribution of any of the Products or the Materials unless and until Licensee has received Licensor's written approval of the samples provided pursuant to (c) of this Paragraph 2.h.(i). In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this Paragraph 2.h.(i) within fourteen (14) days of Licensor's receipt thereof, Licensee may send written notice to Licensor advising no response was received. If Licensor does not respond within five (5) days of Licensor's receipt thereof, then Licensor shall be deemed to have given disapproval.

(ii)     To ensure that each of the Products and the Materials are constantly maintained per season, per License Year in conformance with the samples previously approved for such season in such License Year pursuant to Paragraph 2.h.(i) above, Licensee shall, within fourteen (14) days of receipt of a request from Licensor, send or cause to be sent to Licensor at Licensee's expense: (a) such actual samples requested by Licensor of the Products and the Materials Licensee is using, manufacturing, selling, distributing or otherwise disposing of; and (b) a listing or revised listing of each location where any of the Products and the Materials or either thereof are designed, manufactured, stored or otherwise dealt with, except to the extent such listing or revised listing duplicates currently accurate information provided pursuant to Paragraph 2.j.(iii) hereof. Licensor and its nominees, employees, agents and representatives shall have the right to enter upon and inspect, at all reasonable hours of the day, any and all such location(s) and to take, without payment, such samples of any of the Products and the Materials as Licensor reasonably requires for the purposes of such inspection.

(iii)     If any of the Products or Materials sent or taken pursuant to Paragraph 2.h.(ii) above or that otherwise come to the attention of Licensor does or do not conform in Licensor's reasonable discretion to the previously approved samples for the relevant season in the relevant License Year, Licensor shall so notify Licensee, in writing, specifying in what respect such of the Products or Materials is or are unacceptable. Immediately upon receipt of such notice, Licensee shall suspend all manufacture, sale and distribution of and shall obtain back from Licensee's accounts all such Products and Materials and shall not resume the manufacture, sale or distribution thereof unless and until Licensee has made all necessary changes to the satisfaction of Licensor and has received Licensor's written reapproval of each of such Products and Materials.

(iv)     Except as otherwise specifically provided in this Agreement, all of the Products and the Materials that are not approved by Licensor or that are determined by Licensor to be non-conforming or unacceptable shall not be sold, distributed or otherwise dealt with by Licensee. All such Products and Materials shall be destroyed by Licensee with, if Licensor so requests, an appropriate certificate of destruction furnished to Licensor.

(v)     Except as provided in Paragraph 2.h.(iv) above, any and all sales, distribution or use by Licensee of unapproved, non-conforming or unacceptable Products or Materials shall not only constitute an incurable default under the terms of this

Agreement, but such Products or Materials also shall be considered unlicensed and an infringement of Licensor's proprietary rights, and Licensor shall have the right to bring legal action against Licensee for any and all remedies available to Licensor in addition to the remedies available under this Agreement.

(vi)    Licensee may engage, employ or utilize artists, designers or other third parties (collectively, the "Designers") to develop Products and/or Materials.  Licensee shall obtain a written assignment, and shall supply Licensor with a copy of each such assignment, from any Designer in favor of Licensor under which all of such Designer's right, title and interest, including, but not limited to, all rights of copyright and trademark, in and to such Designer's work product is transferred and conveyed to Licensor to the maximum extent permitted by applicable law so that Licensor will be the sole owner of all rights therein.

i.    <u>Title and Protection and Preservation of Playboy Properties</u>:

(i)    Licensee hereby acknowledges each of the following:  the great value of the goodwill associated with the Trademarks; the worldwide recognition thereof; that the proprietary rights therein and goodwill associated therewith are solely owned by and belong to Licensor; that the Trademarks and other related words, devices, designs and symbols are inherently distinctive or have secondary meaning firmly associated in the mind of the general public with Licensor, its subsidiaries and affiliates and its or their activities; and that all additional goodwill associated with the Trademarks created through the use of such Trademarks by Licensee shall inure to the sole benefit of Licensor. During and after the Term, Licensee shall not:

(a)    attack or question the validity of, or assist any individual or entity in attacking or questioning, the title or any rights of or claimed by Licensor, its subsidiaries and affiliates and their respective licensees and sublicensees in and to the Playboy Properties or any other trademarks, copyrights or such other intellectual or intangible property associated or connected with any or all of Licensor, its subsidiaries and affiliates, their publications, published material, activities, licensees and sublicensees.  Within the EU-member states the obligation not to attack the validity is restricted to not challenging Licensor's ownership of the Playboy Properties;

(b)    directly or indirectly seek for itself, or assist any third party or parties to use or acquire, any rights, proprietary or otherwise, in any patent, trademark, copyright or such other intellectual or intangible property so associated or connected, without the prior written approval of Licensor;

(c)    in any way seek to avoid Licensee's duties or obligations under this Agreement because of the assertion or allegation by any individual(s), entity or entities that any or all of the Playboy Properties are invalid or by reason of any contest concerning the rights of or claimed by Licensor; or

(d)    file or prosecute one or more trademark applications regarding Licensee's use of the Playboy Properties, unless first requested to do so in writing by Licensor.  (Licensee will cooperate with Licensor in connection with any and all such filings.)

(ii)    Licensee shall:

(a)    use the Playboy Properties as permitted under this Agreement in each jurisdiction strictly in accordance with the legal requirements in such jurisdiction. At Licensor's request, Licensee shall cooperate fully with Licensor in preparing and causing to be recorded in every jurisdiction designated by Licensor registered user agreements and all other documents or filings which

Case 2:11-26046-9cv29E2 Document 21-2 Filed 07/01/11 Entered 07/01/11 17:27:01 Desc Exhibit
A Part 2 Page 20 of 28 Filed 12/28/12 Page 7 of 69 Page ID #:316

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 19 of 27

may be necessary or desirable to evidence, protect and implement the rights of or claimed by Licensor pursuant to this Agreement. In the event of any ambiguities between any registered user agreement or other similar document or filing and this Agreement, the terms and conditions of this Agreement shall govern and control. Upon expiration or termination of this Agreement for any reason whatsoever, Licensee shall execute and file any and all documents, as required and directed by Licensor and at Licensee's expense, terminating any and all registered user agreements or other filings. Licensee hereby authorizes and empowers Licensor to terminate all registered user or other filings on Licensee's behalf and in Licensee's name. Licensor shall be responsible for the costs and expenses associated with such recordation and de-recordation; provided, however, that Licensor shall not be responsible for paying fees or expenses incurred, if any, by Licensee for Licensee's review, comment, approval and or signing any documents required to effect such recordation and/or de-recordation;

(b)    affix or imprint irremovably and legibly on each of the Products and on or within all of the Materials such Playboy Properties, trademark notices, copyright notices, legends and Licensor's official hologram as Licensor directs;

(c)    manufacture, sell, distribute or otherwise deal with the Materials solely in connection with the Products (except for any or all of the Materials which do not bear one or more of the Playboy Properties or otherwise are not associated with any or all of the Products by virtue of, but not limited to, such things as design, color or content); and

(d)    not cause or grant permission to any third party or parties to acquire any copyright or other proprietary right in connection with any word, device, design or symbol used by Licensee in connection with any of the Products or the Materials.

(iii)    Licensee hereby assigns, transfers and conveys to Licensor, to the maximum extent permitted by applicable law, all of Licensee's right, title and interest in all copyrightable matter created by Licensee under or in connection with this Agreement so that Licensor shall be the sole owner of all copyrights therein.

(iv)    Anything in this Agreement to the contrary notwithstanding, Licensor shall have no right, title or interest in or to any of Licensee's trademarks, copyrights or tradenames.

j.    Right to Subcontract, Licensee Financial Statements and Lists of Sources and Accounts:

(i)    Licensee may subcontract the manufacture of any or all component parts of any or all of the Products bearing the Playboy Properties pursuant to this Agreement, provided:    (x) Licensee notifies Licensor in advance of any intended supplier/subcontractor and obtains Licensor's prior written approval of such supplier/subcontractor; (y) Licensee obtains from each such supplier/subcontractor an executed written agreement in the form attached hereto and made a part hereof as Exhibit D; and (z) furnishes a copy of each such executed agreement to Licensor.

(ii)    Licensee may subcontract with a third-party distributor for the distribution of the Products in the Territory pursuant to this Agreement, provided:    (x) Licensee notifies Licensor in advance of any intended third-party distributor and obtains Licensor's prior written approval of any such third-party distributor; (y) Licensee obtains from each Licensor-approved third-party distributor an executed written agreement (the "Distributor Contract") attached hereto and made a part hereof as Exhibit E; and (z) furnishes a copy of each Distributor Contract to Licensor. For purposes of this Paragraph 2.j.(ii), third-

party distributors shall not include any distribution entity which is wholly-owned or controlled by Licensee. However, nothing contained in this Paragraph 2.j.(ii) shall be construed to relieve Licensee of its obligation and responsibility to ensure that its distributors, whether third-party or wholly-owned, perform their duties in accordance with the terms and conditions of this Agreement, (including, but not limited to, the E-commerce Guidelines) and the Distributor Contract, including, but not limited to approved distribution channels and Territory restrictions. Licensee shall be responsible to Licensor for any violations by its distributors, whether third-party or affiliated, of the terms and conditions of this Agreement or the Distributor Contract. In the event of any such violation, Licensor shall have the right, but not the obligation, to require Licensee to: (i) immediately terminate, upon receipt of written notice from Licensor, the Distributor Contract with such distributor; and (ii) immediately and permanently cease supplying any or all of the Products to such distributor. In the event Licensee fails to terminate the Distributor Contract with such distributor immediately upon Licensee's receipt of Licensor's notice or fails to cease supplying any or all of the Products to such distributor, Licensor shall have the option, but not the obligation to terminate the License and this Agreement, immediately upon receipt by Licensee of written notice, by deeming any such failure to be an incurable default by Licensee under this Agreement. In addition, Licensee shall be responsible for obtaining from each of its distributors, whether third-party or affiliated, a complete listing of each such distributor's inventory of the Products on hand at the time of termination or expiration of this Agreement and upon the expiration or termination of the "Sell-Off Period" (if any) and supplying a copy to Licensor of such inventory listing within the time frames set forth in Paragraph 8.d. hereof.

(iii)     With the Statement submitted at the end of each License Year pursuant to Paragraph 2.d.(i) hereof and at any other time so requested by Licensor during the Term and the Sell-Off Period, Licensee shall provide Licensor with: (a) copies of Licensee's most recent audited financial statements (including without limitation footnotes) and annual reports, 10-K's, balance sheets or other similar documents that indicate Licensee's financial status; and (b) an updated list of the names and addresses of all manufacturing sources, subcontractors, distributors, suppliers, dealers, wholesalers, retailers, accounts and others which have been engaged in the design, manufacture, advertising, promotion, sale, distribution or other dealings with any or all of the Products and the Materials during the Term and the Sell-Off Period or either thereof. Such list shall, if so requested by Licensor, contain the full specification of all designs, utility models, patents or trademarks that may be involved, directly or indirectly, in the manufacture, production or distribution of any or all of the Products and the Materials. Licensee shall obtain the consent of any and all relevant third parties for such disclosure.

k.     Inventory: Insofar as reasonable, Licensee shall at all times during the Term be able to fulfill all orders for the Products promptly and yet not have an excessive inventory on hand at the time of the expiration or termination of the License. Within forty-five (45) days after each License Year or within ten (10) days of receipt of a request from Licensor, Licensee will furnish Licensor with a complete and accurate statement (the "Inventory Statement") signed by the Chief Financial Officer of Licensee, setting forth in detail the quantities and description of each of the Products in work in process and finished goods inventories of the Products and the locations thereof.

l.     Playboy Properties and Non-Competitive Brands:

(i)     Licensee shall not use, cause or authorize to be used any word, device, design, slogan or symbol confusingly similar to any or all of the Playboy Properties. During the Term and the Sell-Off Period, any or all of the following shall not be used on or in connection with the Products or the Materials without Licensor's prior written consent: (a) permutations of any or all of the Playboy Properties; (b) secondary marks; or (c) new words, devices, designs, slogans or symbols. Upon such authorization by Licensor and use by Licensee, each such permutation, secondary mark, word, device, design, slogan and symbol shall be the property of Licensor and shall be included as one

Case 11-26046   Doc 39-2   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
Case 2:12-cv-10590-SJO-E   Document 2-2   Filed 12/28/12   Page 9 of 69   Page ID #:318
A   Part 2   Page 22 of 28

Case 11-26046   Doc 16-1   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
Exhibit 1   pt. 1   Page 21 of 27

of the Playboy Properties subject to this Agreement. Should Licensee create or develop any advertising, promotion, packaging or trade dress unique to the Products, all such advertising, promotion, packaging or trade dress shall be the property of Licensor and shall not be used by Licensee on or in connection with any other product or merchandise during and after the Term. No later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor so requests, Licensee will assign to Licensor, without charge, all of Licensee's right, title and interest (including without limitation all copyrights) in and to such advertising, promotion, packaging or trade dress and shall cooperate fully with Licensor in preparing and recording whatever documentation may be necessary or desirable or requested by Licensor to effect such assignment.

(ii)  Without Licensor's prior written consent, Licensee shall not design, manufacture, advertise, promote, distribute, sell or deal with in any way in the Territory any product or material that is or are in Licensor's reasonable judgment competitive with or confusingly similar to any or all of the Products and the Materials.

(iii)  Licensee shall not use color combinations, designs, styles, logo treatments, graphics or packaging unique to any or all of the Products on or in connection with any other product, and Licensee, without charge, will assign to Licensor ownership of all rights, including, but not limited to, all rights of copyright and trademark, that Licensee has acquired or may acquire in such color combinations, designs or styles no later than ten (10) days after expiration or termination of this Agreement or at any other time Licensor so requests.

(iv)  Licensee shall not during the Term of this Agreement enter into any retail business or business arrangement involving retail identified with or by the names or trademarks of any men's lifestyle publications, products or services, including but not limited to *FHM, Maxim* or *Stuff*. In the event Licensee commences any such dealing with any such publications, whether directly or indirectly, or in the event the publishers or any substantial holder of the interest in any such publication or in any men's sophisticate publication such as *Maxim, FHM, Stuff, CKM, Hustler* or *Penthouse* acquires or otherwise comes to hold any financial or equity interest in Licensee, Licensor shall have the right to terminate this Agreement as the result of an incurable default.

m.   Indemnification and Product Liability Insurance:

Licensee shall:

(i)  indemnify, defend and hold harmless Licensor, its subsidiaries and affiliates, their respective shareholders, licensees and franchisees and the agents, officers, directors and employees of each (hereinafter collectively referred to as "Indemnitees") from all costs, claims, suits, losses, damages and expenses (including without limitation reasonable attorneys' fees), provided prompt notice of each such claim or suit which comes to the attention of Licensor is given to Licensee by Licensor arising out of or in connection with: (a) the design, manufacture, advertising, promotion, sale or distribution of or any other dealing whatsoever with the Products or Materials; (b) any alleged action or failure to act whatsoever by Licensee; (c) any alleged defect in any or all of the Products; (d) any alleged non-conformity to or non-compliance with any law pertaining to the design, quality, safety, advertising, promotion or marketing of any or all of the Products and the Materials; (e) any sales or distribution by Licensee of the Products to a State, particularly an EU-member State not belonging to the Territory, where a third party owns the registrations for trademarks that are confusingly similar to the Trademarks; or (f) any breach by Licensee of any of its representations or warranties hereunder. In no event, however, will such indemnification include incidental or consequential damages, including, but not limited to compensation or reimbursement for loss of prospective profits, anticipated sales or other losses occasioned by termination of

PEIII\PlayBeverages_energydrinks_eu_ComboWeb\JJ-jl\10          20          11/29/06

Case 11-26046    Doc 29-2    Filed 07/01/11    Entered 07/01/11 17:27:01    Desc Exhibit
Case 2:12-cv-10590-SJO-E    Document 22    Page 234 of 28 2    Page 10 of 69    Page ID #:319
Case 11-26046    Doc 16-1    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
                            Exhibit 1    pt. 1    Page 22 of 27

this Agreement or any other reason(s). Licensee shall have the option to settle or to undertake and conduct the defense of any such claim or suit. Licensee shall have sole and exclusive control over such defense, and Licensee's decisions with respect thereto shall govern and control. Licensor expressly covenants that no discussions by Licensor whatsoever with claimant or litigant, no compromise or settlement by Licensor of any claim or suit and no negotiations by Licensor with respect to any compromise or settlement shall be had, made or entered into without the prior written approval of Licensee;

(ii)    obtain and maintain, at Licensee's own expense, product liability insurance satisfactory to Licensor in the minimum amount of Ten Million U.S. Dollars ($10,000,000) of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" (or better), and qualified to transact business in the Territory (each such insurance policy shall name each of the Indemnitees as additional insureds by reason of the indemnity contained in Paragraph 2.m.(i) above and shall evidence the insurer's agreement that such insurance shall not be amended, canceled, terminated or permitted to lapse without thirty (30) days' prior written notice to Licensor), and provide Licensor with a certificate of such insurance upon execution of this Agreement by Licensee and on each anniversary date of the grant or issuance of each such policy during the Term and the Sell-Off Period evidencing that each such policy has not been altered with respect to the Indemnitees in any way whatsoever nor permitted to lapse for any reason, and evidencing the payment of premium of each such policy; and

(iii)    cause each such policy to be in full force and effect prior to the commencement of any design, manufacture, advertising, promotion, sale, distribution or dealing with any or all of the Products whatsoever. Failure by Licensee to obtain the required insurance prior to such commencement or failure by Licensee to adequately maintain such insurance during the Term and the Sell-Off Period shall be an incurable default by Licensee under this Agreement.

n.    <u>Advertising Expenditures, Advertising Plans and Public Relations</u>:

(i)    In addition to all other amounts or payments due from Licensee under this Agreement, and not to be credited to or offset against any Guaranteed Royalties or Earned Royalties, Licensee agrees to expend within each License Year for advertising and promotion of the Products in trade and consumer media or either thereof (including without limitation displays, fixtures and point-of-sale materials, newspapers, magazines, television and radio, but specifically excluding trade shows) and for contribution to Licensor's advertising and promotion pool (as set forth below) not less than three percent (3%) of Net Sales for such License Year. If the Statement for the last License Quarter of a License Year shows three percent (3%) of Licensee's Net Sales has not been spent as set forth in this Paragraph 2.n.(i), then for the first License Year only the amount of such shortfall shall be added to the three percent (3%) due to be spent during the second License Year. In the event the Statement for any License Year beyond License Year 1 shows that the total percentage of Net Sales (which, for the second License Year, shall be three percent (3%) plus the amount of any shortfall from the first License Year) have not been reached, the difference between the amount actually spent and the amount required to be spent must be remitted to Licensor along with such Statement for use in Licensor's advertising and promotion pool with such Statement.

(ii)    Licensee must submit to Licensor, for Licensor's approval, its advertising/promotional plan and marketing plan for the Products for each ensuing calendar year. Such plans must be submitted not later than October 1st of each calendar year. In the event Licensor, in its reasonable discretion, does not approve of any such plan, Licensee must submit a revised plan or plans to Licensor, for its approval, within not more than fifteen (15) days following Licensee's receipt of Licensor's notice of disapproval and Licensee must incorporate revisions into the plan or plans that address Licensor's concerns or reasons for disapproval.

Case 11-26046    Doc 29-2    Filed 07/01/11    Entered 07/01/11 17:27:01    Desc Exhibit
Case 2:12-cv-10590-SJO-E  Document 12-2  Filed 12/22/12  Page 11 of 69  Page ID #:320
A    Part 2    Page 24 of 28
Case 11-26046    Doc 16-1    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
Exhibit 1    pt. 1    Page 23 of 27

(iii)    Within ten (10) days following the end of each calendar quarter during the Term, Licensee will submit to Licensor, a list of all upcoming public relations efforts regarding the Products (the "PR"), which may include, but will not be limited to, interviews, press releases and press events. In the event Licensee wishes to sanction or schedule any PR after the submission to Licensor of such monthly list, Licensee will immediately notify Licensor of such additional PR. Licensee must obtain Licensor's prior written approval prior to any PR effort taking place. In the event any PR consists of interviews, all talking points for same must be approved in advance in writing by Licensor. In the event Licensor, in its sole discretion, wishes to participate in any PR Licensor will so notify Licensee. In the event Licensor fails to provide its approval or disapproval of any or all things submitted to Licensor pursuant to this Paragraph 2.n.(iii) within fourteen (14) days of Licensor's receipt thereof, Licensor shall be deemed to have disapproved of such things. In the event Licensor disapproves any PR, Licensee will cancel such disapproved PR. Failure by Licensee to cancel any disapproved PR or engaging in any PR that has not been submitted to Licensor in advance for approval shall be an incurable default by Licensee under this Agreement.

3.    **ADDITIONAL COVENANTS OF THE PARTIES.**

    a.    **Reservation of Rights**: All rights not expressly and specifically granted herein to Licensee are reserved by Licensor.

    b.    **Certain Sales**:

        (i)    In the event Licensor during the Term chooses to exercise some or all of Licensor's rights pursuant to Paragraph 1.a.(iii) hereof, Licensee, if requested to do so by Licensor, will sell to Licensor and its licensee(s) or either thereof any or all of the Products at the best prices and terms given to other customers of the Products ordering substantially the same quantities of similar merchandise from Licensee.

        (ii)    In the event of any such sale of the Products by Licensee to Licensor, Licensee shall ship or deliver such Products either directly to Licensor or, as Licensor may direct, to any other individual(s), entity or entities... Any or all such sales of the Products by Licensee to Licensor shall be at the prices described in Paragraph 3.b.(i) above. Licensee will include such sale(s) in the computation of Net Sales for the purpose of computing Earned Royalties and Minimum Net Sales. Licensee shall bill Licensor and its licensee(s) or either thereof in accordance with Licensee's normal billing procedures for all such Products shipped or delivered.

4.    **TITLE AND PROTECTION.**

    a.    **Indemnification by Licensor**: Licensor represents and warrants that: (i) it is the owner of the Trademarks; (ii) it has all necessary rights to the Images for the purposes set forth in this Agreement; (iii) the Trademarks are valid in the Territory; and (iv) the Trademarks are, to the best of Licensor's knowledge, free from any claim by any third party that would unreasonably interfere with the rights granted to Licensee under this Agreement. Licensor shall indemnify, defend and hold harmless Licensee, its subsidiaries and affiliates, their respective shareholders, licensees and franchisees and the agents, officers, directors and employees of each against and from all costs, claims, suits, losses, damages and expenses, including, without limitation reasonable attorneys' fees (provided prompt notice of each such claim or suit which comes to the attention of Licensee is given to Licensor by Licensee) arising out of or in connection with the authorized use of the Playboy Properties on or in connection with the Products by Licensee in the Territory, but in no event shall such indemnification include incidental or consequential damages, including, but not limited to compensation or reimbursement for loss of prospective profits, anticipated sales or other losses occasioned by termination of this Agreement or any other reason(s). Licensor shall have the option to settle or to undertake and conduct the defense of any such claim or suit. Licensor shall have sole and exclusive control over such defense, and

Case 2:12-cv-00890-SJO-E Document 1-2 Filed 07/01/11 Entered 11/11/11 17:27:01 Desc Exhibit
A Part 2-2 Page 25 of 28 12 Page 12 of 69 Page ID #:321

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 24 of 27

Licensor's decisions with respect thereto shall govern and control. Licensee expressly covenants that no discussions by Licensee whatsoever with claimant or litigant, no compromise or settlement by Licensee of any claim or suit and no negotiations by Licensee with respect to any compromise or settlement shall be had, made or entered into without the prior written approval of Licensor.

  b.    Enforcement: Licensee shall promptly notify Licensor in writing of each actual, suspected or apparent infringement or imitation of the Playboy Properties or the Materials that comes to the attention of Licensee. Licensor shall take such action in regard to such infringement or imitation as Licensor, in its sole and absolute judgment, deems to be appropriate. Licensor shall, in its sole and absolute discretion, decide whether to assert any claim or undertake or conduct any suit with respect to such infringement or imitation, but Licensee shall, upon receipt of notice from Licensor and pursuant to Licensor's instructions, on behalf of Licensor, assert any such claim or handle, undertake and conduct any such suit at Licensor's expense in the name of Licensor or Licensee or in both names as Licensor may direct. Licensee expressly covenants that no discussions whatsoever with the infringing or imitating party or parties, no compromise or settlement of any such claim or suit and no negotiations with respect to any compromise or settlement of any such claim or suit shall be had, made or entered into without the prior written approval of Licensor. Licensee may share in as much as fifty percent (50%) of any damage recovery or settlement obtained by Licensor or on Licensor's behalf by Licensee as a result of any such claim or suit only if Licensee notified Licensor upon the initiation of such claim or suit that Licensee desires to participate financially in such claim or suit by contributing to the payment of the costs and expenses thereof and only in an amount that shall bear the same ratio to the damage recovery or settlement as the amount of Licensee's financial participation permitted by Licensor bears to the total costs and expenses incurred in obtaining such damage recovery or settlement. In no event shall Licensor be responsible to Licensee for consequential or incidental damages that result from any such infringement or imitation. Under no circumstances may Licensee enforce Licensor's rights to the Playboy Properties without Licensor's prior written approval and in no event may Licensee take any action on account of any such infringements without Licensor's prior written approval.

5.    RELATIONSHIP BETWEEN THE PARTIES.

  a.    No Joint Venture: Nothing herein contained shall be construed to place the parties hereto in the relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind Licensor or its subsidiaries or affiliates in any manner whatsoever. Licensor will have no fiduciary duty or fiduciary obligation to Licensee under this Agreement.

  b.    Assignment:

    (i)    Licensor, in entering into this Agreement, is relying entirely upon Licensee's skills, reputation and personnel, including without limitation its officers, managers, directors and shareholders. This Agreement and all rights, duties and obligations hereunder are personal to Licensee and shall not, without the prior written consent of Licensor (which may be given or withheld Licensor's reasonable discretion), be assigned, delegated, sold, transferred, leased, mortgaged or otherwise encumbered by Licensee or by operation of law. Any attempt to do so without such consent shall be void and have no force or effect whatsoever and shall constitute a default under this Agreement. If Licensor in its reasonable discretion believes that any change in any or all of the officers, managers, directors and shareholders of Licensee has, will or could materially interfere with or materially and adversely affect Licensee's performance hereunder or the relationship between the parties hereto, Licensor may deem such change to be a default under this Agreement and shall so notify Licensee. In the event of any default pursuant to the provisions of this Paragraph 5.b.(i), Licensee will have the option to reverse such change to the reasonable satisfaction of Licensor within not more than ten (10) days of the date of Licensor's written notice of such default. Licensee must provide to Licensor within such 10-day period evidence of such reversal. If such change is not so reversed, Licensor shall have the right to deem the Agreement to be terminated

Case 11-26046 Doc 20-2 Filed 07/01/11 Entered 07/01/11 17:27:01 Desc Exhibit
Case 2:12-cv-00590-SJO-E Document 2-2 Filed 6/22/12 Page 13 of 69 Page ID #:322
A Part 2 Page 26 of 28
Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 25 of 27

on such 10th day. The consent of Licensor to any such assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change shall not be deemed to be consent to any subsequent assignment, delegation, sale, transfer, lease, mortgage, other encumbrance or change.

(ii)     Licensor may assign this Agreement or assign or delegate any or all of its rights, duties and obligations under this Agreement to any of its parents, subsidiaries or affiliates or to any individual or entity.

6.     **SUBLICENSING.**   Licensee may not, without the prior written approval of Licensor, whose discretion shall be final and absolute, enter into any sublicense agreement or grant any sublicense for any or all of the rights or obligations of Licensee under the License or this Agreement. The consent of Licensor to any sublicense agreement or sublicense shall not be deemed to be a consent to any subsequent sublicense agreement or sublicense.

7.     <u>DEFAULTS AND RIGHTS OF TERMINATION.</u>

a.     <u>Defaults and Right to Cure</u>:

(i)     Except as otherwise provided in this Agreement, if Licensee fails to make any timely payments under the terms of this Agreement, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than ten (10) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default. Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such ten (10) day period. Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

(ii)     Except as otherwise provided in this Agreement and, specifically, Paragraph 7.a.(i) above, if Licensee shall violate any of the terms or conditions hereof or default on any of its duties, obligations or warranties hereunder, Licensor shall have the right and option, but not the duty, to terminate the License and this Agreement upon not less than thirty (30) days' prior written notice, but no neglect or failure to serve such notice shall be deemed to be a waiver of any such violation or default. Such termination shall become effective unless such violation or default described in such notice shall be completely remedied to the satisfaction of Licensor within such thirty (30) day period. Upon such termination, Licensee shall immediately pay all amounts owed under this Agreement.

(iii)     Notwithstanding the provisions of Paragraph 7.a.(i) above, if such violation or default: (a) is of a kind that a remedy or cure cannot effectively restore the prior circumstances; or (b) is described in this Agreement as an incurable default, then the License and this Agreement shall terminate upon receipt by Licensee of written notice thereof without any period of remedy or cure whatsoever. The termination of the License and this Agreement shall be without prejudice to any rights that Licensor otherwise has against Licensee under this Agreement or under law.

b.     <u>Bankruptcy or Assignment for Creditors, Business Discontinuance</u>: If: (i) Licensee files a petition in bankruptcy or is adjudicated a bankrupt; (ii) a petition in bankruptcy is filed against Licensee; (iii) Licensee shall become insolvent or shall make or agree to make an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law; (iv) Licensee discontinues business; (v) Licensee receives a qualified opinion from its independent auditor regarding Licensee's financial statements or an opinion stating that Licensee's financial situation raises substantial doubt about Licensee's ability to continue as a going concern (or the equivalent of such an opinion); or (vi) a receiver shall be appointed for Licensee, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever. If

Case 1:11-26046 Doc 29-2 Filed 07/01/11 Entered 07/01/11 17:27:01 Desc Exhibit
Case 2:12-cv-10590-SJO-E Document 212 Filed 7/27/12 Page 14 of 69 Page ID #:323
A Part 2 Page 27 of 28

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 26 of 27

the License and this Agreement are so terminated, any and all of Licensee and its receivers, representatives, trustees, agents, administrators, successors and assigns shall have no right to sell or in any way deal with any of the Playboy Properties, Products or the Materials, except with the special prior written consent and under the instructions of Licensor that it or they shall be obligated to follow.

     c.    <u>Loss of Trademark Rights</u>:  If Licensee's right to use any or all of the Trademarks is adjudged illegal, invalid or restricted and either (i) such adjudication has become final and non-appealable; (ii) Licensor in its sole discretion chooses not to appeal therefrom; or (iii) if a settlement agreement is entered into by Licensor that prohibits or restricts Licensor's or Licensee's right(s) to use the Trademarks, the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever as of the date (x) such adjudication becomes final and non-appealable; (y) Licensor makes such choice; or (z) the execution and delivery of such settlement agreement.

     d.    <u>Qualified Auditor's Report</u>:  If Licensee receives a qualified opinion from its independent auditor regarding Licensee's financial statements or an opinion stating that the Licensee's financial situation raises substantial doubt about Licensee's ability to continue as a going concern (or the equivalent of such an opinion), the receipt of such opinion shall be considered an incurable default and the License and this Agreement shall automatically terminate without the necessity of any notice whatsoever.

     e.    <u>Cross-Default</u>:  In addition to, and without derogating from any other rights Licensor may have hereunder or under any other agreement between Licensor and Licensee, or otherwise, any breach or default by Licensee (or its successors or assigns) of any other agreement (collectively, the "Other Agreements"), between Licensor (or any affiliate or assignee of Licensor) and Licensee (or its successors or assigns) may also be deemed by Licensor to be a breach or default by Licensee under this Agreement, and any breach or default by Licensee (or its successors or assigns) under this Agreement may also be deemed to be a breach or default by Licensee (or its successors or assigns) of any or all Other Agreements, and Licensor (or the applicable affiliate or assignee of Licensor) shall be entitled to exercise any and all of its rights and remedies under the applicable agreements with respect thereto as if such breach or default occurred under such agreements.

8.    <u>EXPIRATION OR TERMINATION.</u>

     a.    <u>Effect of Expiration or Termination</u>:  Upon and after the expiration or termination of the License and this Agreement, all rights granted to Licensee under this Agreement shall immediately revert to Licensor.  Licensee will refrain from any further use of the Playboy Properties or any further reference to anything similar to the Playboy Properties (including, but not limited to, words, devices, designs and symbols) or in any way associated with any or all of the Products, Licensor and its subsidiaries or affiliates, except with the prior written consent of Licensor or as expressly provided in Paragraph 8.c. hereof.

     b.    <u>Reserved Rights</u>:  The expiration or termination of the License and this Agreement shall not: (i) relieve Licensor or Licensee, respectively, of any obligations incurred prior or subsequent to such expiration or termination; or (ii) impair or prejudice any of the rights of Licensor or Licensee, respectively, accruing prior or subsequent thereto as provided in this Agreement.  Upon termination of the License and this Agreement pursuant to Paragraph 7.c. hereof, Guaranteed Royalties for the then current License Year shall be prorated based on the ratio that the number of days in such License Year prior to termination bears to the number of days in the License Year had the License and this Agreement not been terminated.  Earned Royalties due for such License Year shall be the excess of Earned Royalties over such prorated Guaranteed Royalties.  Any overpayment of Guaranteed Royalties or overpayment or underpayment of Earned Royalties based on such proration shall be immediately adjusted by the parties hereto.

     c.    <u>Continued Sales After Expiration or Termination</u>:  Provided that Licensee is not in

Case 2:12-cv-10590-SJO-E Document 22-2 Filed 02/22/12 Page 15 of 69 Page ID #:324
Case 11-26046 Doc 29-2 Filed 07/01/11 Entered 07/01/11 17:27:01 Desc Exhibit
A Part 2 Page 28 of 28

Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 27 of 27

arrears in the payment of any amounts due to Licensor and that Licensee is in compliance with all of the terms and conditions of this Agreement, then upon the expiration of the License and this Agreement, or if this Agreement is terminated pursuant to any paragraph of this Agreement prior to the Expiration Date and then only upon Licensor's prior written approval (which may be withheld at Licensor's discretion), and except as provided in Paragraph 8.d. hereof, Licensee may, for a period of one hundred and twenty (120) days after the Expiration Date or notice of termination together with Licensor's written consent (the "Sell-Off Period"), sell through Licensee's existing, recognized network of distributors or accounts all of the Products that have been approved by Licensor and that are in process or on hand on the Expiration Date or at the time such notice of termination together with Licensor's approval of such Sell-Off Period is received. In such event, Licensee shall pay Earned Royalties and furnish Statements with respect to the Sell-Off Period in accordance with the terms and conditions of this Agreement as though the License and this Agreement were still in effect. It is expressly understood and agreed by Licensee that the Sell-Off Period shall be: (i) non-exclusive; and (ii) considered a separate accounting period for the purpose of computing Earned Royalties due to Licensor for sales during such Period. Sales during the Sell-Off Period shall not be applied against any Guaranteed Royalties due or payable prior to the Sell-Off Period.

d.    Inventory After Expiration or Termination:

(i)    Licensee shall furnish to Licensor an Inventory Statement:

(a)    not more than thirty (30) days after the expiration of this Agreement;

(b)    not more than thirty (30) days after the expiration of the Sell-Off Period (if any); and

(c)    not more than ten (10) days after: (i) receipt by Licensee of notice of termination of this Agreement or the Sell-Off Period (if any); or (ii) the happening of any event that terminates the License and this Agreement where no such notice is required.

(ii)    Not more than ten (10) days after the expiration or termination of this Agreement or the Sell-Off Period (if any), Licensee must supply Licensor with a certificate of destruction for all Materials, including, but not limited to, holograms, labels, hang tags, buttons, boxes, zippers, decals, advertising material, and equipment capable of recreating the Playboy Properties, including, but not limited to: molds, tools, dies and printing screens.

(iii)    Upon the expiration or termination (for any reason) of this Agreement during the Term or the Sell-Off Period (if any), Licensor reserves the right to purchase all remaining inventory at Licensee's direct variable manufacturing cost, however, if Licensor chooses not to purchase such inventory, it shall be promptly destroyed by Licensee unless otherwise agreed between Licensee and Licensor. Licensor shall inform Licensee of its decision within fifteen (15) days after Licensor's receipt of the Inventory Statement from Licensee.

(iv)    Should Licensor choose not to purchase Licensee's Inventory as provided under Paragraph 8.d.(iii) above, Licensee, within ten (10) days after Licensor's notice, shall provide Licensor with a certificate of destruction for all inventory of the Product on hand or in process.

(v)    Licensor and its agents shall have the right to conduct physical inspections to ascertain Licensee's compliance with this Paragraph 8.d. Any refusal by Licensee to submit to such inspection shall forfeit Licensee's right to a Sell-Off Period, and Licensor shall retain all other legal equitable rights it has in the circumstances, which rights are hereby specifically reserved.

Case 2:12-cv-10590-SJO-E  Document 21-2  Filed 12/27/12  Page 16 of 69  Page ID #:325
Case 11-26046  Doc 29-3  Filed 07/01/11  Entered 07/01/11 17:27:01  Desc Exhibit
A  Part 3  Page 3 of 33
Case 11-26046  Doc 16-2  Filed 06/27/11  Entered 06/27/11 17:30:57  Desc Exhibit
1  pt. 2  Page 2 of 32

e.    Equitable Relief and Legal Fees:

(i)    Subject to Paragraph 8.c. hereof, Licensee hereby acknowledges that its failure to cease the design, manufacture, advertising, promotion, sale or distribution of the Products and the Materials upon the expiration or termination of this Agreement will result in irreparable harm to Licensor and its business interests for which there is no adequate remedy at law. Accordingly, in the event of such failure or in the event of any violation or default by Licensee under this Agreement (after giving effect to the provisions of Paragraph 7.a.(i) hereof), Licensor shall be entitled to equitable relief without the necessity of posting bond by way of any temporary and permanent injunctions and such other relief as any court of competent jurisdiction may deem just and proper. In this regard, Licensee hereby consents to the judgment of temporary and permanent injunctions in favor of Licensor in order to give effect to this Paragraph 8.e.(i).

(ii)    In the event either party hereto files any action against the other to enforce any of the provisions of this Agreement or to secure or protect such party's rights under this Agreement, such party shall be entitled to recover, in any judgment in its favor entered therein, the attorneys' fees and litigation expenses of such party, together with such court costs and damages as are provided by law.

f.    Termination Fee: Notwithstanding anything to the contrary in this Agreement, if Licensor terminates this Agreement as a result of a default by Licensee or a default that is not cured by Licensee within the time frame set forth in Paragraph 7.a.(i) hereof, the payment of all Guaranteed Royalties payable through the Expiration Date will be accelerated and Licensee shall pay to Licensor as a termination fee no later than ten (10) days after the date of such termination all outstanding Guaranteed Royalties required to be paid during the Term of this Agreement in addition to all Earned Royalties due through the effective date of termination, and Licensor may immediately draw down on the full value of any outstanding Letter of Credit required under Paragraph 2.c.(iv) hereof, which such drawing shall not preclude Licensor from seeking from Licensee any deficiency that remains after such drawing.

9.    NOTICES.

a.    Effectiveness: Unless otherwise expressly indicated in this Agreement, each notice, request, approval, consent, payment and Statement (hereinafter referred to as a "Submission") specifically provided for in this Agreement shall be in writing and shall be considered effective or received the earliest of:  (i) five (5) days after the date when such Submission is mailed by certified or registered mail with postage prepaid to the party hereto at the address set forth below; (ii) two (2) business days after the date when such Submission is sent by overnight courier service addressed to such party at such address or the date indicated as received on the overnight courier service confirmation receipt, whichever is earlier; (iii), except for payments, when such Submission is sent by email addressed to such party at such email address and the sender thereof requests and receives written confirmation from such party that such Submission has been received and is legible; or (iv) when such Submission is actually received by such party at such address:

| | | |
|---|---|---|
| To Licensor: | Address: | 730 Fifth Avenue<br>New York, NY  10019 |
| | Attention: | Sarah Haney |
| | Facsimile: | 212 957 2950 |
| | Telephone: | 212 261 5000 |
| With a copy to: | Address: | 680 North Lake Shore Drive<br>Chicago, IL  60611 |
| | Attention: | General Counsel |
| | Facsimile: | 312 266 2042 |
| | Telephone: | 312 751 8000 |

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 17 of 69   Page ID #:326

Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 4 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 3 of 32

To Licensee:        The address specified in Paragraph S.2. of the Schedule
                    Attention:   Ken Hertz
                    Email:       ken@ghlh.com
                    Telephone:   310 248 3107

       b.   <u>Address Change</u>: Notwithstanding the provisions of Paragraph 9.a. hereof, each party hereto may give written notice to the other party of some other address to which Submissions shall be sent, in which event such Submissions to such party subsequently shall be sent to such address.

       10.   <u>CONFIDENTIAL INFORMATION</u>.  Any party hereto (the "Disclosing Party") may from time to time during the Term of this Agreement, make available to other party (the "Receiving Party"), certain materials and Information, all of which is non-public, confidential or proprietary to the Disclosing Party (collectively the "Proprietary Material").  Neither party hereto shall disclose the Disclosing Party's Proprietary Material to third-parties or use the Disclosing Party's Proprietary Material for any purpose other than in connection with the Receiving Party's duties and obligations as set forth in this Agreement. The Receiving Party will ensure that the Disclosing Party's Proprietary Material will be kept confidential by the Receiving Party and its directors, officers, employees, agents, distributors, designers and supplier/subcontractors (collectively the "Representatives"), and that all such Representatives shall be made aware of the confidential nature of the Proprietary Material.  In the event the Receiving Party is requested or required (by oral question, interrogatories, subpoena, civil investigative demand or similar process) to disclose any of the Disclosing Party's Proprietary Material, the Receiving Party will promptly notify the Disclosing Party of such request or requirement and cooperate with the Disclosing Party so that the Disclosing Party may seek an appropriate protective order or otherwise seek appropriate protection of the Proprietary Material.  In the event that such protection is not obtained or that the Disclosing Party waives compliance, the Receiving Party shall furnish only that portion of the Disclosing Party's Proprietary Material which the Receiving Party is advised by written opinion of counsel is legally required to be furnished.  Attached hereto as Exhibit F and made a part hereof is a list (which may be amended from time to time) of Proprietary Material which each party has supplied to the other, but such list is not intended to preclude any other material or information of a non-public, confidential or proprietary nature which may be provided to the Receiving Party by the Disclosing Party verbally or otherwise.  Within ten (10) days from:  (a) the expiration or effective date of termination of this Agreement; or (b) the date of the Disclosing Party's prior written request, the Receiving Party will return to the Disclosing Party, or destroy at the Disclosing Party's request, all of the Disclosing Party's Proprietary Material and all copies of such Proprietary Material produced, or any notes, analysis or other materials prepared or produced, by the Receiving Party or its Representatives.

       Unless mandated by law or a governmental agency or as otherwise required in connection with financial statement disclosure, Licensee will keep all terms and conditions of this Agreement confidential both during and after the Term of the Agreement.

       11.   <u>SEVERABILITY</u>.  Each provision of this Agreement shall be severable.  If, for any reason, any provision herein is finally determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such determination shall not impair the operation or affect the remaining provisions of this Agreement, and such remaining provisions will continue to be given full force and effect and bind the parties hereto.  The parties to this Agreement agree to replace invalid or unenforceable provisions by a valid and enforceable provision which carries out to the maximum possible extent the original economic intent of the parties.

       12.   <u>CONSENTS AND APPROVALS</u>.  If Licensor fails or refuses to grant to Licensee any request, consent or approval, Licensor may, but shall not be required to, give the reason therefor, but Licensor shall not be liable for any events or circumstances that arise as a result of such failure or refusal.

       13.   <u>APPLICABLE LAW</u>.  This Agreement shall be governed by and interpreted under the laws of the State of Illinois without regard to its conflicts of laws provisions.  Licensee hereby submits to personal jurisdiction in Cook County, Illinois.  The parties hereto agree that any and all disputes arising

out of or relating in any way to this Agreement shall be litigated only in courts sitting in Cook County, Illinois. Licensor shall have the option, however, to instead file lawsuit at Licensee's domicile which will then be litigated in the courts competent for that domicile.

14. **NO BROKER.** Licensee warrants and represents that Licensee used no broker in connection with the execution and delivery of this Agreement.

15. **CONSTRUCTION.** The headings used herein are for convenience only and shall not be deemed to define, limit or construe the contents of any provision of this Agreement. The wording of this Agreement shall be deemed to be the wording chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any such party. Time is the essence of this Agreement. The Recitals and the Additional Terms and Conditions (contained in Exhibit G which is attached hereto) shall be deemed to be part of this Agreement. This Agreement may be executed in separate counterparts, each of which is deemed to be an original, and all of which taken together constitute one and the same agreement.

16. **SURVIVABILITY.** The expiration or termination of the License and this Agreement shall not affect those provisions hereof that are meant to survive such termination or expiration.

17. **RIGHTS CUMULATIVE.** The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

18. **ENTIRE AGREEMENT.** This Agreement (with the Schedule and Exhibits A through G) represents the entire understanding of the parties hereto. None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by the parties hereto. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement. No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of Licensor's right to demand exact compliance with any of the terms herein at any time. The failure of either party hereto to enforce, or the delay by either party hereto in enforcing, any or all of its rights under this Agreement shall not be deemed as constituting a waiver or a modification thereof, and either party hereto may, within the time provided by applicable law, commence appropriate proceedings to enforce any or all of such rights. Except as expressly provided in this Agreement, no individual or entity other than Licensee and Licensor shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

This Agreement will become null and void, and Licensor will have no further obligation to enter into this Agreement with Licensee if Licensee has not executed this Agreement and returned it to Licensor so that Licensor receives the executed Agreement by December 29, 2006.

IN WITNESS WHEREOF, the parties hereto, intending this Agreement to be effective as of the Commencement Date, have caused this Agreement to be executed by the duly authorized representative of each.

PLAY BEVERAGES, LLC
(LICENSEE)

By: _____
Title: MENIBEAIN, LLC
AUTHORIZED SIGNER
Date: 11/30/06

PLAYBOY ENTERPRISES
INTERNATIONAL, INC.
(LICENSOR)

By: _____
Title: President, Global Licensing & Exec. V
Date: 12/13/06

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 19 of 69   Page ID #:328
Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 6 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 5 of 32

EXHIBIT A
ATTACHED TO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

THE PLAYBOY PROPERTIES*

# PLAYBOY



* Any revisions to the above list and depictions will be granted only upon Licensor's receipt of
a fully-signed amendment to this Exhibit A.

EXHIBIT B
ATTACHED TO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

<u>E-COMMERCE GUIDELINES</u>

1. Licensee's E-commerce Web Site: Licensee may advertise and offer the availability of the Products on its own E-commerce Web Site and may accept orders for the Products placed through its own E-commerce Web Site subject to the following provisions:

   a. Licensee's E-commerce Web Site must, include a link to www.playboystore.com (or any other URL as Licensor may direct from time to time)and inform visitors to such E-commerce Web Site that the Products and other Playboy-branded Products are available for sale through such link.

   b. Licensee may not advertise or promote the availability of the Products on its own E-commerce Web Site, or accept orders for the Products through its own E-commerce Web Site, if Playboy-branded products [including, but not limited to, the Products, other Playboy-branded items not in the Product category, video media and Spice-branded products] constitute twenty percent (20%) or more of such E-commerce Web Site's total product offerings. For purposes of clarification, such Playboy-branded products (i) may not be the only branded products advertised, promoted and sold on and through such E-commerce Web Site; and (ii) must not constitute twenty percent (20%) or more of all products advertised, promoted or sold on such E-commerce Web Site.

   c. Licensee may not use any of the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-commerce Web Site.

   d. Licensee will ensure that its E-commerce Web Site continuously displays a banner in the form and content acceptable to Licensor informing all visitors to such E-commerce Web Site that no orders for the Products will be accepted and no Products will be shipped outside the Territory.

   e. Licensee will ensure that its E-commerce Web Site continuously displays the trademark or copyright notices as directed by Licensor in connection with the display, advertisement and offer of the Products.

   f. None of the Playboy Properties used in conjunction with the advertisement of the Products on Licensee's E-commerce Web Site may be changed, manipulated or modified in appearance. Licensee may not use the Playboy Properties to advertise, promote or sell non-Playboy branded products or services.

   g. All aspects of the display of the Playboy Properties and Products on Licensee's E-commerce Web Site will be subject to the prior and ongoing approval of Licensor, including design, layout, content, advertising and links. Licensee must obtain Licensor's approval prior to any change in already approved design, layout, content advertising or links of Licensee's E-commerce Web Site.

   h. Notwithstanding anything hereof to the contrary, Licensor shall have the right to immediately withdraw the permission set forth in this Exhibit B and the Agreement upon receipt of Licensor's written notice if Licensor deems, in its sole discretion, that any aspect of Licensee's E-commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices, which Licensor may

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 21 of 69   Page ID #:330
Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 8 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 7 of 32

amend from time to time, set forth on Attachment 1 attached hereto and made a part hereof. In the event of such withdrawal, Licensee must immediately remove all of the Playboy Properties and the Products from Licensee's E-commerce Web Site.

i.   Licensee shall include its own Privacy Policy on Licensee's E-commerce Web Site consistent with the terms and conditions of Playboy.com, Inc.'s privacy policy which is attached hereto by way of example as Attachment 2.

j.   None of the advertisements contained on Licensee's E-commerce Web Site shall include those categories set forth on Attachment 3 attached hereto and made a part hereof unless approved in advance in writing by Licensor.

2.   **E-tailers' and Retailers' E-commerce Web Sites:** Licensee may sell and distribute the Products, and allow its distributors to sell and distribute the Products, to E-tailers and retailers which may sell and distribute the Products via such E-tailers' or retailers' E-commerce Web Sites provided that:

a.   Licensee will not sell or distribute the Products to any E-tailer or retailer who will advertise, promote or offer the Products on an E-commerce Web Site if Playboy-branded products [including, but not limited to, the Products, other Playboy-branded items not in the Product category, video media and Spice-branded products] constitute twenty percent (20%) or more of any such E-commerce Web Site's total product offerings. For purposes of clarification, such Playboy-branded products (i) may not be the only branded products advertised, promoted and sold on and through any such E-commerce Web Site; and (ii) must not constitute twenty percent (20%) or more of all products advertised, promoted or sold on and through any such E-commerce Web Site;

b.   Licensee will use commercially reasonable efforts to ensure that such E-tailers and retailers follow the guidelines set forth in these E-commerce Guidelines for the advertisement, promotion and offer of the Products via any E-commerce Web Site; and

c.   Unless authorized by Licensor in writing, Licensee will not sell or distribute the Products to an E-tailer or retailer: (i) who is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *PLAYBOY Magazine*; (ii) who will advertise, promote or offer the Products on an E-commerce Web Site that is identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion competitive with *PLAYBOY Magazine*; or (iii) who will advertise, promote, or offer the Products for sale on an E-commerce Web Site in conjunction with any products or services identified with or by the names of any adult male lifestyle/entertainment publications which are, in Licensor's opinion, competitive with *PLAYBOY Magazine*.

In the event Licensor discovers any E-commerce Web Site which is in violation of any of the guidelines set forth in this Exhibit B, Licensee, upon Licensor's prior written notice, shall cease all sales and distribution of the Products to the retail or E-tailer owner or controller of any such E-commerce Web Site.

3.   **Distributors' E-commerce Web Sites:** Licensee will ensure that its third-party distributors adhere to the terms and conditions of the E-commerce Guidelines attached to each such distributor's Distributor Contract. Licensee shall also ensure that its affiliated distributors adhere to the terms and conditions set forth in the Agreement and in these E-commerce Guidelines. In the event Licensor discovers any E-commerce Web Site, either owned or controlled by any affiliated or third-party distributor, which is in violation of any of the E-commerce Guidelines, Licensee shall, at Licensor's option, cease selling or distributing the Products to any such distributor.

**ATTACHMENT 1**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**PLAY BEVERAGES, LLC**
**DATED AS OF NOVEMBER 1, 2006**

**STANDARDS AND PRACTICES**

The following may not be depicted (in actual or simulated form) or explicitly described on any E-commerce Web Sites displaying the Playboy Properties or the Products:

1.   Violence

     Violent behavior and links to sexuality or eroticism with violence, directly or indirectly.

2.   Rape

     Rape (including so-called "implicit" or "consenting" rape) is strictly forbidden.

3.   Incest

4.   Sadism and Masochism

5.   Bondage

6.   Bestiality

7.   Child Pornography

     No nude or seminude photos of anyone under 18 years old at the time such photos were taken. Even if a model visibly looks or is actually older than 18, no depictions of any model who is portrayed as younger than 18 in any sexual act. No explicit description of or explicit references to anyone under 18 years of age.

8.   Extreme Sexual Explicitness

     No penetration, erections, ejaculations or close-up shots or descriptions of oral sex.

9.   Graphic Close-ups of Genitals

     No close-ups or descriptions of genitals, particularly in the context of actual or simulated sexual activity.

10.   Actual Sexually Explicit Conduct

      No sexual intercourse (including genital-genital, oral-genital, anal-genital or oral-anal).

11.   Necrophilia

12.   Defecation

13.   Fisting

14.   Bukkake

15.   Any content or interactivity, the presentation of which would be obscene, illegal or actionable under applicable laws.

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 23 of 69   Page ID #:332
Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 10 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 9 of 32

ATTACHMENT 2
ATTACHED TO AND MADE A PART OF EXHIBIT B TO
THE PRODUCT LICENSE AGREEMENT
BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

## EXAMPLE PRIVACY POLICY

This Privacy Policy (the "Policy") applies to Playboy Enterprises, Inc.'s and Playboy.com, Inc.'s (collectively, "Playboy") family of websites (the "Sites"). These include playboy.com; cyber.playboy.com; store.playboy.com; auctions.playboy.com; playboynet.playboy.com; racingusa.playboy.com; sportsbook.playboy.com; casino.playboy.com; and any other sites at which this Policy appears. It does not apply to other online or offline Playboy sites, products or services.

This Policy explains what information we collect about you and what we do with it. We reserve the right to modify this policy at any time, and we will post any new policy here. By using or navigating any of the Sites, you acknowledge that you have read, understand and agree to be bound by this Policy or any modified Policy as posted. If you do not agree to these terms, please do not use or visit any of our Sites.

What information do we collect?

We collect personal information that you provide to us such as your name, e-mail address, street address and telephone number. We also collect credit card information from you. We generally collect this personal information on our registration and order forms when you sign up to receive products or services from any of our Sites. We may also collect information from our online surveys such as age, gender and income level. Finally, we collect IP addresses and anonymous demographic information.

What do we do with the information we collect?

We use personal information and other demographic or profile information you provide to us to fulfill your order or request; to provide you with information about Playboy and some of our partners; and to contact you when necessary.

We use IP addresses and anonymous demographic information to tailor your experiences at our Sites by showing content in which we think you will be interested and displaying content according to your preferences. Anonymous demographic information is shared with advertisers and market researchers on an aggregate basis.

We use information collected to evaluate and improve our services. We may develop and use, in our sole discretion, consumer research which may be based on your use of our services.

Personal information collected on the Sites is stored and processed in the United States and by using this site, you consent to any such transfer of information outside of your country.

Do we share the information we collect with third parties?

In some cases, we will share information we collect (including personal information or anonymous demographic information) with third party companies who may offer products or services in which we believe you may be interested. We also share this information with third parties with whom we partner to co-promote and administer sweepstakes and contests on our Sites. You may elect not to receive promotional e-mails from us or other companies we select by choosing one of the unsubscribe options described below.

We may also share information we collect with third party service providers to manage certain aspects of the services we provide, such as maintaining our servers and processing or fulfilling orders for products and services you purchase through the Sites.

PEII\PlayBeverages_energydrinks_ou_ComboWebIJJ-jll10          34          11/29/06

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 24 of 69   Page ID #:333
Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 11 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 10 of 32

We may also disclose your information in special cases if required to do so by law, court order or other governmental authority or when we believe in good faith that disclosing this information is otherwise necessary or advisable, including, for instance, to identify, contact, or bring legal action against someone who may be causing injury to or interfering with the rights or property of Playboy, another user or anyone else that could be harmed by such activities.

**Is the information submitted in public forums confidential?**

No. The Sites may offer chat rooms, forums, message boards and/or news groups to our users. Please remember that any information disclosed in these areas becomes public information. Accordingly, you should exercise caution when deciding to disclose your personal information and you do so at your own risk.

**Do we use cookies?**

Yes. Cookies are pieces of information generated by web servers and stored in your computer for future access. The Sites use cookie technology to enhance your online experience by making it easier for you to navigate through our Sites or make a feature work better. Generally, cookies can be disabled. However, you must accept cookies in order to navigate the Sites; register for our membership Sites and order products from our online stores.

**Do we use web beacons?**

Yes. Some of our Sites may contain electronic images known as "web beacons" or single-pixel gifs that allow us to count visitors to our Sites and deliver co-branded services. Web beacons collect limited information including cookie number, time and date of a page view and a description of the page on which the web beacon resides.

**Are the Sites secure?**

We are committed to maintaining the security of your information and have measures in place to protect against the loss, misuse and alteration of the information under our control. All credit transactions occur in a secure area of the Site using Secure Sockets Layer ("SSL") software to process orders. SSL encrypts the information you input on the Sites. In addition, all information is stored in a secure location behind a firewall with limited administrative access.

**Does this Policy apply to linked sites other than the Sites?**

No. The Sites contain links to other Internet sites, resources and sources of Playboy. By clicking on an ad banner or other link, you will be redirected off the Sites and to third party websites. Playboy is not responsible for the privacy policies of such sites. You should make sure that you read and understand the privacy policies of these sites and direct any concerns regarding external links to the site administrator or webmaster of that third party website.

**How do I unsubscribe?**

All e-mails you receive from us will include specific instructions on how to unsubscribe and you may unsubscribe at any time. Additionally, we give you the following options for removing your information from our database:

    (1)    send an email to admin@playboy.com;

    (2)    select the opt-out link at the bottom of any Playboy email and follow the instructions provided;

    (3)    send mail to the following address: Customer Service, Playboy.com, Inc., 680 North Lake Shore Drive, Chicago, IL 60611.

**Can I update/correct my information?**

Yes. You may correct or update your personal information by sending us an email at pb@playboy.com.

**ATTACHMENT 3**
**ATTACHED TO AND MADE A PART OF EXHIBIT B TO**
**THE PRODUCT LICENSE AGREEMENT**
**BETWEEN**
**PLAYBOY ENTERPRISES INTERNATIONAL, INC.**
**AND**
**PLAY BEVERAGES, LLC**
**DATED AS OF NOVEMBER 1, 2006**

**UNACCEPTABLE ADVERTISEMENT CATEGORIES ON E-COMMERCE WEB SITES**

SEXUAL AIDS & DEVICES (TAKEN ON A CASE-BY-CASE BASIS)
Dildos
Vibrators - if implied use is sexual
Creams and ointments - that increase pleasure or claim to extend tumescence, etc.

EXPLICIT SEXUAL MATERIAL
X-Rated videos
X-Rated audio cassettes
Sexually oriented telephone services
Explicit sex books
Suggestive T-shirts
X-Rated clothes (i.e., candypants)
Adult entertainment nightclubs and cabarets

MEDICAL
Growing new hair (including transplants) (TAKEN ON CASE-BY-CASE BASIS)
Hypnotism (i.e., stop smoking, lose weight)
Breast/Penis enlargement
Super vitamins with unsubstantiated claims
Condoms - if copy is suggestive
Aphrodisiacs
Inhalants (i.e., amylnitrate)
Weight reducers
Hemorrhoid remedies

SELF-IMPROVEMENT/BEATING THE ODDS
Betting services
Books on cheating (cards, IRS, etc.)
Lotteries
Home study courses

DRUG PARAPHERNALIA
All items including rolling papers

WEAPONS
Hand guns
Switchblade knives

SUGGESTIVE NAMES
No drug related product names unless the description of the product's use is clear.

COMPARISON ADVERTISING
Aggressive competitive ads that might create a problem with other advertisers.
Aggressively competitive claims which are not substantiated.

MISCELLANEOUS
No PLAYBOY name or logo without permission
No Nazi or anti-Semetical paraphernalia
No ads for competitive publications such as *Maxim, FHM, Stuff, CKM, Hustler* or *Penthouse*
All mail-order must include a money-back guarantee

PEI\PlayBeverages_energydrinks_eu_ComboWeb\JJ-JI\10                 36                 11/29/06

EXHIBIT C
ATTACHED HERETO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

TO BE PUT ON GUARANTOR'S LETTERHEAD
NO REVISIONS MAY BE MADE TO THIS LETTER.


[DATE]


Playboy Enterprises International, Inc.
680 North Lake Shore Drive
Chicago, IL 60611

SUBJECT:   <u>GUARANTEE</u>

Dear Sirs:

In order to induce you to continue with the Product License Agreement dated as of November 1, 2006 (the "Agreement") with Play Beverages, LLC ("Play Bev"), a _____ company of _____ ("_____"), _____ hereby guarantees without any limitation of any kind, the performance by Play Bev of all the terms and conditions of the Agreement, and, therefore undertakes to be responsible to you, jointly and severally with Play Bev for all liabilities of Play Bev arising out of its obligations under or in connection with said Agreement or by reason of any breach thereof.

This Guarantee shall remain in force and may be called upon by you without requiring you to commence any proceedings of any nature against Play Bev pursuant to the terms of the Agreement.

Very truly yours,

_____


By:   _____

Title:   _____

Date:   _____

Case 2:12-cv-10590-SJO-E    Document 21-2    Filed 12/27/12    Page 27 of 69    Page ID #:336

Case 11-26046    Doc 29-3    Filed 07/01/11    Entered 07/01/11 17:27:01    Desc Exhibit
A    Part 3    Page 14 of 33
Case 11-26046    Doc 16-2    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
1    pt. 2    Page 13 of 32

EXHIBIT D
ATTACHED HERETO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

## SUPPLIER/SUBCONTRACTOR CONTRACT

1.    By execution of this Supplier/Subcontractor Contract ("Contract"), _____ ("Supplier") agrees and acknowledges that:  (i) all images and/or trademarks including, but not limited to PLAYBOY, (the "Playboy Properties") applied at the request of Play Beverages, LLC ("Purchaser") to merchandise covered by this Contract are properties of Playboy Enterprises International, Inc. ("Playboy"), and when used upon merchandise means that such merchandise is sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Supplier will not sell, ship or otherwise dispose of any such merchandise except upon the order of Purchaser or Playboy; (iii) Supplier will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Playboy Properties or any trademark, image, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise; and (iv) Supplier will defend, indemnify and hold harmless Purchaser and Playboy and the distributors and dealers and the officers and employees of each of the foregoing against all liability whatsoever which may be incurred by them or any of them as a result of any alleged defects in material or workmanship in the merchandise covered by this Contract.

2.    Supplier agrees that no production or manufacture of any merchandise covered by this Contract will commence until this Contract has been signed, dated and returned by Supplier to Purchaser. Supplier further agrees that it will not produce, cause to be produced or assist in the production of more units than are specified by Purchaser nor will Supplier produce, cause to be produced or assist in the production of any product or item not specifically requested by Purchaser using any or all of the Playboy Properties or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Playboy Properties during or at any time after the completion of merchandise requested by this Contract.

3.    Supplier will, upon request from Purchaser or Playboy, deliver to Purchaser or will destroy in the presence of Purchaser or its representative(s), all molds, designs or any other elements used in reproducing any or all of the Playboy Properties.

4.    Playboy is an intended third-party beneficiary of this Contract.

5.    This Contract, when attached to a purchase order, shall consist of the entire agreement between the parties and shall supersede any conflicting or contrary terms and conditions of any purchase order or other order form whether supplied by Purchaser or Supplier.

6.    This Contract may not be modified or terminated except in writing, and no claimed modification, termination or waiver shall be binding unless also signed by an authorized representative of Playboy.

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 28 of 69   Page ID #:337
Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 15 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 14 of 32

7.   VIOLATION OF THIS AGREEMENT BY SUPPLIER MAY RESULT IN PROSECUTION FOR
     TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION
     AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

| SUPPLIER | PURCHASER |
|---|---|
| | PLAY BEVERAGES, LLC |
| _____ | |
| (Name of Company - Please Print) | |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

| SUPPLIER INFORMATION | PLAYBOY |
|---|---|
| Name: _____ | Name:   PLAYBOY ENTERPRISES INTERNATIONAL, INC. |
| Address: _____ | Address:   730 Fifth Avenue |
| _____ | New York, NY 10019 |
| Contact: _____ | Contact:   Sarah Haney |
| Telephone: _____ | Telephone:   212 261 5000 |
| Facsimile: _____ | Facsimile:   212 957 2950 |

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 29 of 69   Page ID #:338

Case 11-26046    Doc 29-3    Filed 07/01/11    Entered 07/01/11 17:27:01    Desc Exhibit
A    Part 3    Page 16 of 33
Case 11-26046    Doc 16-2    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
1    pt. 2    Page 15 of 32

EXHIBIT E
ATTACHED HERETO AND MADE A PART OF
THE PRODUCT LICENSE AGREEMENT BETWEEN
PLAYBOY ENTERPRISES INTERNATIONAL, INC.
AND
PLAY BEVERAGES, LLC
DATED AS OF NOVEMBER 1, 2006

### DISTRIBUTOR CONTRACT

1.      By execution of this Distributor Contract ("Contract"), _____ ("Distributor") agrees and acknowledges that: (i) all trademarks and/or images including, but not limited to, PLAYBOY (the "Playboy Properties") used on _____ (the "Products") distributed in _____ (the "Territory") at the request of Play Beverages, LLC ("Playboy's Licensee") are trademarks of Playboy Enterprises International, Inc. ("Playboy"), and when used upon the Products means that such Products are sponsored, approved, recommended or sold by Playboy or its licensees; (ii) Distributor will not sell, ship or otherwise dispose of any Products except upon the order and within the specifications and guidelines of Playboy's Licensee or Playboy; (iii) Distributor will never make, cause others to make or assist others in making, any claim whatsoever to any or all of the Trademarks or any trademark, designation, name, phrase, design or symbol similar thereto in connection with the manufacture, advertising, promotion, sale or distribution of merchandise; and (iv) Distributor will defend, indemnify and hold harmless Playboy's Licensee and Playboy and the distributors and dealers and the officers and employees of each of the foregoing against all liability whatsoever which may be incurred by them or any of them as a result of Distributor's distribution of the Products covered by this Contract.  In no event may Distributor advertise, sell or distribute the Products outside of the Territory.

2.      Distributor agrees that no distribution of the Products covered by this Contract will commence until this Contract has been signed, dated and returned by Distributor to Playboy's Licensee.  Distributor further agrees that it will not distribute, cause to be distributed or assist in the distribution of the Products outside the Territory or other than as specified by Playboy's Licensee nor will Distributor distribute, cause to be distributed or assist in the distribution of any product or item not specifically requested by Playboy's Licensee which bears any or all of the Playboy Properties or any trademarks, images, designations, names, phrases, designs or symbols similar to any or all of the Playboy Properties during or at any time after the distribution of the Products requested by this Contract. Within member states of the European Community (the "EU"), rights or obligations created or imposed by this Contract may not be exercised or enforced in a manner contrary to Community Law.  Licensee may not solicit orders from outside the Territory nor engage in any commercial or promotional activities with respect to the Products outside the Territory, the right of any purchaser of the Products within the Territory to export the Products purchased to other member states of the EU staying unaffected.  Limitation of the exercise of rights or the enforcement of obligations due to Community Law or the provisions of the foregoing subparagraphs shall not affect the validity or enforceability of any other rights and obligations under this Contract.

3.      Any advertisement, promotion, sale or distribution of the Products via an "E-Commerce Web Site" or the fulfillment of any orders for the Products placed via any "E-Commerce Web Site" shall be subject to the terms and conditions of the E-commerce Guidelines attached to this Contract as Attachment 1 and made a part hereof.  In the event Distributor fails to adhere to any of the terms and conditions of the E-commerce Guidelines, Playboy's Licensee may immediately terminate this Contract upon written notice to Distributor. "E-Commerce Web Site" shall mean promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successor. "TCP/IP Protocol" (which stands for Transmission Control Protocol/Internet Protocol) shall mean the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets. "TCP/IP Successors" shall mean programs, languages, protocols or other technical means that are being developed or that have yet to be developed which are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks.

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 30 of 69   Page ID #:339

Case 11-26046    Doc 29-3    Filed 07/01/11    Entered 07/01/11 17:27:01    Desc Exhibit
A    Part 3    Page 17 of 33
Case 11-26046    Doc 16-2    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
1    pt. 2    Page 16 of 32

4.    Distributor will be responsible for ensuring all of its distributors (not retailers) for the Products adhere to and perform their duties in accordance with the terms and conditions of this Contract including adhering to the Territory restrictions.

5.    Distributor will maintain accurate records concerning the distribution of the Products and shall supply within ten (10) days of a request from Playboy or Playboy's Licensee a statement detailing Distributor's accounts for the Products.  Upon request from Playboy's Licensee and/or Playboy, Playboy's Licensee and/or Playboy shall also have the right at all reasonable hours to conduct an examination of Distributor's books and records and shall have the right to make extracts therefrom in order to ensure Distributor's compliance with this Contract.

6.    Playboy is an intended third-party beneficiary of this Contract.

7.    This Contract, when attached to a distribution order, shall consist of the entire agreement between the parties and shall supersede any conflicting or contrary terms and conditions of any distribution order or other order form whether supplied by Distributor or Playboy's Licensee.

8.    This Contract may not be modified or terminated except in writing, and no claimed modification, termination or waiver shall be binding unless also signed by an authorized representative of Playboy.

9.    If Distributor violates any of the terms and conditions of this Contract, Playboy's Licensee and/or Playboy will have the right to immediately terminate this Contract upon written notice to Distributor.  In such event, Distributor must provide Playboy's Licensee and/or Playboy within ten (10) days of the date of such notice of termination with a statement setting forth the number of Products on hand and a listing of all of Distributor's accounts for the Products.

10.    In the event the Product Licensee Agreement between Playboy and Playboy's Licensee dated as of November 1, 2006 (the "Agreement") expires or is terminated, this Distributor Contract shall immediately terminate upon the expiration or termination of the Agreement.

11.    Playboy shall have the right to terminate this Distributor Contract upon not less than ten (10) days prior written notice.

12.    VIOLATION OF THIS AGREEMENT BY DISTRIBUTOR MAY RESULT IN PROSECUTION FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND OTHER CAUSES OF ACTION AND THE IMPOSITION OF FINES AND/OR CRIMINAL PENALTIES.

**DISTRIBUTOR**                                    **PLAYBOY'S LICENSEE**

                                                   PLAY BEVERAGES, LLC
_____
(Name of Company - Please Print)

By: _____                        By: _____

Title: _____                     Title: _____

Date: _____                      Date: _____


**DISTRIBUTOR INFORMATION**                         **PLAYBOY**

Name: _____                       Name:    PLAYBOY ENTERPRISES
                                                             INTERNATIONAL, INC.

Address: _____                    Address:  730 Fifth Avenue

                                                             New York, NY  10019

Contact: _____                    Contact:  Sarah Haney

Telephone: _____                  Telephone:  212 261 5000

Facsimile: _____                  Facsimile:  212 957 2950

PEI\PlayBeverages_energydrinks_eu_ComboWeb\JJ-jl\10                         41                    11/29/06

Case 2:12-cv-10590-SJO-E   Document 21-2   Filed 12/27/12   Page 31 of 69   Page ID #:340

Case 11-26046   Doc 29-3   Filed 07/01/11   Entered 07/01/11 17:27:01   Desc Exhibit
A   Part 3   Page 18 of 33
Case 11-26046   Doc 16-2   Filed 06/27/11   Entered 06/27/11 17:30:57   Desc Exhibit
1   pt. 2   Page 17 of 32

ATTACHMENT 1
ATTACHED TO AND MADE A PART OF
THE DISTRIBUTOR CONTRACT BETWEEN
PLAY BEVERAGES, LLC
AND

_____
DATED AS OF _____

E-COMMERCE GUIDELINES

1.   Distributor's E-commerce Web Site:  Distributor may advertise and offer the availability of the Products on its own E-commerce Web Site and may accept orders for the Products placed through its own E-commerce Web Site subject to the following provisions:

a.   Distributor's E-commerce Web Site must, in conjunction with a link to www.playboystore.com (or any other url as Playboy's Licensee may direct from time to time), inform visitors to such E-commerce Web Site that the Products and other fine Playboy-branded Products are available for sale through such link.

b.   Distributor may not advertise or promote the availability of the Products on its own E-commerce Web Site, or accept orders for the Products through its own E-commerce Web Site, if Playboy-branded products [including, but not limited to, the Products, other Playboy-branded items not in the Product category, video media and Spice branded products] constitute twenty percent (20%) or more of any such E-commerce Web Site's total product offerings.  For purposes of clarification, such Playboy-branded products (i) may not be the only branded products advertised, promoted and sold on and through such E-commerce Web Site; and (ii) must not constitute twenty percent (20%) or more of all products advertised, promoted or sold on such E-commerce Web Site.

c.   Distributor may not use any of the Trademarks, or portions thereof, in connection with the domain name, html title, meta tags or other hidden html text for its E-commerce Web Site.

d.   Distributor will ensure that its E-commerce Web Site continuously displays a banner in the form and content acceptable to Playboy informing all visitors to such E-commerce Web Site that no orders for the Products will be accepted and no Products will be shipped outside the Territory.

e.   Distributor will ensure that its E-commerce Web Site continuously displays the trademark or copyright notices as directed by Playboy's Licensee in connection with the display, advertisement and offer of the Products.

f.   None of the Playboy Properties used in conjunction with the advertisement and offer of the Products on Distributor's E-commerce Web Site may be changed, manipulated or modified in appearance.  Distributor may not use the Playboy Properties to advertise, promote or sell non-Playboy branded products or services.

g.   All aspects of the display of the Playboy Properties and Products on Distributor's E-commerce Web Site will be subject to the prior and ongoing approval of Playboy, including design, layout, content, advertising and links.  Distributor must obtain Playboy's approval prior to any change in already approved design, layout, content advertising or links of Distributor's E-commerce Web Site.

h.   Notwithstanding anything hereof to the contrary, Playboy's Licensee shall have the right to immediately withdraw the permission set forth in this Attachment 1 and the Distributor Contract upon receipt of the written notice Playboy's Licensee if Playboy deems, in its sole discretion, that any aspect of Distributor's E-commerce Web Site, including, but not limited to, content, advertising, links or html code, violates the Standards and Practices,

# EXHIBIT B

## AMENDED AND RESTATED
## EXCLUSIVE MANUFACTURING, MARKETING
## AND DISTRIBUTION AGREEMENT

THIS AMENDED AND RESTATED EXCLUSIVE MANUFACTURING, MARKETING AND DISTRIBUTION AGREEMENT (the "Agreement") is made and entered into this 21st day of August, 2007 ("Effective Date") by and between CIRTRAN BEVERAGE CORP., a Utah corporation ("CBC"), and PLAY BEVERAGES, LLC, a Delaware limited liability company ("PlayBev").

## RECITALS

A.    PlayBev is engaged in the business of marketing and distributing beverages, including energy drinks and flavored water beverages, and related merchandise with the Playboy and rabbit head logo (the "Products") pursuant to a license agreement ("License Agreement") from Playboy Enterprises, Inc. ("Playboy").

B.    CBC has been formed by CirTran Corporation, a Nevada corporation ("CirTran"), to arrange for the manufacture, marketing and distribution of the Products through various distribution channels, including traditional retail channels as well as catalogs, internet, live shopping and other channels.

C.    Pursuant to an Exclusive Manufacturing, Marketing and Distribution Agreement between the parties dated May 25, 2007 (the Original Agreement"), PlayBev granted to CBC the exclusive rights during the term of the Original Agreement to manufacture, market, distribute and sell the Products through all distribution channels (herein the "Purpose") in the United States.

D.    The parties have agreed to amend the Original Agreement to expand CBC's Territory to include all areas in PlayBev has rights under its License Agreement from Playboy, and to make certain other changes to the Original Agreement as set forth below. The parties desire to set forth their agreements in writing.

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties agree that the Original Agreement is hereby amended as of the date hereof and restated to read, in its entirety, as follows:

1.    Manufacturing.

(a)    Subject to all of the terms and conditions of the License Agreement, CBC shall be the exclusive master manufacturer for all Products for PlayBev to be sold in the Territory, as defined below. If and to the extent that CBC does not perform the actual manufacturing itself, CBC will select and contract with vendors and subcontractors (a "Vendor") to manufacture the Products as described below and will provide overall quality control, logistics, management and administrative duties with respect to manufacturing as needed. PlayBev will not cause or permit any Product not manufactured by or under the supervision of CBC to be imported, sold or distributed in the Territory.

(b)     The initial Products consist of an energy drink (tentatively called "Playboy Pure Energy Drink") and flavored or unflavored water beverage (tentatively called "Playboy Water" or "Playboy $H_2O$") (the "Initial Products"). The parties have determined that Vendors will be required for the following functions relating to the Initial Products: (i) identification of key regional bottlers, (ii) finalization of Product formulation and production of sample / prototype Initial Products, (iii) production of prototype Initial Product packaging and bottling and conversion to production line packaging and bottling, (iv) supply chain management, and (v) subcontractor to identify and coordinate with Vendors under clauses (i) through (iv). PlayBev and, to the extent provided in the License Agreement, Playboy, shall have the right to approve all of such Vendors, which approval will not be unreasonably withheld or delayed. PlayBev may suggest entities or groups to serve as Vendor in any such capacity, and CBC will consider such suggestions in good faith. CBC will contract directly with the Vendors and on such pricing and payment terms as shall be negotiated directly between CBC and the Vendors. If and when CBC determines in its reasonable judgment that additional or different Vendors are required or desirable, it shall engage such additional Vendors, subject in each case to PlayBev's approval, which approval will not be unreasonably withheld or delayed. CBC may engage its affiliates as Vendors, subject to the approval conditions described herein.

(c)     As additional Products are developed, the parties shall similarly identify the Vendors which are required and CBC will engage the Vendors subject to PlayBev's approval.

(d)     CBC shall engage directly with all distributors (other than CBC/ASM) and customers as the vendor of record and negotiate all payment terms directly. As vendor of record, all payments for the Product will be made directly to CBC. All pricing terms shall be approved by PlayBev in advance in writing, which approval shall not be unreasonably withheld or delayed.

(e)     PlayBev will use its best efforts to have CBC and, to the extent required, its Vendors approved as manufacturers under the Playboy license. If a Vendor is required to be approved but Playboy does not approve the Vendor, CBC will engage an alternative Vendor, subject to PlayBev's approval as set forth above. If CBC is not approved by Playboy, then notwithstanding Sections 1 (a) through (d) above, (i) the Vendors will contract directly with PlayBev, rather than CBC, and CBC shall assign to PlayBev any then-existing contracts with the Vendors, (ii) the roles of CBC and PlayBev in selecting and approving Vendors described in Sections 1(b) and (c) shall be reversed, (iii) CBC shall remain as the vendor of record to customers and distributors, and (iv) CBC shall supervise the manufacturers and other Vendors approved by Playboy.

(f)     CBC will be compensated for its services pursuant to this Section 1 as described in Section 3.

2.     Distribution, Sales and Marketing.

(a)     Subject to the terms and conditions of the License Agreement, CBC shall be the exclusive master distributor for PlayBev for all Products to be sold in the Territory, as defined below. CBC shall engage American Sales and Merchandising, LLC, a Maine limited liability company ("ASM"), as a subcontractor to provide distribution and marketing plans in the Territory and other services for distributing the Products, including, but not limited to, all sales

and marketing for all wholesale and retail sales, packaging, distribution in the Territory, on-premise and off-premise distribution, product designs, and merchandise displays. CBC will enter into a mutually agreed upon agreement directly with ASM (the "ASM Agreement") upon execution of this Agreement with respect to ASM's duties and responsibilities; provided that CBC and ASM are able to negotiate terms of the ASM Agreement consistent with Section 3(c).

(b)     During the term of this Agreement, PlayBev covenants and agrees that neither it nor any other person deriving their rights from PlayBev (other than CBC) shall manufacture, market, advertise, sell or distribute the Products or any improvements or derivations thereof or any other product based on the license from Playboy for any purpose that is competitive with the Purpose for which CBC is contracting with PlayBev under this Agreement ("Restricted Products") which are sold or distributed in the Territory.

(c)     Within 30 days after the date of this Agreement, PlayBev will provide CBC with a three month forecast of marketing expenditures for the Products in the Territory. CBC will thereafter establish a budget, approved by PlayBev, for the period covered by the forecast for CBC to provide all sales, marketing and administrative support regarding the sales, marketing and distribution activities. Such activities shall include, but not be limited to, the creative development and maintenance of the website associated with the Playboy Energy drink Product, printed material to be used in marketing and sales to retailers, wholesalers, restaurants, bars and sponsored events and product design (the "Programs"). Once the budget is approved by CBC and PlayBev, CBC will fund the Programs to the extent of the budget based on the accomplishment of predetermined milestones agreed to by CBC and PlayBev pursuant to a bridge loan on terms mutually acceptable to CBC and PlayBev (the "Bridge Loan"). The parties are not obligated to proceed with the Bridge Loan unless the parties are able to agree upon the budget and the terms of the Bridge Loan. Within 30 days prior to expiration of the period covered by the initial forecast, PlayBev will prepare a forecast for the following three month period, which forecast shall indicate to which the Programs can be funded from operations. The parties shall negotiate the terms of a potential budget and Bridge Loan for such subsequent period. This process shall continue for each subsequent three month period. Notwithstanding anything herein to the contrary, in the event that the Bridge Loan is paid in full pursuant to Section 6, CBC shall have no further obligation to fund the Programs or make further advances under the Bridge Loan.

(d)     Within 90 days after the date of this Agreement, PlayBev will provide CBC with a 90 day forecast of sales of the Products in the Territory. Thereafter, every month PlayBev will provide CBC with a forecast of sales for the last 60 days of the period covered by the period forecast and an additional 30 days. The parties will discuss in good faith any disagreements that CBC has with the forecast. CBC will rely on the forecast to schedule manufacturing and distribution resources.

(e)     PlayBev may engage CBC as its media placement agency to place all advertising in print, web, television, radio and other promotional outlets on terms to be agreed to by the parties pursuant to a media placement agreement agreed to by CBC and PlayBev (the "Media Placement Agreement").

3.      Compensation; Calculation and Payment of Royalties.  PlayBev shall compensate CBC as follows:

(a)      For its services rendered pursuant to Section 1(a) of this Agreement, CBC shall receive from PlayBev an amount equal to 20% of the cost of goods sold ("COGS"). "COGS" includes all actual and verifiable third party costs, including the actual cost of Product payable to the manufacturer and other costs that generally accepted accounting principles, consistently applied, require CBC to classify as costs of goods sold as well as, without duplication, the charges of all Vendors.

(b)      If CBC is providing services to PlayBev pursuant to Section 1(e) rather than Section 1(a), then CBC shall receive from PlayBev and amount equal to 20% of COGS for its supervision under Section 1(e). "COGS" includes all actual third party costs, including the actual cost of Product payable to the manufacturer and other costs that generally accepted accounting principles, consistently applied, require PlayBev to classify as costs of goods sold as well as, without duplication, the charges of all Vendors.

(c)      For its services rendered pursuant to Section 2(a) of this Agreement, CBC shall receive from PlayBev 6% of the gross sales ("Gross Sales") of all Products in the Territory. CBC, in its agreement with ASM, will pay 2/3 of such 6% or 4% of Gross Sales to ASM in accordance with the terms of the ASM Agreement. It is anticipated that ASM will utilize outside commissioned sales representatives, brokers or sales contractors to be the sales representatives for customers throughout the Territory. Commissions owing to these sales representatives, up to 3% of Gross Sales, shall received by CBC from PlayBev for payment to the sales force directly or through ASM. "Gross Sales" includes gross sales of the Products but does not include separately stated charges for shipping, handling, insurance or taxes and are net of any returns, markdowns, charge backs, credit card discounts, rebates, refunds and similar charges. Gross Sales shall be calculated on a cash basis so that payment is due only when payment is received for the Products. Notwithstanding the above, if CBC is unable to obtain ASM's agreement to the ASM Agreement on the terms outlined above, CBC will so notify PlayBev and PlayBev will, at its option, either cause ASM to agree to the terms outlined above or PlayBev will agree to modify this Section 3(c) to conform to the terms agreed to by ASM (i.e. to pay CBC 150% of the amount CBC is required to pay to ASM).

(d)      For its services rendered pursuant to Section 2(c), PlayBev shall reimburse CBC for the cost of the Programs funded under the Bridge Loan, plus 5% of such Programs cost, pursuant to the terms of the Bridge Loan.

(e)      For its services rendered pursuant to Section 2(e), PlayBev shall reimburse CBC for media placement and other services provided by CBC under Section 2(e), plus 5% of the media placement costs, pursuant to the terms of the Media Placement Agreement.

(f)      From the Gross Sales of Product collected by CBC, CBC will pay on PlayBev's behalf the royalty payable to Playboy under the Playboy license which is calculated on the basis of a percentage of gross sales. PlayBev shall remain solely responsible for payment of (i) any minimum or other royalties or payments due under the Playboy license which are not calculated as a percentage of sales, and (ii) any percentage royalties due on sales outside of the Territory,

and (iii) percentage royalties due on sales within the Territory if collected Gross Sales are insufficient to pay the same.

(g)     For purposes of determining the payments due under this Section 3, CBC will give PlayBev a quarterly report of Gross Sales and COGS. The quarterly reports ("Monthly Reports") will be given by 45th day of each calendar quarter reporting Gross Sales and COGS for the prior completed calendar quarter, as well as royalties and compensation paid during such completed quarter. From Gross Sales collected by CBC, CBC will pay on a monthly basis the Vendors, the Playboy royalty described in Section 3(f) and will pay itself compensation due under Sections 3(a) through (e). Any remaining amount of Gross Sales after such payments shall be remitted to PlayBev within five business days after the date of the Quarterly Report.

4.     Territory. As used herein, the "Territory" consists of all territories identified in the License Agreement as it now exists or as may be amended in the future, including, without limitation, the United States, its territories, possessions and protectorates. PlayBev will promptly notify CBC of any changes in the territories identified in the License Agreement.

5.     Sales Below Break-even. Notwithstanding anything herein to the contrary, in the event that the volume-weighted average price at which CBC is able to sell the Products hereunder is less than 150% of COGS, CBC's obligation to perform services hereunder or to provide funding under the Bridge Loan or Media Placement Agreement shall be suspended until PlayBev makes other arrangements acceptable to CBC for the payment of costs and compensation or until CBC is able to obtain an average price for the Products above 150% of COGS.

6.     Pre-Payment on Sale of International Territories. In the event that PlayBev (i) licenses a third party to manufacture or distribute the Products outside of the United States, (ii) otherwise sublicenses PlayBev's rights under the Playboy license for areas outside of the United States, or (iii) sells or assigns PlayBev's interest in the Playboy license, subject to this Agreement, whether or not as part of a sale of all or substantially all of PlayBev's assets, then PlayBev agrees that all proceeds from such transaction shall be applied as follows: FIRST to the payment of any past due amounts owed to CBC pursuant to this Agreement, the Bridge Loan or the Media Placement Agreement, to the prepayment of amounts owing to CBC under the Bridge Loan,  and to certain other creditors pursuant to the Intercreditor Agreement by and between PlayBev, CBC, George Denney, Rhino Beverages, LLC and Liberty Beverages, LLC; and SECOND any remaining balance as PlayBev may determine in its sole discretion.

7.     Term and Termination.

(a)     The initial term of this Agreement shall commence as of the date first written above and shall terminate on December 31, 2017 (the "Initial Term"). This Agreement shall automatically renew for up to two renewal terms of three years each unless PlayBev notifies CBC or CBC notifies PlayBev in writing of its intent not to renew at least three, but not more than 12, months prior to the termination of the initial term or the then-current renewal term.

(b)     At least three months prior to the end of the Initial Term, PlayBev may notify CBC that it intends to renegotiate, price or source alternative manufacturing, distribution or other services as provided in Sections 1 and 2 from a person other than CBC.  In such event, PlayBev

and CBC agree that any new proposals from third parties will be based on experience, resources, pricing, credit, term and capabilities. CBC shall have a right of first refusal to match any bona fide bid accepted by PlayBev, in which case this Agreement shall be renewed on such third party terms. In the event PlayBev does not renew this Agreement with CBC after the Initial Term such that CBC is no longer the exclusive manufacturer and distributor of the Products in the Territory, as a condition to entering an agreement with a third party and as part of the terms thereof, CBC shall receive payment in full for all monies owed it by PlayBev, including but not limited to receivables, reimbursement for Products purchased, direct sales, general and administrative expenses, plus a withdrawal fee equal to 15% of such amounts.

(c) Either CBC or PlayBev may terminate this Agreement on 60 days prior written notice to the other party based on a material breach of this Agreement by the non-terminating party, unless such breach is cured within such 60-day period or, in the event of a non-monetary breach which cannot reasonably be cured within 60 days, that the breaching party commences within such 60-day period steps calculated to cure the breach as soon as practicable and the cure is completed within 90 days.

8. Non-Competition. During the term of this Agreement, both parties agree that they will not sell or distribute in the Territory the Product or any products that are confusingly or substantially similar or directly competitive to the Product other than as set forth in this Agreement.

9. Representations and Warranties.

(a) CBC warrants to PlayBev and PlayBev warrants to CBC that (i) it is an entity duly organized, valid, existing and in good standing under the laws of the state, province or country of its incorporation or establishment and has the corporate or equivalent power to own its assets and properties and to carry on its business as now being conducted; (ii) its obligations hereunder shall be performed in full compliance with the all applicable determinations of any governmental authority and all applicable federal, state or local laws, statutes, ordinances, rules, regulations and orders ("Applicable Laws"); (iii) it will cooperate with the other, as necessary, to remain in full compliance with the Applicable Laws; (iv) the execution, delivery and performance of this Agreement have been duly authorized, do not violate its certificate of incorporation, by-laws or similar governing instruments or Applicable Law and do not, and with the passage of time will not, materially conflict with or constitute a breach under any other agreement, judgment or instrument to which it is a party or by which it is bound; and (v) this Agreement is the legal, valid and binding obligation of such party, enforceable in accordance with its terms.

(b) PlayBev represents and warrants that the Playboy License Agreement is in full force and effect as of the date hereof and that such License Agreement has not been amended from the form provided to CBC.

(c) ASM will be responsible to obtain, as a cost of goods sold, all licenses, permits and governmental approvals for the sale of the Products in the Territory. The parties shall cooperate fully with ASM in seeking such licenses, permits and approval sand shall execute such documents in support thereof as ASM shall reasonably request. Each of the parties represents

and warrants to the other that it will notify ASM and the other party of any license, permit or approval requirement which ASM has not obtained.

10.    Covenants Regarding Playboy License Agreement.

(a)    PlayBev covenants and agrees that it shall maintain the Playboy License Agreement in full force and effect during the term of this Agreement, other than the removal of rights for areas outside of the Territory. PlayBev shall not take any action or allow any inaction which constitutes an event of default under the Playboy License Agreement. In the event that PlayBev receives a notice of default under the Playboy License Agreement it shall copy CBC with such notice within three business days after receipt and shall keep CBC fully informed of PlayBev's efforts to dispute or cure the alleged default. If the notice of default relates to a monetary default, CBC shall have the right, but no the obligation, to cure the default on PlayBev's behalf and PlayBev shall repay the amounts so paid by CBC on terms to be mutually agreed upon.

(b)    PlayBev agrees that it will not amend the Playboy License Agreement, or waive or release any rights thereunder, during the term of this Agreement except with CBC's express written consent (which consent will not be unreasonably withheld or delayed), unless such amendment, waiver or release does not affect any rights or obligations in the Territory.

(c)    CBC shall not knowingly take any action that constitute a material event of default under the Playboy License Agreement. Breach of this Section 10(c) will constitute a material breach of this Agreement.

11.    License of Product Intellectual Property.

(a)    Subject to the terms and conditions of this Agreement and the License Agreement, PlayBev hereby grants to CBC during the term of this Agreement an exclusive license solely for the purpose of fulfilling CBC's duties hereunder (i) to use the intellectual property licensed from Playboy to manufacture, sell and distribute the Products in the Territory (the "Purpose"); (ii) to use the trademarks licensed from Playboy for the Purpose; and (iii) to use the recipes, formulas, manufacturing specifications and know-how related to the Product for the Purpose. The intellectual property described in clauses (i), (ii) and (iii) of the preceding sentence is referred to as the "Product Intellectual Property".

(b)    PlayBev represents, warrants and covenants that it has all necessary power and authority to grant to CBC the rights to the Product Intellectual Property in this Agreement, and neither the granting of the rights nor the exercise of them by CBC will infringe or violate the intellectual property or other proprietary or intangible rights of any other person or entity. PlayBev has not been and is not, as of the date of this Agreement, a party to any litigation enforcing or defending PlayBev's rights in, to or with respect to the Products or the Product Intellectual Property, and PlayBev is not aware of any such claims made or threatened involving the validity of PlayBev's rights in, to or with respect to the Products or Product Intellectual Property.

(c)    PlayBev shall provide to CBC, and CBC shall have the right to use during the term of this Agreement for the Purpose, such modifications, improvements, new versions,

redesigns or adaptations of the Products (collectively "Improvements") as may be developed or controlled by PlayBev. CBC shall also have the right to make such minor modifications and improvements necessary to correct any defects in Product design or in response to customer input, subject to the Playboy License. All such Improvements and minor modifications shall be the sole property of PlayBev, both during and after the term of this Agreement, except as provided in the Playboy License.

12.     Infringement and Indemnification.

(a)     If PlayBev or CBC becomes aware of any infringement or alleged infringement of the Product Intellectual Property, that party shall immediately notify the other in writing of the name and address of the alleged infringer, the alleged acts of infringement, and any available evidence of infringement. PlayBev shall take such action with respect to the alleged infringement as PlayBev determines is reasonable, including commencement of legal action against the alleged infringer. If PlayBev determines that it is not reasonable to pursue the infringement, it shall so notify CBC, in which event, other than as provided in the Playboy License, CBC shall have the right to pursue claims against the alleged infringer. In the event CBC elects to pursue the alleged infringer, any and all expenses incurred in connection with such legal proceedings shall be borne solely by CBC, who shall retain for itself any and all monies or other benefits derived from such legal proceedings.

(b)     CBC will defend, indemnify and hold harmless PlayBev and its employees, directors, officers and agents against any third party allegations, demands, suits, investigations, causes of action, proceedings or other claims ("Third Party Claims") and from all damages, liabilities, judgments, costs and expenses (including reasonable attorneys' fees and costs) and other such losses ("Losses") which are based on, and send arise in connection with such Third Party Claims to the extent based on, any of the following: (i) any failure of CBC to comply with any Applicable Law; (ii) any product liability claims relating to defective manufacturing of the Product; (iii) any claims that CBC used the Playboy trademarks in contravention of what was authorized by PlayBev; or (iv) any other breach of CBC's obligations under this Agreement, including, without limitation, any representations or warranties of CBC.

(c)     PlayBev will defend, indemnify and hold harmless CBC and its employees, directors, officers and agents against any Third Party Claims (as defined above) and any Losses (as defined above) which are based on and arise in connection with such Third Party Claims and to the extent based on, any of the following: (i) any negligent act or omission by PlayBev relating to PlayBev's design and specifications for the Product or marketing and promotion of the Product; (ii) any failure of PlayBev to comply with any Applicable Law; (iii) any other breach of PlayBev's obligations under this Agreement, including any representations or warranties of PlayBev; (iv) the Product infringing upon any intellectual property rights of a third party, including, without limitation, patent, copyright, trade secret, trademark, etc.; or (v) allegation of illness, personal injury or death caused by the Product or any other product liability claim related to the Product which results from the design or specifications provided by PlayBev.

(d)     The Party entitled to indemnification under this Section 12 (the "Indemnified Party") will provide the Party obligated to provide indemnification under this Section 12 (the "Indemnifying Party") with prompt notice of any Third Party Claim for which its seeks

indemnification, provided that the failure to do so will not excuse the Indemnifying Party of its obligations under this Section 12 except to the extent prejudiced by such failure or delay. The Indemnifying Party will defend any such Third Party Claim and have the sole right to control the defense and settlement of the Third Party Claim, provided that the Indemnified Party may not, without the Indemnified Party's consent, enter into any settlement, which admits guilt, liability or culpability on the part of the Indemnified Party. The Indemnified Party will provide reasonable cooperation to the Indemnifying Party in defending any Third Party Claim.

13. Records And Right To Audit.

(a) Maintenance of Records. During the term of this Agreement CBC shall keep, maintain and preserve for at least three (3) years following the relevant transaction, complete and accurate books, accounts, records and other materials covering any and all transactions related to this Agreement. PlayBev and/or its duly authorized representatives shall have the right to inspect and audit such records related to this Agreement.

(b) Inspection and Audit. All materials shall be available for inspection and audit (including photocopying) at any time during normal business hours, and upon at least five (5) days notice by PlayBev and/or its representatives. CBC will cooperate with PlayBev and/or its representatives in the performance of their duties of inspection and audit and shall permit full access to the records relating to this Agreement.

(c) Deficiencies. Any discrepancies found from the audit shall be immediately paid or to CBC, as the case may be, plus interest at a rate of ten percent (10%) per annum, or the maximum rate permitted by law, whichever is less. In the event there is a discrepancy in favor of the CBC of ten percent (10%) or more, the cost of the audit shall also be paid by CBC.

14. Miscellaneous.

(a) Assignment. This Agreement shall be binding upon the parties and their respective successors and assigns. Neither party may assign this Agreement in whole or in part without the other party's prior written consent, which consent shall not be unreasonably withheld or delayed. CBC may delegate performance of its obligations hereunder to one or more affiliates.

(b) Acknowledgement of Ownership. The parties acknowledge that CBC is a majority member in After Bev, LLC, and that After Bev, LLC is a member in PlayBev.

(c) Notices. All notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally, sent by document, overnight delivery service or, to the extent receipt is confirmed, faxed to the appropriate address or number set forth below.

If to CBC:
Iehab Hawatmeh
c/o CirTran Beverage Corp.
4125 South 6000 West
West Valley City, Utah 84128
Fax: (801) 963-5180

With a Copy To:
Paul H. Shaphren, Esq.
Callister Nebeker & McCullough
2180 South 1300 East, Suite 600
Salt Lake City, Utah 84106
Fax: (801) 746-8607

If to PlayBev:
Jeff Pollack
Play Beverages, LLC
1100 Glendon Ave., Suite 1000
Los Angeles, CA 90024
Fax: (   )

With a Copy To:
Law Offices of David F. Michail, a
Professional Corporation
5959 West Century Blvd., Suite 950
Los Angeles, CA 90045
Attention: David Michail
Fax: (   )

or at such other address and to the attention of such other person as either party may designate by written notice to the other.

(d)     Governing Law, Dispute Resolution. This Agreement shall be governed by and construed by the laws of the State of Utah, disregarding the conflicts of laws provisions thereof. Any claim, dispute or controversy arising out of, or relating to any section of this Agreement or the making, performance, or interpretation of the rights and obligations explicitly set forth in this Agreement shall, upon the election by written notice of either party, be settled on an expedited basis by binding arbitration in Salt Lake City, Utah before a single arbitrator mutually agreeable to the parties, or if no agreement is reached, before a single arbitrator from the American Arbitration Association selected in accordance with its rules then in effect, which arbitration shall be conducted in accordance with such rules, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of controversy.

(e)     Attorneys' Fees. In the event of any litigation concerning any controversy, claim or dispute among the parties hereto, arising out of or relating to this Agreement or the breach hereof, or the interpretation hereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees, and costs incurred therein or in the enforcement or collection of any judgment or award rendered therein.

(f)     Amendment and Waiver. Except as otherwise expressly provided herein, any provision of this Agreement may be amended only with the written consent of the parties. No term or provision of this Agreement shall be deemed waived unless such waiver shall be in writing and signed by the party making such waiver. Any waiver of a particular breach of this Agreement shall not constitute a waiver of any other breach, nor shall any waiver be deemed a continuing waiver unless it so states expressly.

(g)     Entire Agreement; Severability. This Agreement supersedes all proposals and term sheets, oral or written, all negotiations, conversations or discussions between or among parties relating to the subject matter hereof and all past dealing or industry custom. If any provision of this Agreement is held to be illegal or unenforceable, that provision shall be limited

or eliminated to the minimum necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

(h)     Survival of Obligations. The obligations of confidentiality and exclusivity arising under this Agreement are intended to survive any termination of this Agreement.

(i)     Counterparts. This Agreement may be executed in one or more counterparts each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

CIRTRAN BEVERAGE CORP.,
a Utah corporation

By: _____

Iehab Hawatmeh
President

PLAY BEVERAGES, LLC,
a Delaware limited liability company

By: _____
Name: JEFF POLLAA
Title: mgr